UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
Case No. 8:25-cv-01119-MSS-LSG

Proven Industries Inc, a Florida corporation
*Plaintiff,*

v.

Trevor McNally, individual
*Defendant.*

_____/

## PLAINTIFF'S EMERGENCY MOTION FOR PRELIMINARY INJUNCTION

Plaintiff, Proven Industries Inc. ("Plaintiff" or "Proven"), pursuant to Fed. R. Civ. P. 65 and Local Rules 6.01 and 6.02, moves for a preliminary injunction enjoining Defendant, Trevor McNally ("Defendant" or "McNally"), from infringing Proven's copyrighted video and publishing content that falsely implies Proven's lock products are insecure, trivially bypassed without skill or preparation, and that Proven knowingly misleads customers about the product's security. In support thereof, Plaintiff states as follows:

## I. Request for Emergency Relief Under Local Rule 3.01(e)

Defendant continues to maliciously publish social media videos that falsely imply Proven's locks are easy to unlock without a key and without preparation, expertise or training – even after Proven filed its Verified Complaint based on the same assertions. All of Defendant's videos employ the common theme of falsely implying Proven's locks are easy to unlock without a key and without expertise or training.  [*See* [DE 01] Verified Compl. ¶¶ 2, 32, 43–44; Sansone Decl. ¶¶ 7–10, 20–21].  On May 28, 2025, Defendant maliciously published his most recent video. The May 28, 2025 video comes one day after Proven's counsel advised Defendant's counsel about an email from one of Proven's employees expressing concern for the employee's own safety and job security because of the hundreds of violent, sexual, and threatening messages Proven received because of videos Defendant published on May 23, 2025 and May 25, 2025. [Lee Decl. ¶¶ 23–28]. Proven learned about defendant's May 23 and May 25 videos after Proven's president and family members began receiving many harassing phone calls, texts and direct messages at all hours of the day and night. [*See* Lee Decl. ¶¶ 18–28, 34]. McNally, knowing that his followers have expressly stated their intent to harm Plaintiff's business and reputation in response to his videos, continues to

publish targeted content that amplifies the damage and escalates the harm to Plaintiff. [*See* [DE 01] Verified Compl. ¶¶ 63–69, 72–74; Lee Decl. ¶¶ 29–30]. The imminent damage justifying emergency relief is the ongoing and escalating reputational and commercial harm to Plaintiff caused by Defendant's retaliatory conduct. Defendant will not stop until he destroys Proven's reputation. [*See* Lee Decl. ¶¶ 30–32, 35]. Proven requests the Court enter an order requiring Defendant to stop publishing and remove all videos in question regarding Proven or its employees, and that further Defendant's false narrative, to prevent further harm to Proven, its employees and their family members.

## II. Summary of Arguments

Plaintiff files this Motion for injunction because Defendant has engaged in a retaliatory online campaign designed to harm Proven's reputation, mislead consumers, and destroy customer trust. [*See* [DE 01] Verified Compl. ¶¶ 43, 67–72].

McNally is a commercial content creator and social media influencer with millions of followers across YouTube, TikTok, Instagram, and Facebook. [*See id.* ¶ 3]. McNally posted four videos on his social media accounts that are at issue in this Motion. All three videos (collectively, the "McNally Videos" and individually, "Part 1," "Part 2," "Part 3", and "Part 4") show McNally shimming a lock that Proven sells to customers. [*See* Verified Compl. ¶¶ 20–21, 25–31, 35–39]. The McNally Videos fail to show or explain the preparation and skill involved to shim Proven's locks, falsely implying that Proven's locks are very easy to bypass and would not properly secure property. [*See* Bonfiglio Decl. ¶¶ 10–20; Sansone Decl. ¶¶ 9–15, 18–19]. Defendant posted the McNally Videos all for commercial gain. [*See* Verified Compl. ¶¶ 59–62, 75, 83].

The Defendants campaign against Plaintiff began on April 3, 2025, when McNally published "Part 1," using verbatim excerpts from Proven's copyrighted promotional video without authorization, combined with a misleading lock-picking demonstration. [*See id*. ¶¶ 19–28; Canning Decl. ¶¶ 10–13]. The demonstration omits critical facts: McNally had already disassembled the lock or used the key to open the lock to inspect its internal mechanism, and custom-fabricated a shim specifically for that model. [*See* Bonfiglio Decl. ¶¶ 9–13; Sansone Decl. ¶¶ 8–10, 14–15]. McNally's video falsely portrays the bypass as immediate, effortless, and replicable by an average person using a scrap of aluminum can. [*See* Verified Compl. ¶¶ 32–36, 41–44].

After pre-suit notice and multiple DMCA takedown requests, Part 1 was removed from all platforms except TikTok. [Lee Decl. ¶¶ 17–18]. Rather than de-escalate, McNally retaliated by publishing three additional videos (Parts 2–4), each building upon the original defamatory implication. [*Id*. ¶¶ 19–23]. These follow-ups target the same and additional Proven products while again omitting context and staging demonstrations under unrealistic conditions (e.g., shimming the lock while not affixed to a trailer coupling). [*See* Suppl. Sansone Decl. ¶¶ 5–7, 10–11]. Part 3 falsely implies that Proven's President, Ronald Lee II, harassed McNally's wife, based on a text sent to a publicly available phone number, and addressed said text to "Trevor" in an attempt to resolve the matter pre-suit. [*See* Lee Decl. ¶¶ 12–13, 22]. McNally has expanded his campaign against Proven in Part 4 demonstrating his intent to attack Plaintiff's additional product lines. [*See* Suppl. Sansone Decl. ¶¶ 3–4, 10–11].

