UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

Case No. 8:25-cv-01119-MSS-LSG

Proven Industries Inc, a Florida corporation

*Plaintiff,*

v.

Trevor McNally, individual

*Defendant.*

## Declaration of Ronald James Lee, II, In Support of Plaintiff's Emergency Motion for Preliminary Injunction and Incorporated Memorandum of Law

I, Ronald Lee, II, declare as follows:

1. I am over eighteen years of age and reside in the Middle District of Florida.

2. Proven Industries is a family-owned and operated business founded in response to the theft of a family trailer and over $40,000 worth of equipment. That loss became the catalyst for developing a superior line of trailer coupler locks. Since then, Proven has dedicated thousands of hours to engineering and testing our products. Each locking system is the result of, on average, more than 200 hours of research and development, and all our products are manufactured in the United States using high-grade materials. We proudly emphasize our commitment to quality, integrity, and American manufacturing. The family-run nature of the Proven business is central to its identity and customer relationships. When Proven's credibility and product

1

integrity are attacked publicly, as in the McNally Videos, it threatens the very core of the business Proven has built, undermining both the personal and professional trust that drives Proven's success.

3. I have over a decade of experience in business operations, manufacturing, and product development. In my role at Proven, I oversee all aspects of the company's operations, including product engineering, marketing, customer service, and strategic planning. My professional background includes years of hands-on experience in mechanical product design and development, as well as managing day-to-day operations in the security device manufacturing industry. I have led Proven's growth as an industry-recognized manufacturer of trailer hitch locks and related security products. My combined experience in engineering collaboration, product oversight, and business leadership enables me to testify competently about the matters addressed in this Declaration.

4. I am the President of Proven Industries Inc. ("Proven"), the Plaintiff in this matter. I make this declaration in support of Plaintiff's Motion for Preliminary Injunction. The facts stated in this declaration are based on my personal knowledge, including my direct observations and duties as President. If called as a witness, I could and would competently testify to the facts stated herein.

5. Proven designs, manufactures, and sells trailer hitch locks, including our signature product, the Latch Pin Lock. I oversee all aspects of Proven's business, including marketing strategy, product development, and customer communications.

6. On March 3, 2025, Proven released a promotional video titled *YOU GUYS KEEP SAYING YOU CAN EASILY BREAK OFF OUR LATCH PIN LOCK* (the "Proven Video"). The video was registered by my attorney, Derek Fahey, Esq., with the U.S. Copyright Office on April 7, 2025 (Reg. No. PA 2-524-347). *See* Exhibit A, U.S. Reg. No. PA 2-524-347; *see* Exhibit B-1, copy of the Proven Video delivered on USB by Priority Mail.

7. I personally reviewed the public social media accounts of Defendant Trevor McNally ("Defendant"). As of April, and May 2025, I observed the following: Over 3.5 million subscribers on his YouTube channel; Over 2.5 million followers on TikTok; Over 500,000 followers on Instagram; and Over 260,000 followers on Facebook.
*See* Exhibit C, Screenshots of McNally's YouTube Channel, TikTok, Instagram, and Facebook.

8. Shortly after April 3, 2025, and several times after, I learned of and personally watched a video ("Part 1 Video") posted by McNally on TikTok, YouTube Shorts, Instagram Reels, and Facebook. The Part 1 Video begins by using approximately fifteen (15) seconds from the Proven Video, including our narration, visuals, and product demo without our permission. *See* Exhibit B-2, copy of Part 1 Video delivered on USB by Priority Mail.

9. I personally observed that the Part 1 Video shows McNally bypassing Proven's lock with a piece of aluminum can in roughly ten (10) seconds. Part 1 Video omits any explanation that he had previously disassembled or studied the lock to learn how the lock worked in order to fabricate a custom shim. *See* Exhibit B-1, copy of Part 1 Video delivered on USB by Priority Mail. These

omissions give a false impression that our lock is defective and easily bypassed by anyone without tools or skill.

10. Part 1 Video also is completely devoid of how McNally knew how to make the shim, knew what dimensions or shape the shim should be in, or where to position the shim in order to open the lock. *See* Exhibit B-1, copy of Part 1 Video delivered on USB by Priority Mail.

11. Part 1 Video also is completely devoid of any explanation of how many times McNally practiced in order to open the lock. *See* Exhibit B-1, copy of Part 1 Video delivered on USB by Priority Mail.

12. On April 4, 2025, I searched for and found at least two phone numbers that I thought could be Mr. McNally's phone numbers. I wanted to contact Defendant to ask him to take down the Part 1 Video and to try to resolve any dispute between us. These phone numbers were listed along with other numbers associated with Defendant's name and home address.

13. On April 4, 2025, I texted at least two phone numbers that I thought could be the Defendant's phone number. *See* Exhibit D, Screenshot of text messages from Mr. Lee to two different phone numbers.