Defendant continues to publish new videos that build on the original false implication and copyright infringement of Part 1. [Fahey Decl. ¶ 7; Canning Decl. ¶¶ 10–11; Lee Decl. ¶¶ 19–23]. These additional videos continue to portray Plaintiff's

locks as insecure and easy to bypass while omitting material facts about the Defendant's inspection and preparation to shim the lock, and while also failing to have the lock in a secure configuration coupled to a trailer – its intended use. [Lee Decl. ¶¶ 19–21; Sansone Decl. ¶¶ 7–9; Suppl. Sansone Decl. ¶¶ 5–9]. The McNally Videos, as a result of these implications, also suggest that Plaintiff knowingly deceives customers by selling ineffective products. Each video increases public engagement and spreads the defamatory message to a wider audience. [Lee Decl. ¶¶ 20–23; Suppl. Sansone Decl. ¶¶ 7–9].

Because McNally continues to post misleading videos in retaliation of Proven's effort to protect is intellectual property and its reputation, McNally continues to escalate the matter. Plaintiff received harassing messages, threats, and accusations based on false claims that its products are defective and that it acted improperly by texting Defendant's wife, though the message was a good-faith attempt to resolve the issue sent to a publicly available number. [Lee Decl. ¶¶ 24–26, 30–31]. Viewers have contacted employees directly, disrupting operations and creating a hostile work environment. [*Id.* ¶¶ 26-29]. Defendant's followers obtained the personal number of Plaintiff's President and published it on the comments of McNally's Videos. [*Id.* ¶ 27]. As a result, viewers have sent threatening texts, including racial slurs and hate speech to Proven's employees and their families and loved ones. [*Id.*]. These actions caused severe emotional distress, raised safety concerns, and created a hostile work environment incited by Defendant's videos. [*Id.* ¶¶ 26-27, 31]. They have also diverted resources away from the day-to-day operations of Proven to address these matters. [*Id.* ¶ 26].

Defendant, by and through his followers actively seek to harm Plaintiff's

business by posting false reviews, disrupting operations, and damaging its reputation. [*Id.* ¶¶ 26-29, 30]. These actions tortiously interfere with Defendant's business operations as well as its customer relationships. [*Id.*]. These actions have caused monetary losses for the Plaintiff as well as incalculable damages in dealing with the repercussions and fallout of the misleading implications in the McNally Videos. [*Id.* ¶ 31]. With full knowledge of these actions, Defendant continues to incite and escalate the misconduct through defamatory and retaliatory content and the publication of new videos directed at Proven. [*Id.* ¶ 34].

Injunctive relief is necessary to prevent ongoing irreparable harm to Plaintiff's business, reputation, and customer relationships. The defamatory content continues to spread and cannot be remedied by monetary damages alone. Injunctive relief is warranted to prevent continued harm, especially given Defendant's prior history of similar conduct for commercial gain, making further harm not only likely but foreseeable. [*Id.*]. Plaintiff notified Defendant's counsel of the ongoing harm, but no corrective action was taken. [Fahey Decl. ¶ 7-11]. This motion will be served concurrently with filing.

### III. Brief Statement of Facts

Proven manufactures high-security locking systems, including a signature trailer hitch lock marketed as a Latch Pin Lock. [Lee Decl. ¶ 2]. In March 2025, Proven released the Proven Video, which is an approximately ninety (90) second promotional video showing the product's durability, branding, and security features. [[DE 01], Verified Compl. ¶¶ 14-15].

On April 3, 2025, McNally posted a short-form video to TikTok, YouTube Shorts, Instagram Reels, and Facebook ("Part 1"). [*Id.* ¶ 20]. Part 1 was posted by

McNally as a thirty-two (32) second video ("McNally Video") on multiple social media platforms. [*Id.* ¶¶ 21-22]. Part 1 begins with approximately fifteen (15) seconds of Proven's copyrighted video and audio ("Proven Video") without permission. [*Id.* ¶¶ 24-31]. McNally intentionally copied the heart of the Proven Video, including the Proven Video's opening narration, branded visuals, and core product demonstrations. [*Id;* Canning Decl. ¶¶ 7-12]. The portion of the Proven Video that McNally copied included the audio narration from the Proven Video, the opening attention-grabbing audiovisual sequence, and the initial product demonstrations, all of which were designed to draw viewers in, establish the lock's and Proven's credibility, and promote its security features. [*Id.*].

While the audio from the Proven Video plays, Part 1 cuts to McNally watching the Proven Video on a mobile device, with the Proven Video clearly visible on the screen of the mobile device. [[DE 01], Verified Compl. ¶ 33, 96]. McNally appears swinging his legs and drinking from a juice box during this sequence. [*Id.*]. McNally uses these actions to signal that the lock is easy to defeat and to set up Part 1 for a mocking, juvenile tone. [*Id.* ¶¶ 34, 43, 77]. By incorporating these theatrics while copying the Proven Video, McNally primes viewers to view the Proven lock as unserious and insecure and undermines Proven's reputation as a credible manufacturer of high-security products and sets up his series of videos as an attack against the Plaintiff. [*Id.*].

After displaying the copied excerpts of the Proven Video, Part 1 then cuts to the sequence of McNally bypassing the Proven lock using a piece of an aluminum can. [*Id* . ¶ 35]. Part 1 omits that McNally had previously inspected the internal mechanism of the lock, and fabricated a custom shim specifically for that lock. [*Id* . ¶ 41; Supp.