14. I have personally tracked Part 1 Videos viewership and reposting. As of May 2025, I observed that it had accumulated more than 13 million views across platforms. I also reviewed hundreds of user comments referencing the Part 1 Video that were posted on Proven's social media channels and product listings.

15. After the Part 1 Video, I personally handled or reviewed documentation including the following:

a) A product return explicitly citing the McNally Video (*see* Exhibit E);

b) A repeat customer that was hesitant to purchase after viewing the video. This customer had previously purchased from us multiple times and had never indicated any dissatisfaction with our products. However, due to the increased volume and stress caused by harassment from McNally's followers, our customer service team was unable to provide the level of support we normally offer, which contributed to the poor customer service (see Exhibit F); and

c) Reports, emails and messages from customer service about disruptive inquiries stemming from the video. (s*ee* Exhibit G).

16. As part of my regular duties, I have access to the business records maintained in the ordinary course of Proven's operations and am familiar with the procedures for creating and maintaining such records.

17. I was involved in Proven's decision to disable comments on multiple social media posts due to hostile and misleading user comments. Because of the large number of negative comments on the Proven Video as a result of the Part 1 Video, Proven disabled the comments from public viewing. Attached as Exhibit H are a comments posted on some of Proven's videos after Defendant published the Part 1 Video.

18. I only learned about McNally's two additional videos (referred to as the Part 2 Video and the Part 3 Video) about Proven's locks after I started receiving phone calls and text messages on my personal cell phone.

19. The Part 2 Video was posted on May 23, 2025, and the Part 3 Video was posted on May 25, 2025. McNally published the Part 2 Video and the Part

5

3 Video on TikTok, YouTube Shorts, Instagram Reels, and Facebook. *See* Exhibits B-3 and B-4, copies of Part 2 Video and Part 3 Videos, respectively, delivered on USB by Priority Mail.

20. I have personally viewed the Part 2 and Part 3 Videos several times. Both the Part 2 and Part 3 Videos omit any explanation that McNally had previously disassembled or studied the lock to learn how the lock worked in order to fabricate a custom shim. *See* Exhibits B-3 and B-4, copies of Part 2 Video and Part 3 Videos, respectively, delivered on USB by Priority Mail. These omissions give a false impression that Proven's lock is defective and easily bypassed by anyone without tools or skill.

21. Both the Part 2 and Part 3 Videos also are completely devoid of how McNally knew to make the shim, knew what dimensions or shape the shim should be in, or where to position the shim in order to open the lock.

22. The Part 2 and Part 3 Videos also are completely devoid of any explanation of how many times McNally practiced in order to open the lock.

23. After McNally published the Part 2 and Part 3 Videos, Proven's customer service department started receiving an increased amount of very disturbing messages from McNally social media followers. *See* Exhibit I.

24. Since McNally published the Part 2 and Part 3 Videos, one of Proven's customers has said that they would not buy from Proven because Proven "harass[ed] someone's wife". *See* Exhibit J.

25. On May 28, 2025, McNally published a fourth video ("Part 4 Video") targeting another Proven lock, this time installed on a cargo container. Like the earlier videos, the Part 4 Video depicts a supposed bypass using a

shim but fails to explain how the shim was made, how it fits the specific locking mechanism, or whether any prior disassembly or practice was involved. The video falsely implies that the lock can be easily and quickly bypassed with common materials, when in reality, any such bypass would require advance planning, custom fabrication, and repeated trial and error. Although shorter than the prior videos, the Part 4 Video continues the misleading narrative that our locks are inherently insecure.

26. The volume and tone of the messages received by Proven's team have created a disruptive and hostile work environment, raising concerns about employee well-being and safety. This has impaired internal morale and affected day-to-day operations. Specifically, one of Proven's customer services representatives, Mr. David Smith, complained about the hundreds of messages he received and read from McNally followers in the past few days. In an email, he complained about the disturbing messages he received and questioned if he should be concerned for his safety. *See* Exhibit K.

27. My personal phone number was posted in the comments of the McNally Videos. Since that time, I have received a continuous stream of harassing phone calls and text messages from unknown numbers at all hours of the day and night. These communications have included profanity, threats, and racially charged language. *See* Exhibit L. My partner, Erin Schweitzer, has also received harassing messages through Facebook Messenger. *See* Exhibit M. Additionally, my son has received vile and threatening messages, including derogatory slurs and explicit threats of violence, such as "I would kill your fucking nigger child" and "racemixing pussy". *See* Exhibit N.