Sansone Decl. ¶¶ 4–5, 7; Sansone Decl. ¶¶ 13–16]. Part 1 has since received millions of views across platforms. [[DE 01], Verified Compl. ¶ 55]. Viewers repeatedly reposted the content, amplified its message, and left disparaging comments on Proven's social media pages and product listings based upon McNally's modified and misleading video. [Lee Decl. ¶¶ 14, 17, 27, 29, 30].

Since McNally published Part 1, Proven has experienced measurable and ongoing harm. [*Id*. ¶¶ 15, 17, 26-31]. At least one customer has returned previously purchased products specifically referencing Part 1. [*Id*. ¶¶ 15]. At least one prospective buyer directly stated that they would not purchase the lock after viewing the video. [*Id*.]. Proven was forced to disable comments on posts and product videos due to an influx of mocking and misleading replies furthering the false narrative that McNally conveyed to the viewers. [*Id*. ¶ 17]. As a result of the McNally Video, Proven has incurred increased costs in moderating its social media accounts, managing customer service inquiries, and adjusting marketing strategies to combat the video's reach. [*Id*. ¶ 31].

Prior to filing Plaintiff's Verified Complaint demanded McNally remove Part 1. [[DE 01], Verified Compl. ¶ 9]. When McNally failed to take down Part 1, Plaintiff filed DCMA take down requests via the social media platforms to mitigate its damages. [Fahey Decl. ¶¶ 3-5]. As of the date of filing this Motion, Part 1 has been removed from all platforms except Tik Tok via DMCA take down request. [*Id*. ¶ 6] Defendant has since posted Parts 2-4 targeting the Plaintiff in retaliation. [Lee Decl. ¶¶ 19-25; *See* Lee Decl. ¶ 34].

Part 2 was posted by Defendant on May 23, 2025, Part 3 was posted by Defendant on May 25, 2025, and Part 4 was posted by Defendant on May 28, 2025.

[Lee Decl. ¶¶ 18-20]. Plaintiff learned of Part 2 and Part 3 over Memorial Day weekend after its customer service team began receiving messages from concerned customers and disturbing comments from McNally's followers. [*Id.*] Proven's president, Ronald Lee II, along with several employees, family members and loved ones also received disturbing calls and harmful text messages on their personal phones. [*Id.* ¶ 27].

In Part 2 and Part 3, McNally shims the Proven Latch Pin lock while it is not in use on a trailer coupling. [Supp. Sansone Decl. ¶¶ 6–7]. By failing to attach the lock to a trailer coupling, its intended use, the lock is easier to shim. [Supp. Sansone Decl. ¶¶ 6–7; *See* Bonfiglio Decl. ¶¶ 9-20 ].  This is because McNally can maneuver the shim and the lock at will, and position his fingers in the gap between the shackle and the lock body to make bypassing the lock easier. [*Id.*]

Part 3 falsely implies that Proven's Mr. Lee threatened Defendant's wife. [Lee Decl. ¶ 24]. When in fact, Proven's Mr. Lee contacted a publicly available phone number associated with Defendant to try to talk to work out a resolution.  *[Id.* ¶¶ 12-13]. This text was addressed to "Trevor," Defendant's first name as shown on Defendant's social media accounts, and stated "Hey Trevor its Ron with Proven Industries I wanted to run some ideas by you, when is a good time to talk." [*Id.*]. McNally intentionally misrepresents Plaintiff's pre-suit efforts to speak with Defendant to rally his followers against the Plaintiff. [*See Id.*].

Part 4 again shows McNally shimming a Proven lock; however, in Part 4 McNally now targets a different Proven product, furthering McNally's pattern of retaliation. [*Id.* ¶ 25]. In Part 4, McNally continues to omit key details from his lock-picking demonstrations, including prior attempts, inspection of the locks, and the custom preparation of the shims used to bypass said locks. [*Id.* ¶ 25; Supp. Sansone

Decl. ¶¶ 4–7].

After the release of Parts 2 and 3, Proven's customer service department received a wave of harassing and obscene messages from McNally's followers, and such influx of bogus customer service tickets has damaged the customer service department such that it is experiencing difficulty responding to legitimate tickets. [Lee Decl. ¶ 33; *See* Lee Decl. ¶ 15] One employee, Mr. David Smith, reported that the messages created a hostile work environment. [Lee Decl. ¶ 26]. McNally's conduct has also led to direct harassment of Proven's personnel and their families. [*Id*. ¶ 27-29]. Viewers have sent disturbing messages to employees' personal phones and contacted family members and loved ones of Proven's President, Ronald Lee II, with threatening and offensive remarks. [*Id*.]. In response to McNally's actions and the furtherance of his action by and through his follwers, Proven has incurred significant costs managing false reviews, moderating its social media platforms, and addressing customer confusion. [*Id*. ¶ 31-32]. These harms are ongoing and cannot be fully measured. [*Id*. ¶ 31-32, 35].

## IV. Legal Standard

To obtain a preliminary injunction, a party must show "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the nonmovant; and (4) that the entry of the relief would serve the public interest." *Schiavo ex. Rel Schindler v. Schiavo*, 403 F.3d 1223, 1225-26 (11th Cir. 2005).

### 1. Proven Has a High Likelihood of Success on the Merits

### i. Copyright Infringement

To show a likelihood of success on the merits for a claim of copyright

infringement, a party "must show by evidence (1) that [it] owns a valid copyright and (2) that the defendant copied constituent elements of the copyrighted work that are original." *See Pronman v. Styles*, 645 Fed. Appx. 870, 873 (11th Cir. 2016).