28. The volume and nature of the harassing messages I received, along with those directed at my partner, son, and grandson, have caused significant emotional distress and disruption to my day-to-day operations as President of Proven. I have had to divert time from running Proven to manage the fallout, including blocking numbers, consulting with family members, and taking steps to ensure the safety and well-being of my son and grandchild. These intrusions have impacted my ability to focus on the business and have required personal and professional attention that would not have been necessary but for McNally's videos. The effect of this ongoing harassment underscores the seriousness and immediacy of the harm caused by McNally.

29. In addition to me and my family being personally targeted as a result of the McNally videos, I have also observed my employees being called out and contacted by name. For example, one of our employees, Harrison Gammaro, was specifically mentioned in social media comments in a derogatory and harassing manner. Several employees have expressed concern for their own safety and well-being as a result of these comments and the surrounding harassment. This goes beyond my concern for Proven, as I am also concerned for my employees' safety and well-being. See Exhibit O.

30. As a result of the fraudulent negative comments Proven's products, particularly on Amazon, Proven has a measurable decrease in revenue, has a measurable decrease in sales on Amazon, and has experienced permeant damages to its ability to sell its product – specifically Proven's product is not indexing on Amazon as normal and Proven cannot have "featured offers" on its product. See Exhibit P.

31. After Part 1 of the McNally Videos was posted, I observed a noticeable decrease in revenue, an increase in advertising spend, and a decrease in conversion. From the period of April 3rd through May 28th vs previous period of February 6th through April 2nd, Proven saw a loss of revenue from combined Google Ads and Meta Ads conversion value vs previous. After Parts 2-4 of the McNally Videos were posted, I observed a further noticeable decrease in revenue. From May 23rd through May 28th vs previous period of May 17th through May 22nd, Proven saw a loss of revenue from combined Google Ads and Meta Ads conversion value vs previous. Since the string of recent videos started on May 23rd Proven has seen a large increase in negative comments on Meta Ad and Google Ad posts with many of them mentioning McNally or opening their locks with cans. *See* Exhibit Q.

32. Based on my observations and leadership role, I believe that Proven is suffering irreparable harm. The McNally Video spreads a false implication that undermines Proven's credibility in the marketplace and for Proven's employees. The damage to Proven's reputation, goodwill, and customer relationships cannot be adequately remedied by money.

33. After the McNally videos, there has been a substantial influx of messages and customer service tickets that have disrupted business operations. *See* Exhibit R.

34. Based on my personal knowledge and past observations, I believe McNally's targeting of the Proven products was not isolated or accidental. I observed online that McNally previously posted a similar video falsely implying that another company's lock could be defeated with a milk jug. Like

9

with Proven's product, that video began with use of another company's promotional material, included theatrical behavior to increase engagement, and likely omitted key context. That prior video went viral, generating over 50 million views. I watched another video of McNally's acknowledging that the other company submitted a takedown notice, and McNally escalated the situation by publicly attacking them again. I believe McNally followed the same formula with Proven, deliberately crafting viral content that he knew from experience would mislead viewers and provoke harassment and increase revenue to his social media channels and affiliates. I also observe McNally frequently engaging with his followers in the comments. This pattern shows that McNally understands and exploits the foreseeable harm to the companies he targets. *See* Exhibit S.

35.  McNally's unauthorized use of Proven's video, along with his omission of critical facts and misleading demonstration, has caused ongoing harm to our business and brand. These harms are not speculative, they are measurable, immediate, and continuing. Based on my personal observations and business records reflecting the harm to Proven's operations, reputation, and revenue, I respectfully request that the Court grant the preliminary injunction to prevent further damage.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Signed this 31st day of   May  , 2025, in ruskin_____, Florida.

10

Signature: *Ron Lee*

Name: Ronald James Lee, II

Title: President

# Audit trail

1/1

| | |
|---|---|
| Name of the document | Declaration of Ronald Lee II.pdf |
| Signature reference ID | eb4c6a20-cf4f-42cf-844c-58336dbf4b10 |
| Date format | YYYY-MM-DD HH:MM:SS UTC |
| Status | SIGNED |
| Signing completed | 2025-05-31 19:52:41 UTC |

**Signing initiated**
2025-05-31 18:52:13 UTC

**Patent Specialist** (info@plusfirm.com) sent document for signing.
**Signers:**
   - **Ronald James Lee, II** (rlee@provenlocks.com)
Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/137.0.0.0 Safari/537.36
IP: 2600:8800:6180:2600:2a:d16f:207f:ffd5

**Document signed**
2025-05-31 19:52:40 UTC

**Ronald James Lee, II** (rlee@provenlocks.com)
docbase-public
IP: 2603:900b:4f0:c430:98d0:541e:33e7:4a42
Authentication code: Not required

**Signing completed**
2025-05-31 19:52:41 UTC

---

Document was signed by using Pipedrive signing service.
We store viewing info only for signers that allow it. We show the first view from each signer.
Electronic signatures in this PDF document can be verified with Adobe Acrobat Reader.

pipedrive