First, Proven owns a valid, registered copyright for the Proven Video as an audiovisual work titled YOU GUYS KEEP SAYING YOU CAN EASILY BREAK OFF OUR LATCH PIN LOCK. [Lee Decl. ¶ 6; Fahey Decl. ¶¶ 3–4; Verified Compl. ¶¶ 16-17]. The Proven Video is an original work created by Proven's internal team and includes original scripting, branded product demonstrations, voiceover narration, and visual presentation. [Canning Decl. ¶¶ 2–9; Verified Compl. ¶¶ 16]. Proven first published the Proven Video on March 3, 2025, and registered it with the U.S. Copyright Office on April 7, 2025, under Registration No. PA 2-524-347. [Fahey Decl. ¶ 3; Lee Decl. ¶ 6; Verified Compl. ¶ 32]. Proven created and released the video as a work made for hire and retains all rights in the audiovisual content. [Verified Compl. ¶ ¶ 13-18]

Second, in Part 1, McNally copied substantial and original portions of the Proven Video without authorization. [Canning Decl. ¶¶ 10–14; Lee Decl. ¶¶ 8–9; Verified Compl. ¶¶ 23–32]. McNally intentionally copied some of the most distinctive and commercially valuable portions of the Proven Video, namely, the Plaintiff's scripted narration and product demonstration. [*Id.*]. McNally used approximately fifteen (15) seconds of the Proven Video's ninety (90) seconds, approximately one-sixth of the entire Proven Video. [*Id.*]. But more importantly, McNally copied portions of the Proven Video that Proven deliberately designed to capture viewer attention, establish brand credibility, and demonstrate the product's core function. [*Id.*]. McNally's copying of the Proven Video was both quantitatively and qualitatively

substantial. [*See Id.*]. McNally did not offer any commentary or critique about the Proven Video. [*See Id.*].

McNally's use of the Proven Video is not fair use. [Verified Compl. ¶¶ 45–83.]. McNally copied the heart of the Proven Video for commercial gain, displayed it on monetized platforms, and paired it with misleading demonstrations that falsely implied product failure. [Canning Decl. ¶¶ 10–14]. McNally did not remix the Proven Video using platform-native features. [Verified Compl. ¶¶30]. Additionally, McNally did not transform the Proven Video, nor did McNally critique it or use it for commentary or education. [Verified Compl. ¶¶ 23–32]. Instead, McNally used the Proven Video solely as a visual and an auditory aid to draw attention to Part 1 and increase viewership, receiving over 13 million views across all platforms. [*Id.* ¶ 55]. The copied content served as a springboard to launch a series of retaliatory attacks against Plaintiff and its products. [Lee Decl. ¶¶ 18–35]. These attacks began with Part 1 and continued through Parts 2 to 4. [*See Id.*]. McNally undertook this conduct with no good faith purpose, no fair use justification, and no legitimate commercial need. [*See Id.*].

### ii.    Defamation by Implication in furtherance of Tortious Interference

To show a likelihood of success on the merits for a claim of defamation by implication under Florida law, a plaintiff "must establish the following elements: (1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory. *Turner v. Wells,* 879 F.3d 1254, 1262 (11th Cir. 2018)(citing *Jesus, Inc.* v. *Rapp*, 997 So. 2d 1098, 1105–06 (Fla. 2008); *Bell v. Pollock*, 8:22-cv-02677-MSS-CPT

(M.D. Fla. Apr 17, 2025). Where a party "juxtaposes a series of facts so as to imply a defamatory connection between them, or creates a defamatory implication by omitting facts, [the party] may be held responsible for the defamatory implication, unless it qualifies as an opinion, even though the particular facts are correct." *Turner,* 879 F.3d at 1269 (citing *Jews for Jesus, Inc,* 997 So. 2d at 1108 (quoting (quoting W. Page Keeton et al., Prosser & Keeton on the Law of Torts § 116, at 117 (5th ed. Supp. 1988)). Importantly, courts may treat both pure opinions and opinions based on facts as defamatory if the underlying facts are false or misrepresented. *Bell v. Pollock*, 8:22-cv-02677-MSS-CPT (M.D. Fla. Apr 17, 2025)(citing *Zimmerman v. Buttigieg*, 521 F.Supp.3d 1197, 1213 (M.D. Fla. 2021) (citing Deeb v. Saati, 778 Fed.Appx. 683, 687-88 (11th Cir. 2019))(further citing *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 19 (1990) (stating that "even if the speaker states the facts upon which he bases his opinion, <u>if those facts are either incorrect or incomplete</u>, or if his assessment of them is erroneous, <u>the statement may still imply a false assertion of fact</u>," and noting that at common law, false statements of fact, "whether expressly stated or implied from an expression of opinion," were not privileged)(emphasis added)).

In certain instances, courts in Florida have authority to grant preliminary injunctions that involve speech, such as defamation by implication, where false commercial speech furthers a separate tort and causes irreparable harm. *See Sui et al. v. Harry Wu et al.,* Case No: 8:11-cv-37-T-23TBM (M.D. Fla. 2011) (citing *Murtagh v. Hurley*, 40 So. 3d 62, 66 (Fla. 2d DCA 2010). For example, when a defamatory implication furthers tortious interference with business relationships, courts may enjoin its continued publication without violating the First Amendment, provided the plaintiff proves the underlying cause of action to a reasonable certainty and such

defamation is not incidental to the tortious interference. *See Murtagh*, 40 So. 3d at 66-67 (Fla. 2d DCA 2010)(denying injunctive relief where plaintiff failed to present evidence that demonstrated or allowed an inference that defendant's conduct "had a deleterious effect on" plaintiff's business); *See also Baker v. Joseph,* 938 F.Supp.2d 1265 (S.D. Fla. 2013)(citing *Zimmerman v. D.C.A. at Welleby, Inc.*, 505 So. 2d 1371, 1372 (Fla. 4th DCA 1987).

### 1. Part 1 of the McNally Videos

In Part 1, McNally creates the defamatory implication that Proven knowingly markets and sells a lock that provides no real security and that its lock can be bypassed effortlessly with an aluminum can by anyone, without tools, skill, or preparation. [Lee Decl. ¶¶ 8–11; Verified Compl. ¶¶ 36–41; Supp. Sansone Decl. ¶¶ 4–7; Bonfiglio Decl. ¶¶ 9–12]. This implication is defamatory because it conveys a provably false assertion of fact about the effectiveness of Proven's lock product and the integrity of its business practices. [Lee Decl. ¶¶ 14, 32–33; Verified Compl. ¶¶ 40–42]. It suggests that Proven misleads customers and sells a defective product under the guise of high security. [Lee Decl. ¶ 32; Verified Compl. ¶¶ 38–40]. McNally also uses the lowest value option lock cores to implicate all of Proven's products as defective. [Supp. Sansone Decl. ¶ 8; Sansone Decl. ¶¶ 13–14; Verified Compl. ¶ 43].

This implication does not arise from satire, opinion, or protected commentary. [Verified Compl. ¶ 39; Lee Decl. ¶ 33]. It results from McNally's deliberate presentation of misleading information, including his omission of key facts about studying the internal mechanisms of the lock and fabricating a custom shim. [Lee Decl. ¶¶ 9–11; Supp. Sansone Decl. ¶¶ 4–7; Bonfiglio Decl. ¶¶ 9–10; Verified Compl. ¶ 41]. These omissions create a materially false narrative. [Verified Compl. ¶¶ 40–41; Lee

Decl. ¶ 11]. McNally reinforces that narrative by copying Proven's own copyrighted, pairing it with juvenile theatrics such as swinging his legs and sipping a juice box, and then bypassing the lock in seconds. [Lee Decl. ¶ 8; Canning Decl. ¶¶ 7–12; Verified Compl. ¶¶ 23]. All of the foregoing which gives the impression that the lock is or can be easily picked without any preparation, merely by using a piece of an aluminum can. [*Id.*]. The implication directly harms Proven's reputation and misrepresents the Latch Pin lock product's actual functionality, as well as the entire line of Proven security products. [Lee Decl. ¶¶ 25, 30, 32; Supp. Sansone Decl. ¶¶ 6–8; Verified Compl. ¶¶ 40–42]. This misrepresentation discourages purchases, erodes trust, harms commercial operations, and has damaged Proven's commercial relationships. [Lee Decl. ¶¶ 15, 30–31, 33; Verified Compl. ¶¶ 44–46].

The implication triggered a foreseeable surge of targeted fallout against Proven. [Lee Decl. ¶¶ 14, 17, 30–31, 33; Verified Compl. ¶¶ 42–44]. Viewers reposted Part 1, left mocking and misleading comments on Proven's social media posts, submitted disruptive inquiries to customer service, posted disruptive comments to Proven's marketing and advertising channels, and posted negative reviews on its ecommerce platforms without owning, purchasing, or using the product. [Lee Decl. ¶¶ 15, 17, 26, 30-33; Verified Compl. ¶¶ 56-58, 65-67]. Proven was forced to disable comments on certain posts and reallocate resources to counteract the fallout. [Lee Decl. ¶ 17]. As a result, McNally caused Proven to incur increased costs in social media moderation, customer service, decreased revenue, increased advertising costs, and harm to its ecommerce distribution channels. [Lee Decl. ¶¶ 15, 17, 26, 30-33; Verified Compl. ¶¶ 56-58, 65-67].

## 2. Part 2 and Part 3 of the McNally Videos

Parts 2 and 3 continue and intensify the defamatory implication established in Part 1. [Lee Decl. ¶¶ 20–21, 26; Verified Compl. ¶¶ 67-75]. After Plaintiff first attempted to contact Defendant, which went unanswered, Plaintiff filed suit and initiated DMCA takedowns to address the harm caused by Part 1. [Lee Decl. ¶¶ 12–13; Fahey Decl. ¶ 6]. In retaliation, and consistent with Defendant's prior actions to increase the virality of his videos, Defendant published Parts 2 and 3. [Lee Decl. ¶¶ 20–21, 26; Verified Compl. ¶¶ 67-75]. These videos again depict Defendant bypassing the same Proven lock shown in Part 1, while omitting critical context about prior preparation, repeated practice, disassembly of the lock, and fabrication of custom shims specifically designed for that model. [Lee Decl. ¶¶ 20–22; Sansone Decl. ¶¶ 13–16; Supp. Sansone Decl. ¶¶ 4–6]. It is clear by Parts 2 and 3 that McNally wants to instigate his followers in furtherance of a smear campaign against Proven. [Lee Decl. ¶¶ 23–24, 27–29, 32, 34; Verified Compl. ¶¶ 67-75].

In both videos, Defendant bypasses the lock without securing it to a trailer coupling or any fixed object. [Lee Decl. ¶ 20-23; Bonfiglio Decl. ¶¶ 7–9; Supp. Sansone Decl. ¶ 7]. This omission is significant because the lock is intended to be used in a fixed position. [Supp. Sansone Decl. ¶¶ 6–7; *See* Bonfiglio Decl. ¶¶ 10-13]. By holding the lock freely, Defendant is able to manipulate both the shim and the device with ease, creating an artificial demonstration of vulnerability. [Supp. Sansone Decl. ¶¶ 7–8; *See* Bonfiglio Decl. ¶¶ 10-13]. This setup does not reflect real-world use, yet Defendant presents the bypass as effortless and typical. [*See Id.*]. McNally fails to disclose that he had prior experience with the lock, had practiced the bypass technique repeatedly, and had previously constructed a custom shim for the specific lock model, all of which misleads viewers into believing the lock is inherently defective and universally

15

vulnerable. [Sansone Decl. ¶¶ 13–16; Supp. Sansone Decl. ¶¶ 4–6]. Without knowledge of Part 1, because it was removed for DMCA implications, new viewers are led to believe that Parts 2 and 3 are McNally's first encounter with the Proven lock product. [Lee Decl. ¶¶ 19–21, 34; Verified Compl. ¶¶ 54, 68].

Part 3 adds a new layer of defamatory implication. Defendant falsely suggests that Proven's president contacted Defendant's wife with improper intent. [Lee Decl. ¶¶ 24, 27]. In reality, the outreach was directed at Defendant himself through a publicly listed number, prior to the filing of this lawsuit, in an attempt to resolve the matter. [Lee Decl. ¶¶ 12–13, 24]. Defendant deliberately misrepresents this contact to provoke outrage and incite his followers against Proven. [Lee Decl. ¶¶ 24, 28–29]. By doing so, he reinforces the narrative that Proven is not only selling insecure products but is also acting maliciously, thereby amplifying the harm and intensifying the campaign of reputational sabotage against Plaintiff. [Lee Decl. ¶¶ 28–30, 32–34].

### 3. Part 4 of the McNally Videos

In Part 4, McNally targets a different lock product from Plaintiff. [Lee Decl. ¶ 25]. The video again omits material details, including prior inspection of the lock's internal mechanisms, preparatory steps, and the knowledge required to fabricate a suitable shim. [Supp. Sansone Decl. ¶¶ 4–7]. As with prior parts, McNally falsely implies that the lock can be easily defeated by anyone using a piece of scrap metal, when in fact the bypass was only possible due to McNally's prior knowledge, experience, and concealed preparation. [Lee Decl. ¶ 25; Supp. Sansone Decl. ¶¶ 5–6]. Part 4 further demonstrates that Defendant has escalated his campaign to discredit Plaintiff's entire product line. [Lee Decl. ¶¶ 25, 34–35]. This conduct is retaliatory, misleading, and designed to suggest that all of Plaintiff's products are defective. [Lee

Decl. ¶¶ 25, 30, 34; Supp. Sansone Decl. ¶ 7]. McNally continues to retaliate against Plaintiff and, by posting a fourth video with a new product, has demonstrated a willful intent to escalate the harm and perpetuate the defamatory implications against the Plaintiff. [Lee Decl. ¶ 25]. McNally has turned his initial conduct into a personal vendetta aimed at damaging Plaintiff's business and reputation, consistent with a pattern of similar behavior by Defendant in the past. [*Id.* ¶ 34].

### 4. McNally's Furtherance of Tortious Interference with Proven's Business Relationships

McNally's conduct exceeds mere commentary and constitutes deliberate and unlawful interference with Proven's business relationships. By publishing a series of viral videos that falsely portray Plaintiff's locks – without regard to the security option level - as insecure and easily bypassed, McNally disrupted customer confidence, deterred prospective buyers, and caused measurable harm to Proven's commercial standing. [Lee Decl. ¶¶ 15–35; Verified Compl. ¶¶ 58-83].

McNally knew or should have known that his demonstrations were misleading and would harm Proven. [Lee Decl. ¶ 34; Verified Compl. ¶¶ 67-73]. McNally intentionally omitted critical context, including but not limited to, prior disassembly and inspection of the lock, repeated practice, and custom shim fabrication, all to create the false impression that bypassing Proven's lock requires no effort, skill, or tools. These omissions were calculated to exaggerate product vulnerability and maximize audience reaction. McNally then published the videos to millions of followers across multiple social media platforms knowing that its message would reach existing and potential customers. [Verified Compl. ¶ 55]. Additionally, because McNally frequently engages with followers throughout his videos, McNally knew that they would further his intentions to undermine Proven and its business relationships. [Lee Decl. ¶¶ 33–

17

35]. Also intentionally bypassed one of the lowest security core that Proven offers for its locks, and while bypassing said locks without having the locks attached to a coupling. [Sansone Decl. ¶¶ 10–11; Supp. Sansone Decl. ¶¶ 4–7; Bonfiglio Decl. ¶¶ 10–14].

The harm to Plaintiff was not only foreseeable, but it was also immediate and confirmed. [Lee Decl. ¶¶ 15–35]. McNally's followers publicly stated their intent to damage Proven's business, encouraged others to avoid its products, and spread the same false implications. [*Id.* ¶ 15]. Customers returned products. [*Id.*]. Prospective buyers declined to purchase. [*Id.*]. Plaintiff received harassing messages and false reviews. [*Id.* ¶ 26-27]. Followers contacted Proven employees and even family members of its President with disturbing and threatening messages. [*Id.*]. Plaintiff has received numerous false and negative reviews from individuals that have not purchased the Proven lock product and said reviews reference the McNally Video and further McNally's smear campaign against Plaintiff. [*Id.*]. The negative reviews are damaging the Plaintiff's reputation with the Better Business Bureau and its ecommerce platforms. [*Id.* ¶ 15, 30]. For instance, Amazon has removed Proven's ability to have a "featured offer" for its Latch Pin Lock product due to the influx of negative reviews and decline in sales. [*Id.* ¶ 30, 31, 33]. McNally's actions were knowing, malicious, and without lawful justification. The resulting harm to Proven is ongoing and irreparable, incalculable, and cannot be undone by monetary relief. As a result, the interference with Proven's business relationships is not incidental to the defamatory implication, it is the direct and foreseeable result of McNally's actions.

## 2. Proven will continue to suffer irreparable injury if relief is not granted

Regarding the copyright claim, continued public display of the Proven Video

without permission deprives Plaintiff of control over its intellectual property and erodes the value of the work. The unauthorized use distorts the original message and diminishes the promotional and licensing value of the video in the marketplace. This type of loss, including reputational damage and lost goodwill in a creative work, constitutes irreparable harm. Without a direct injunction, Defendant remains free to republish or redistribute the infringing content, depriving Plaintiff of control over its copyrighted work and allowing the continued erosion of its commercial value and brand integrity.

Regarding the defamation by implication claim, the McNally Videos falsely portray Plaintiff's products as insecure, suggest that Proven knowingly deceives consumers, and implies Plaintiff's business practices are unethical because it took steps to remove its copyrighted content from Defendant's platform and sought legal redress for Defendant's original defamatory video (Part 1). These implications are repeated and magnified across Parts 2 through 4, each reinforcing the original false narrative. Defendant omits key facts, such as the need for disassembly, prior inspection, and custom shim fabrication, and manipulates the Latch Pin lock outside of intended conditions, misleading viewers into believing the bypass is effortless and universally replicable.

The harm resulting from this false narrative is immediate, ongoing, and irreparable and Proven has actual damages. [Lee Decl. ¶¶ 15–35]. McNally's followers have posted disparaging comments, sent hostile messages, and engaged in targeted harassment, not only through customer service channels, but also by contacting Proven's employees and the family members of its President. [*Id.*]. These communications have disrupted operations and created a hostile and stressful work

environment, raising serious workplace concerns and affecting employee well-being. [*Id.*]. This reputational damage, combined with operational disruption and workplace impact, constitutes irreparable injury. [*Id.*] The harm to Proven's goodwill, customer trust, employee safety, and business reputation cannot be measured in dollars or corrected by monetary relief alone. Traditional remedies such as DMCA takedowns have proven inadequate to stop the continuing spread and reposting of the defamatory content. Absent injunctive relief, Defendant is likely to continue publishing – and has shown that he will continue to publish – and amplify these false implications, deepening the injury to Plaintiff's brand, destabilizing its workforce, and interfering with commercial relationships in ways that cannot be undone. The pattern of retaliation, scale of dissemination, and ongoing nature of the injury make emergency injunctive relief both necessary and appropriate.

### 3. The injury to Proven outweighs any harm to Defendant

The balance of equities favors Plaintiff. Proven continues to suffer significant reputational harm, customer confusion, and disruption to its business relationships as a direct result of the McNally Video and its ongoing circulation. Defendant, by contrast, will suffer no legitimate harm from being restrained from engaging in unlawful conduct. The proposed injunction is narrowly tailored and does not implicate the First Amendment. It would not prevent Defendant from engaging in lawful commentary, criticism, or speech about lock security or lock products in general. It does not prohibit Defendant from discussing his experiences with locks, voicing his opinions, or creating original content. An injunction against the Defendant would only restrain Defendant from engaging in conduct that is already unlawful: namely, reproducing Plaintiff's copyrighted promotional video without authorization and

conveying materially false implications about Plaintiff's product through omission and misleading presentation to tortiously interfere with Plaintiff's business and consumers.

Without injunctive relief, Defendant continues to be unjustly enriched at Plaintiff's expense and continues to publish misleading and damaging videos faster than Proven can react. Defendant has monetized the harm by generating views, engagement, and possible affiliate revenue through misleading and defamatory videos that target Plaintiff's products and reputation. Each post drives traffic to Defendant's platforms, increasing his influence and income, while amplifying commercial harm to Plaintiff. The injunction does not restrict lawful speech. It simply prevents further unlawful conduct that exploits Plaintiff's intellectual property and damages its reputation for Defendant's commercial benefit. Equity weighs heavily in favor of stopping the ongoing exploitation and restoring a level playing field.

### 4. Enjoining Copyright Infringement and/or Defamation by Implication is in the Public Interest

Regarding the Plaintiff's claims of copyright infringement, granting injunctive relief in this case serves the public interest. The public has a recognized interest in the enforcement of intellectual property rights and in the fair and truthful presentation of commercial information. Defendant's unauthorized copying and use of Plaintiff's copyrighted video undermines those interests. McNally copied and repurposed the most distinctive segment of Proven's original work, using it to drive internet traffic to McNally's own commercial content. This conduct misleads consumers and diminishes the value and effectiveness of Plaintiff's promotional material. An injunction will reinforce copyright protections, deter future unauthorized use, and help preserve the integrity of original commercial works.

Regarding the Plaintiff's claims of defamation by implication, the public also

has an interest in the fair and truthful presentation of commercial information. McNally's video implies that Plaintiff knowingly markets a defective lock and misleads consumers. These false implications continue to circulate widely and interfere with Plaintiff's customer relationships. Courts have recognized that false commercial speech may be enjoined when it furthers an independent tort, such as tortious interference with business relationships, which is the case here. *See Sui v. Harry Wu*, Case No. 8:11-cv-37-T-23TBM (M.D. Fla. 2011) (citing *Murtagh,* 40 So. 3d at 66 (Fla. 2d DCA 2010)); *Bake,* 938 F.Supp.2d 1265 (citing *Zimmerman,* 505 So. 2d at 1372 (Fla. 4th DCA 1987)).

The reputational and commercial harm caused by Defendant's video is both ongoing and incalculable. The videos continue to spread a false narrative, disrupt Plaintiff's operations, harass Proven personnel, mislead viewers who have no firsthand experience with the product. In light of the severe and growing impact on Plaintiff's operations, staff, and public image, the equities clearly support the issuance of immediate injunctive relief. These are precisely the type of injuries that justify injunctive relief. *See id.*

Furthermore, the Florida Supreme Court has already recognized that Florida's statutory defamation protections have already balanced the rights of individuals to be free from defamatory statements against the First Amendment protections for free speech and expression. *See Jews for Jesus, Inc.,* 997 So. 2d at 1111-12 (Fla. 2008) (discussing First Amendment implications and public policy). Section 770.01, Florida Statutes, requires pre-suit notice, which was provided in this case, and which gave Defendant an opportunity to correct the defamatory statements. *See id.* No corrective action was taken by the Defendant, nor did Defendant make any attempt to discuss

the matter with Plaintiff pre-suit. Instead, after this lawsuit was filed, after the Plaintiff filed DMCA takedowns, and after Defendant was notified of the damages it had caused, Defendant doubled down and posted additional videos to attack the Plaintiff, its customers, and its reputation.

The notice provisions of Fla. Stat. § 770.02 as well as the limitations on available damages where the falsehood was published in good faith and corrected promptly adequately balance the implications of free speech under the first amendment. *Id.* However, the safeguards to protect speech under Fla. Stat. § 720.02 do not extend to speech where the Defendant deliberately harms a business through knowingly false implications and commercial exploitation. Therefore, an injunction is a necessary measure to limit the harm to the Plaintiff.

McNally's conduct falls outside the scope of protected commentary and into the realm of commercial exploitation and theft promotion. Injunctive relief in this case supports the public interest by holding McNally accountable for his deliberate actions and preserving the integrity and safety of the marketplace. Additionally, public policy weighs against the unregulated dissemination of misleading lock-picking videos that falsely suggest consumer security devices are ineffective when in use. States like Florida criminalize the possession of burglary tools, including lock-picking instruments, due to the inherent public risk, tools which McNally promotes. *See* Fla. Stat. § 810.06. The McNally Video, created for personal profit, reputational sabotage, and theft promotion, serves no public good. The continued spread of deceptive videos purporting to teach lock breaching runs counter to these public safety interests, because there is no other legitimate purpose to disseminate these videos other than to promote theft. Even platforms like YouTube prohibit content that encourages illegal or

dangerous activities, including "instructional theft" or demonstrations that bypass security systems. *See* YouTube, Harmful or Dangerous Content Policies, Google Help, https://support.google.com/youtube/answer/2801964?hl=en (last visited June 2, 2025). No public interest is served by allowing a social media creator to deceptively create videos, misuse a business' content without permission, promote theft and lock bypassing, and promote false implications about said business' product to mislead consumers, jeopardize the safety of their assets, and irreparably damage the business.

**V.    Conclusion**

WHEREFORE, Plaintiff Proven Industries Inc. respectfully requests that the Court enter a preliminary injunction, effective during the pendency of this action or until further order of the Court, enjoining Defendant Trevor McNally, his agents, representatives, affiliates, and all persons in active concert or participation with him who receive actual notice of the injunction, from:

1.      Reproducing, displaying, distributing, or otherwise using any portion of Plaintiff's copyrighted audiovisual work titled "YOU GUYS KEEP SAYING YOU CAN EASILY BREAK OFF OUR LATCH PIN LOCK", including any excerpt or derivative thereof, in any medium or format;

2.      Publishing, reposting, or distributing any video, post, or content that falsely implies Plaintiff's lock product can be trivially bypassed without tools, expertise, or preparation;

3.      Publishing, reposting, or distributing any video or post that combines visual elements of the Proven Video or Plaintiff's product branding with misleading depictions, omissions, or staged demonstrations intended to imply product failure;

4.      Encouraging, promoting, or directing others to post false reviews, submit

misleading inquiries, or engage in coordinated online activity based on the McNally Video or its false implications;

5.      Failing to remove any existing videos, social media content, or online comment that incorporates the Proven Video or promotes the false implication that Plaintiff's product is ineffective or deceptively marketed;

6.      Failing to preserve all drafts, communications, posting data, affiliate marketing records, and monetization metrics related to the creation, dissemination, and performance of the McNally Video; and

7.      Awarding such further relief as the Court deems just and proper.

Pursuant to 15 U.S.C. § 1116(d)(5)(D) and Fed. R. Civ. P. 65(c), Plaintiff is prepared to post a bond in an amount the Court deems appropriate for the payment of damages to which Defendants may be entitled if found to be wrongfully enjoined or retrained.

Dated: June 2, 2025                Respectfully Submitted,

                                   /Derek Fahey/
                                   Derek R. Fahey, Esq.
                                   The Plus IP Firm, PLLC
                                   Fla. Bar. No. 88194
                                   101 N.E. 3rd Ave., Suite 1500
                                   Fort Lauderdale, Florida 33301
                                   Telephone: (954) 332-3584
                                   Email: Derek@plusfirm.com
                                   *Attorney for Plaintiff*
                                   *LEAD ATTORNEY TO BE NOTICED*


                                   /Austin Nowacki/
                                   Austin R. Nowacki, Esq.
                                   The Plus IP Firm, PLLC
                                   Fla. Bar. No. 1016961
                                   Email: austin@plusfirm.com
                                   *Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on 2 June 2025 a true and correct copy of the foregoing was served to all counsel of record via email and by filing with the Clerk of the Court using Florida E-Filing Portal, on all counsel or parties of record.

/Derek Fahey/
Derek Fahey, Esq.