Signature ref: 4ba22b3a-3e3f-4492-a7ed-d34d1b6ef9e5

Exhibit 1

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

Case No. 8:25-cv-01119-MSS-LSG

Proven Industries, Inc., a Florida corporation,

*Plaintiff,*

   v.

Trevor McNally, individual,

*Defendant.*

_____/

## **Amended Complaint and Demand for Jury Trial**

Plaintiff, Proven Industries, Inc. (hereinafter, "Proven" or "Plaintiff"), by and through its undersigned counsel, hereby file this Amended Complaint against Defendant, Trevor McNally (hereinafter, "McNally" and/or "Defendant"), and alleges the following:

### Introduction

1.   This is an action for: (i) copyright infringement under 17 U.S.C. § 501 et seq.; (ii) defamation by implication under Florida law; (iii) false advertising under the Lanham Act, 15 U.S.C. § 1125(a); (iv) violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201 et seq.; (v) tortious interference with business relationships; (vi) unjust enrichment; (vii) civil conspiracy; and (viii) trade libel under Florida law. Each cause of action is based on a distinct legal theory and seeks separate and non-

duplicative relief arising from different forms of harm caused by Defendant's conduct.

2.    McNally published and widely distributed a series of misleading and defamatory videos that falsely imply a critical vulnerability in Proven's lock products. The first McNally video published by Defendant on 3 April 2025 ("Part 1 Video") used portions of Proven's copyrighted content without authorization, falsely depicted Proven's model 651 latch pin lock product as ineffective, and resulted in reputational harm, lost sales, and increased marketing costs to Proven. Since the commencement of this action, Defendant has published additional videos to his social media channels, namely, McNally Videos (Parts 2 – 6), each of which continues the same false implication and harm from the Part 1 Video. Collectively, Parts 1-6 are collectively referred to as the "McNally Videos" and with respect to each a "Part [ ] Video".

3.    McNally published the McNally Videos on multiple social media platforms including YouTube, Instagram, TikTok, and Facebook, where McNally has over 3.5 million YouTube subscribers, over 536,000 Instagram followers, over 2.5 million TikTok followers, and over 267,000 Facebook followers.

4.    McNally published the McNally Videos in a manner that intentionally targeted and caused foreseeable harm to Proven Industries in the Middle District of Florida. Although McNally did not film the video in Florida, McNally committed intentional torts, including but not limited to, defamation by implication, copyright infringement, and unfair trade practices, knowing that Proven, a Florida-based company, would suffer reputational and commercial

Signature ref: 4ba22b3a-3e3f-4492-a7ed-d34d1b6ef9e5

injury in this District.

## Jurisdiction and Venue

5.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) (federal questions: copyright and Lanham Act), and supplemental jurisdiction under 28 U.S.C. § 1367 over the related state-law claims.

6.    Personal jurisdiction is proper under Florida long-arm statute, Fla. Stat. § 48.193, because McNally committed intentional torts, including willful copyright infringement, defamation by implication, and deceptive trade practices, that McNally knew or should have known would cause injury in Florida. Although McNally resides in Virginia, McNally directed his conduct toward a Florida-based business with the intent to affect its operations, making his actions purposefully directed toward Florida for jurisdictional purposes.

7.    Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred here, and the harm was suffered here.

8.    Plaintiff has complied with all condition's precedent to the filing of this action. To the extent that Fla. Stat. § 770.01 applies, Plaintiff provided the required notice to Defendant prior to filing suit.

## Parties

9.    Plaintiff, Proven Industries Inc, is a Florida corporation with its principal place of business in Florida.

10.    Defendant, Trevor McNally is an individual above the age of majority residing in Virginia.

Signature ref: 4ba22b3a-3e3f-4492-a7ed-d34d1b6ef9e5

11.    Defendant, Trevor McNally maintains an online presence for commercial purposes where McNally has accumulated more than two billion views with over seven million followers on social media accounts on Instagram, Facebook, YouTube, TikTok, and Threads, all under the user display name "McNallyofficial".

## Factual Allegations

12.    Plaintiff, Proven Industries, Inc., is the sole author and copyright owner of a video titled "YOU GUYS KEEP SAYING YOU CAN EASILY BREAK OFF OUR LATCH PIN LOCK" (the "Proven Video").

13.    The Proven Video was completed and first published on March 3, 2025.

14.    The Proven Video was uploaded to Plaintiff's official YouTube Shorts account, its Tik Tok account, its Instagram account, and its Facebook account on March 3, 2025.

15.    The Proven Video consists entirely of original audiovisual content created by Plaintiff as a work made for hire and includes original cinematography, visual effects, product demonstration, branding, scripting, and editing.

16.    The Proven Video is registered with the United States Copyright Office under Registration No. PA 2-524-347. A true and correct copy of the Certificate of Registration is attached hereto as **Exhibit A**.

17.    The effective date of registration is April 7, 2025.

### *Part 1 Video*

18.    Defendant extracted, reproduced, and republished a portion of the Proven Video without authorization.

19.    McNally published the Part 1 Video on April 3, 2025.

20.    The Part 1 Video was published to McNally's YouTube Shorts, TikTok, Instagram, and Facebook accounts.

21.    The Part 1 Video is accessible from devices located within the Middle District of Florida at the following URLs:

    a. YouTube Shorts: https://www.youtube.com/shorts/YjzlmKz_MM8

    b. Instagram: https://www.instagram.com/p/DIAH9vps19y/?hl=en

    c. TikTok: https://www.tiktok.com/@mcnallyofficial/video/7489223700735118622

    d. Facebook: https://www.facebook.com/share/r/1ZicXjkyNb/

22.    As of April 17, 2025:

    a. The Part 1 Video received over 9.6 million views, 435,000 likes, and 6,262 comments on YouTube Shorts;

    b. on Instagram, it received over 514,000 likes, 3,190 comments, and 20,000 shares;

    c. on TikTok, it received over 3.2 million views, 314,900 likes, 1,981 comments, and 17,100 saves; and

    d. on Facebook, it was posted to McNally's account, which has over 267,000 followers.

23.    The Part 1 Video incorporates an EXACT copy of excerpts of the Proven Video at its outset and uses it without transformation or commentary, except to frame it for ridicule.

24.    Attached in **Exhibit B** is a composite of still images of the Part 1 Video showing that McNally copied EXACT portions of the Proven Video.

Signature ref: 4ba22b3a-3e3f-4492-a7ed-d34d1b6ef9e5

25.    Shown directly below is a first representative still image of the Part 1
Video showing that McNally made an EXACT copy of excerpts of the Proven
Video.



26.    As shown directly above, the Part 1 Video published by McNally begins
with the audio and visual work of the Proven Video, namely, the purported
continuous opening audio consisting of the script "*Today, I'm going to prove a
lot of you haters wrong. We've been getting a lot of comments saying that you
can easily break off one of our latch pin locks, and today we're going to debunk
that. We're going to put it through the wringer and show you how much it can
handle.*" and visual excerpts of the Proven Video.

27.   Shown directly below is a side-by-side comparison that serves as a representative example of how the Part 1 Video includes an exact reproduction of the Proven Video.

 

**Proven Video (*left*)**                    **Part 1 Video (*right*)**

28.   As shown directly above, the image on the left is a frame from the original Proven Video published by Plaintiff, and the image on the right is a corresponding frame from the Part 1 Video published by Defendant. The closed captioning of the audio is the same on both still images – reciting, "today I'm going to prove…". The images are nearly identical in content, showing the same background, subject, gesture, lighting, and attire. The Part 1 Video replicates the frames from the Proven Video, including the same individual,

Signature ref: 4ba22b3a-3e3f-4492-a7ed-d34d1b6ef9e5

motion, and visual sequence. The side-by-side comparison of the frames depicted on the prior page shows that Defendant copied and republished a portion of Plaintiff's original copyrighted video verbatim and without transformation, modification, or commentary.

29.    Approximately two seconds into the Part 1 Video, the footage shifts to a point-of-view perspective in which Defendant is shown watching the Proven Video on a mobile device. The Proven Video is visibly displayed on the screen, and its original audio is clearly audible within the Part 1 Video. Shown directly below is a second representative still image of the Part 1 Video.



30.    The portion of the Proven Video that Defendant copied, as shown on the mobile device in the still image of the Proven Video shown directly above, is used by McNally as a visual and thematic springboard for Defendant's lock

Signature ref: 4ba22b3a-3e3f-4492-a7ed-d34d1b6ef9e5

shimming demonstration.

31.    McNally neither used the Proven Video as part of social media platforms native features, nor shared via embed, remix, or other platform-native features. Instead, McNally intentionally copied the Proven Video into the Part 1 Video.

32.    The portion of the Proven Video copied by Defendant was not used for commentary, criticism, education, or news reporting, but rather for mere illustration and commercial entertainment.

33.    Defendant's use of the Proven Video was not transformative because the visual excerpts and audio was copied verbatim. Defendant did not provide any comments or analysis about the Proven Video.

34.    The reproduction of the Proven Video in the Part 1 Video was not necessary to convey any legitimate message, and was instead included to improperly attract viewers, and use Proven's own statements about the durability and ruggedness of Proven's lock to ridicule Plaintiff through juxtaposition with McNally's lock-shimming demonstration, and frame the lock product as insecure.

35.    McNally did not use any portion of the Proven Video or other Proven videos in his additional videos (Parts 2-6 Videos) because the Proven Video was only used as an illustrative aid in the Part 1 Video.

36.    Defendant's use of the Proven Video competed with Plaintiff's original publication on the same social media platforms, diverted traffic and engagement, and impaired the market value and licensing potential of the original work and advertised product.

Signature ref: 4ba22b3a-3e3f-4492-a7ed-d34d1b6ef9e5

37.    On YouTube, Defendant's use of the Proven Video exceeded the limited license available to users, which permits only playback or embedding of videos published on its platform. McNally, instead created a separate, monetized derivative work from Plaintiff's copyrighted content.

38.    On Facebook and Instagram, McNally's reuse of the Proven Video in the Part 1 Video violated Meta's Terms of Use and Community Standards, which prohibit users from uploading copyrighted content without permission. Meta does not grant content licenses between users.

39.    On TikTok, although users may remix content within the platform, McNally did not use TikTok's built-in tools to remix or stitch the Proven Video. Instead, McNally uploaded the Part 1 Video as a pre-produced video incorporating Plaintiff's copyrighted content without permission.

40.    McNally falsely warranted to TikTok that McNally owned or had rights to all content in the Part 1 Video, as required by TikTok's Terms of Service.

41.    The first approximately sixteen seconds of the Part 1 Video consist of spliced excerpts taken directly from the Proven Video. These excerpts include both visual and audio elements and were arranged by Defendant without transformation, commentary, or attribution.

42.    In the Part 1 Video, McNally appears swinging his legs and sipping from an apple juice box. By juxtaposing this sequence with the copied portions of the Proven Video, including the language *"Today, I'm going to prove a lot of you haters wrong. We've been getting a lot of comments saying that you can easily break off one of our latch pin locks, and today we're going to debunk that"*, McNally intentionally conveys to the purchasing public that the subsequent

Signature ref: 4ba22b3a-3e3f-4492-a7ed-d34d1b6ef9e5

demonstration is going to be mere 'child's play'.

43.    Shown directly below is a third representative still image of the Part 1 Video, showing McNally drinking from, and shaking, a juice box, all while swinging his legs, and displaying the Proven Video on a mobile device. During this sequence, the audible sound consisted of audio directly copied from the Proven Video. This audio was not playing out of the mobile device, rather, it was extracted from the Proven Video, and played over the Part 1 Video so that it could be clearly heard by viewers.



44.    The tone, posture, and use of the juice box prop and childish leg swinging that McNally orchestrated in the Part 1 Video was intentional juxtaposed with the copied portion of the Proven Video to diminish the perceived seriousness of Proven Industries as a professional manufacturer and falsely imply that the

Signature ref: 4ba22b3a-3e3f-4492-a7ed-d34d1b6ef9e5

company markets products that are unserious, insecure, or not worthy of consumer trust.

45.    At approximately the 15 second mark in the Part 1 Video, McNally allegedly shims Proven's latch pin lock in an approximately 12 second continuous sequence using a custom shim fabricated from an aluminum can.

46.    The Part 1 Video opens with a direct, unaltered excerpts from Proven Video, which depicts the lock as a durable product that is not easily broken off by brute force. Immediately following the copied portions of the Proven Video, McNally cuts to footage of himself bypassing the latch pin lock with a homemade shim, without verbal explanation or contextual disclosure. This sequence of the content in the Proven Video and the Part 1 Video creates a false and defamatory implication that Proven's marketing claims are deceptive and that its products are ineffective.

47.    McNally juxtaposes the Proven Video's core message, that the lock is durable, with his own footage showing the lock being bypassed quickly and casually, creating the false implication that Plaintiff's representations are deceptive.

48.    The Part 1 Video omits critical facts necessary to fairly present and understand the context of the demonstration.

49.    McNally failed to disclose that he had previously inspected the internal components of the latch pin lock, namely, the location of the plunger when in a lock position and the type of locking mechanism.

50.    McNally failed to disclose that the latch pin lock featured in the demonstration was intentionally locked using a lock core with a spring latch

mechanism.

51.    McNally failed to disclose that the lock core with the spring latch mechanism was only one of the lock cores that Proven offers, and which differs from Proven's other lock core products that include different mechanisms less susceptible to this type of shimming bypass.

52.    McNally failed to disclose that but for using the lock core with the spring latch mechanism, it would be extremely difficult, if not impossible, to bypass the Proven latch pin lock in the manner shown by McNally without prior knowledge of the inner working mechanism of the lock.

53.    McNally failed to disclose how many prior attempts were required before he was able to bypass the Proven lock in the ten-second demonstration.

54.    McNally failed to disclose that the Proven latch pin lock's tight internal clearances required the use of an extremely thin bypass tool, specifically a shim cut from an aluminum can rather than professional lock picking tools.

55.    While the shim is briefly visible in the Part 1 Video, McNally failed to disclose the steps, trial attempts, or prior knowledge required to fabricate the custom shim used in the video.

56.    McNally failed to disclose the risks associated with using aluminum as a bypass material, including the likelihood of shearing, bending, or jamming the tool inside the lock.

57.    In the Part 1 Video, McNally also failed to disclose the physical risks of attempting such a bypass, including potential cuts or injuries from the use of makeshift tools and force.

58.    The Part 1 Video contains no disclaimers, limitations, or clarifications

Signature ref: 4ba22b3a-3e3f-4492-a7ed-d34d1b6ef9e5

about the Part 1 Video's context, setup, or repeatability under normal locking conditions.

59.    These omissions, when paired with the selective demonstration, falsely imply that Proven's lock will not secure your valuable because it is easily bypassed by anyone without tools, preparation, prior inspection, or risk.

60.    The lock-picking sequence shown in the Part 1 Video appears to be edited to appear as a single, continuous 12-second event.

61.    In the Part 1 Video there are visual inconsistencies, including changes in the shim's shape, hand positioning, and lighting, which indicate that the footage was edited or re-shot and spliced to present as a continuous sequence.

62.    Shown directly below is a fourth representative still image taken from the Proven Video at approximately the 19–20 second mark, which depicts a first appearance of the shim used by McNally in his lock-shimming demonstration.



Signature ref: 4ba22b3a-3e3f-4492-a7ed-d34d1b6ef9e5

63.    Shown directly below is a fifth representative still image taken from the Proven Video at approximately the 30 second mark, which depicts a second appearance of the shim used by McNally in his lock-shimming demonstration.



64.    A comparison between the first appearance of the shim and the second appearance of the shim in the Part 1 Video shows that the cutout or notch in the shim differs in size between the two shots.

Signature ref: 4ba22b3a-3e3f-4492-a7ed-d34d1b6ef9e5

65.     This visual inconsistency supports the inference that the Part 1 Video was likely not filmed in the single, continuous take that it purports to be, Instead, the Part 1 Video was instead edited to omit failed or repeated attempts at bypassing the lock.

66.     Besides the visual inconsistencies of the appearance of the shim, based on information and belief, there are additional discrepancies in the Part 1 Video that suggest the Part 1 Video was intentionally edited to imply that Proven's locks are ineffective.

67.     Although Defendant makes no verbal statements in the Part 1 Video, the video communicates materially false and misleading messages through its juxtaposition of visual narrative, editing choices, tone, omissions, and Proven's Part 1 Video's verbal statements.

68.     Specifically, the Part 1 Video falsely implies that Plaintiff's lock product will not protect a consumer's valuables because it can be easily and trivially bypassed by an unskilled person in a matter of seconds using basic tools, without any prior disassembly or technical preparation.

69.     McNally's use of juvenile imagery, such as sipping from a juice box while casually applying the shim, juxtaposed with the copied visual and verbal portions of the Proven Video, reinforces the misleading impression that the lock is inherently insecure and marketed deceptively — all of which is implied without any express claim being made.

70.     The Part 1 Video omits any reference to preparation, tooling, disassembly or inspection, and presents the lock bypass as effortless and trivial. The overall presentation implies to the average viewer that Plaintiff's

product lacks meaningful security and that Plaintiff misrepresents its functionality to the public.

71.   Defendant's use of the Proven Video was without the consent of the Plaintiff.

### *Part 2 Video*

72.   On 23 May 2025, McNally posted the Part 2 Video to his social media channels, accumulating millions of views and thousands of comments collectively across all platforms. For example, the Part 2 video is accessible at https://youtube.com/shorts/MbQp5JcQwLA?si=WWgJ6_hInMD72I5w.

73.   In the Part 2 Video, Defendant retrieves Plaintiff's latch pin lock product directly from its Amazon packaging and begins a demonstration purporting to show how easily the lock can be bypassed.

74.   Defendant then consumes a can of Liquid Death® on camera and uses the can to fabricate a shim, which he then uses to bypass the lock.

75.   The lock is not attached to a trailer, hitch, or any fixed object during the demonstration. Instead, Defendant manipulates the loose lock by hand, outside of any real-world use conditions.

76.   By isolating the lock and removing it from its intended mounted application, Defendant artificially creates a scenario in which the bypass is easier and unrepresentative of actual use.

77.   McNally does not disclose that shimming an unattached lock significantly reduces the resistance, leverage, and spatial limitations that would normally exist during use.

78.   McNally uses a casual, dismissive tone throughout the video, minimizing

Signature ref: 4ba22b3a-3e3f-4492-a7ed-d34d1b6ef9e5

the preparation, technique, and safety concerns associated with the bypass method. Unlike the Part 1 Video, in the Part 2 Video, McNally now acknowledges the risks of using the aluminum shim the demonstrated manner by saying "*You don't have to [round out the edges of the shim], I'm just doing it so I don't lacerate myself on an aluminum shim.*" Unlike in the Part 1 Video where McNally was seen wearing gloves, McNally is not wearing gloves in the Part 2 Video because he has substantial practice, preparation, knowledge, and experience with the Proven lock that an ordinary viewer would not otherwise have.

79.    McNally states, "No science, no math needed," implying that the method is accessible and reproducible by any viewer, regardless of skill or experience.

80.    By doing so, Defendant juxtaposes the consumer's expectation of a secure, purpose-built lock, reinforced by the product's branding and packaging, with an informal, uncontrolled demonstration, misleadingly implying that the product is ineffective or inherently flawed.

81.    This juxtaposition creates a false implication that the lock, even when used as intended, offers little to no protection and can be easily defeated by any user, without disclosing the specialized knowledge, positioning, or context required to achieve the bypass.

82.    McNally again fails to disclose the specific type of lock core used and its locking mechanism in the demonstration, or that it was selected from among Plaintiff's various product lines. This omission creates the misleading impression that all of Plaintiff's lock products can be bypassed with equal ease.

83.    Defendant presents the entire sequence, including the drinking, cutting,

and bypass, as casual, low-effort, and repeatable by anyone, reinforcing the false implication that Plaintiff's locks offer little to no practical security.

84.     The Part 2 Video falsely suggests that the bypass of Plaintiff's lock was spontaneous and effortless. In reality, McNally had prior experience with the same lock model, had previously practiced the bypass technique, and already knew the exact fabrication method for the shim. The Part 2 Video omits this critical context, creating the false implication that any viewer, without preparation or knowledge, could trivially defeat the lock, thereby misleading consumers and disparaging the product's actual effectiveness.

85.     The Part 2 Video constitutes commercial speech. It is designed to attract viewership, and generate revenue through social media engagement. By falsely implying that Plaintiff's lock is trivial to defeat, Defendant misrepresents the nature, characteristics, and qualities of Plaintiff's goods in commerce.

### *Part 3 Video*

86.     On 25 May 2025, McNally posted the Part 3 Video to his social media channels, accumulating millions of views and thousands of comments collectively across all platforms. For example, the Part 3 video is accessible at https://youtube.com/shorts/LvRrtk6miUk?si=2V31k7xSFpAFnx2k.

87.     In the Part 3 Video, Defendant reuses substantially the same footage from the Part 2 Video demonstrating a shim bypass of Plaintiff's latch pin lock, again outside of real-world conditions. This footage is juxtaposed with a series of text messages allegedly sent by Ronald Lee, a representative of Plaintiff, to Defendant's wife.

88.     One such message reads, "Hey Trevor, it's Ron from Proven Industries,

I wanted to run some ideas past you. When is a good time to talk?" Defendant blacks out the name "Trevor" in the message to falsely imply that the message was sent to someone other than himself, namely his wife. McNally then characterizes this communication, which is civil in tone and clearly intended for Defendant, as a threat.

89.    This deliberate juxtaposition of a neutral business inquiry with an accusatory narrative, paired with the visual redaction of his own name, creates a false implication of harassment or misconduct by Plaintiff, when in fact the message was directed appropriately to Defendant and not to his spouse.

90.    McNally then falsely implies that Plaintiff's product is defective, and that Plaintiff attempted to mislead the public in its response to the Part 1 Video. McNally states that Plaintiff "shimmed the wrong part of their own lock," despite the response video being a good-faith demonstration by Proven to dispel the false implications created by McNally. This framing implies incompetence or deception on behalf of Proven, when in fact the lock was being used in a manner consistent with ordinary consumer expectations and experiences.

91.    In referencing the response video by Proven, Defendant fails to disclose that Plaintiff specifically pointed out the availability of alternative lock cores with different mechanisms, some of which are not susceptible to the bypass technique demonstrated and exploited by McNally.

92.    The Part 3 Video then continues with a cutaway lock in isolation, allowing Defendant to freely manipulate the mechanism outside of any real-world mounting conditions. Defendant demonstrates the bypass using a

Signature ref: 4ba22b3a-3e3f-4492-a7ed-d34d1b6ef9e5

custom shim, without disclosing that this technique may not succeed when the lock is properly installed. The lock is shown out of context, reinforcing the misleading implication that all Proven locks can be trivially bypassed, regardless of configuration or application.

93.     While McNally briefly acknowledges that "difficulty will depend on what [the lock] is attached to," the Part 3 Video nonetheless juxtaposes an isolated cutaway demonstration with a disparaging narrative that implies the lock is universally and trivially bypassed providing consumers with no protection. The presentation omits critical facts about the mounting requirements, the custom setup used, and the atypical conditions enabling the bypass, thereby reinforcing the false implication that the product provides no meaningful security in real-world use.

94.     The Part 3 Video constitutes commercial speech. It is designed to attract viewership, and generate revenue through social media engagement. By falsely implying that Plaintiff's lock is trivial to defeat, Defendant misrepresents the nature, characteristics, and qualities of Plaintiff's goods in commerce.

### *Part 4 Video*

95.     On 28 May 2025, McNally posted the Part 4 Video to his social media channels, accumulating hundreds of thousands of views and hundreds of comments collectively across all platforms. For example, the Part 4 video is accessible at https://youtube.com/shorts/TG90ugXgtrc?si=8hQJmIRMzUliIPP O.

96.      In the Part 4 Video, McNally installs a Proven cargo door lock on a shipping container and refers dismissively to its components as a "little

Signature ref: 4ba22b3a-3e3f-4492-a7ed-d34d1b6ef9e5

doohickey" and "nubbin."

97.   After assembling the lock, McNally demonstrates its operation and asserts that, because it uses a spring latch mechanism, it can be bypassed by accessing or manipulating that latch "directly or indirectly."

98.   McNally reuses the same spring-latch core, this time installed in a different Proven product. By doing so, McNally deliberately advances the false implication from Parts 1-3 Videos that all of Plaintiff's lock products share the same alleged vulnerability and provide little or no security, regardless of model or application.

99.   McNally fails to disclose that this lock core with the spring lock mechanism is one of multiple models offered by Plaintiff, including those with alternative lock cores designed to prevent this type of bypass. He also omits any discussion of the conditions required to carry out such a bypass in the field.

100.   The Part 4 Video constitutes commercial speech. It is designed to attract viewership, and generate revenue through social media engagement. By falsely implying that Plaintiff's lock is trivial to defeat, Defendant misrepresents the nature, characteristics, and qualities of Plaintiff's goods in commerce.

### *Part 5 Video*

101.   On 31 May 2025, McNally posted the Part 5 Video to his social media channels, accumulating hundreds of thousands of views and hundreds of comments collectively across all platforms. For example, the Part 5 video is accessible at https://youtube.com/shorts/TUIxIFkeiIE?si=9jZjOx5uw_MLi1w K.

102.   In the Part 5 Video, McNally purports to bypass Proven's padlock

Signature ref: 4ba22b3a-3e3f-4492-a7ed-d34d1b6ef9e5

product using a hook-shaped shim fabricated from an aluminum can.

103.  McNally performs the bypass on a disassembled padlock that is not
attached to any object, allowing full control and manipulation of the lock
outside of realistic operating conditions.

104.  At the beginning of the demonstration, McNally removes the grub screw
retaining the core, weakening the structural integrity of the padlock and
creating conditions not representative of actual product use. This critical
disassembly is not disclosed as material to the ease of the bypass shown.

105.  McNally falsely implies that the bypass method shown can be easily
replicated by the average person using minimal tools and effort, stating: "We're
going to go in from the side, kind of wrap around, and just give it some pumps.
There we go."

106.  McNally further implies that the lock's internal mechanism is
fundamentally flawed by stating: "This is a fixed actuator, which I have never
seen a padlock that has ball bearings and a fixed actuator, which normally you
can't bypass, that you can bypass."

107.  By highlighting this combination as anomalous and subject to bypass,
McNally falsely implies that the product is poorly designed and insecure,
further extending his misleading narrative to yet another Proven lock product.

108.  The Part 5 Video constitutes commercial speech. It is designed to attract
viewership, and generate revenue through social media engagement. By falsely
implying that Plaintiff's lock is trivial to defeat, Defendant misrepresents the
nature, characteristics, and qualities of Plaintiff's goods in commerce.

### Part 6 Video

109.    On 2 June 2025, McNally posted the Part 6 Video to his social media
channels, accumulating hundreds of thousands of views and hundreds of
comments collectively across all platforms. For example, the Part 6 video is
accessible at https://youtube.com/shorts/_goIYP3FfO8?si=ret256ujBI3hiHVn.

110.    In the Part 6 Video, McNally shims a plurality of puck locks in rapid
succession, each using another spring-latch core.

111.    McNally intentionally demonstrates the bypass while the puck locks are
unmounted and freely movable, allowing him to manipulate angles, tension,
and positioning not possible under normal conditions. This controlled
presentation furthers the false implication that the lock can be bypassed
regardless of how it is installed. In reality, Proven's lock bodies are specifically
designed to house the puck lock in fixed positions that deter or prevent this
type of shim-based bypass.

112.    McNally offers no disclosure that the locks share the same internal
mechanism or that he has developed, practiced, and refined the bypass method
for over time. This omission creates the false implication that all of Plaintiff's
puck locks, regardless of model or core type, are inherently vulnerable and can
be universally bypassed by any consumer in seconds.

113.    McNally omits that Plaintiff offers puck locks with alternative locking
mechanisms and upgraded cores that cannot be bypassed using the same
technique. By failing to acknowledge this fact, McNally furthers the false
implication that Plaintiff's entire product line is insecure by design.

114.    McNally trivializes the bypass demonstration by interjecting an
unrelated and comedic story about guacamole preparation mid-demonstration.

As he says, "Sometimes when I make guacamole, I just buy the store-bought stuff, and then I'll, like, add my own cilantro and lime, some fresh jalapeño… Tastes like I did it all myself, but it's a lot easier," McNally simultaneously manipulates the shim to open the lock. This casual and mocking tone, coupled with repeated phrases like "stick it in, wrap it around, give it a few pumps," furthers the false implication that defeating Plaintiff's lock is effortless, requires no skill or understanding, and is insecure. The juxtaposition diminishes the complexity of the task and misleadingly suggests that the lock is inherently flawed or insecure.

115. The Part 6 Video constitutes commercial speech. It is designed to attract viewership and generate revenue through social media engagement. By falsely implying that Plaintiff's lock is trivial to defeat, Defendant misrepresents the nature, characteristics, and qualities of Plaintiff's goods in commerce.

* * *

116. On information and belief, McNally receives compensation or other commercial benefits from his publication of the McNally Videos that were each published at least four times to at least YouTube, TikTok, Instagram, and Facebook.

117. On information and belief, McNally receives compensation or other commercial benefits from his affiliation with Covert Instruments through the publication of videos, such as the McNally Videos, to his social media channels.

118. On information and belief, McNally coordinated with individuals at or affiliated with Covert Instruments to produce and publish the McNally Video.

119. Following publication of the Part 1 McNally Video, McNally's viewers

Signature ref: 4ba22b3a-3e3f-4492-a7ed-d34d1b6ef9e5

began engaging in a coordinated pattern of online harassment targeting Plaintiff, including posting disparaging comments, submitting negative reviews, and circulating false claims about the effectiveness of Proven's products.

120.   Numerous of McNally's followers have commented on Plaintiff's social media posts with disparaging, threatening, or mocking language, often echoing the themes, imagery, and misleading implications conveyed by the McNally Video.

121.   At least one customer returned the latch pin lock product after watching the Part 1 Video.

122.   Plaintiff has lost business opportunities with commercial customers who viewed the McNally Video and opted not to purchase or proceed with intended transactions.

123.   McNally actively monitors and interacts with the comment sections of his videos on his social media channels.

124.   McNally was aware of this growing pattern of hostility against Proven.

125.   Rather than discouraging such conduct, McNally amplified it by continuing to publish additional videos, Parts 2 through 6, each reinforcing the same false implication of the Part 1 Video that Plaintiff's locks are defective, insecure, or trivial to bypass.

126.   These subsequent videos were not posted in isolation but in direct response to the public reaction, further fueling the defamatory narrative and inciting further reputational and commercial harm to Plaintiff.

127.   McNally's continued postings served to validate and encourage the

conduct of his audience, including individuals who targeted Plaintiff's online platforms, sales channels, and customer reviews.

128.   The subsequent videos Parts 2 through 6 Videos caused a surge in disruptive, disturbing, and illegitimate customer service complaints.

129.   Since McNally published the Part 2 and Part 3 Videos, one of Proven's customers has said that they would not buy from Proven because Proven "harass[ed] someone's wife".

130.   After McNally posted the Part 2 and Part 3 Videos, viewers began texting and direct messaging Ron Lee, President of Proven, his loved ones, and his family members personal phone numbers. These communications include profanity, threats, and racially charged language.

131.   McNally was made aware of the disturbing communications.

132.   Instead of diffusing the situation, McNally published additional subsequent videos Parts 4, 5, and 6.

133.   McNally knew or should have known that publishing the McNally Videos to his audience of millions would incite a wave of targeted hostility toward Plaintiff located in the Middle District of Florida.

134.   Plaintiff's customer service channels received abusive or misleading messages from individuals who identified themselves as viewers of the McNally Videos.

135.   Numerous false or negative online reviews and comments referencing the McNally Videos appeared across platforms shortly after its publication, suggesting a coordinated response from McNally's audience. Exhibit D.

136.   Several Proven employees have expressed concern for their own safety

Signature ref: 4ba22b3a-3e3f-4492-a7ed-d34d1b6ef9e5

and well-being as a result of these comments and the surrounding harassment.

137. As a result of the fraudulent negative comments Proven's products, particularly on Amazon, Proven has a measurable decrease in revenue, has a measurable decrease in sales on Amazon, and has experienced permeant damages to its ability to sell its product, specifically Proven's product is not indexing on Amazon as normal and Proven cannot have "featured offers" on its product.

138. Plaintiff has incurred reputational damage, customer confusion, and the need for emergency marketing and advertising techniques and procedures to mitigate the harm caused by the McNally Videos.

139. The conduct of McNally's followers, acting in concert and with knowledge of the McNally Videos, further McNally's intended false implications by causing further harm to Plaintiff. This harm was foreseeable, encouraged, and ratified by McNally's publication of multiple videos to escalate the matter and McNally's failure to diffuse his audience.

140. McNally's conduct was part of a broader scheme to harm Plaintiff's business reputation by influencing his audience to avoid Proven's products and harm its business, customers, and operations.

141. The timing, content, and branding of the McNally Videos reflect a common plan to disparage Plaintiff and promote Covert Instruments' affiliated products and services.

142. McNally acted with actual malice or with reckless disregard for the truth by knowingly presenting a misleading demonstration and suppressing key context.

143.   Defendant published the McNally Videos with actual knowledge that its visual editing, omissions, and mock tone would lead viewers to believe that Plaintiff's lock product was insecure and deceptively marketed, despite Defendant knowing that bypassing the lock required specialized preparation and manipulation not disclosed to the viewer.

144.   Defendant acted with deliberate indifference to the truth, including by failing to disclose that the locks were at least studied in advance, that a custom shim was designed to defeat it, and that the lock's bypass was staged and edited for effect.

145.   McNally failed to exercise reasonable care or competence in assessing and representing Plaintiff's products, despite presenting himself as an expert.

146.   Defendant's conduct was not a one-time error in judgment, but rather a calculated effort to ridicule Plaintiff's products and brand before a massive online audience, knowing that doing so would spark reputational harm and commercial loss.

### Count I
### Copyright Infringement
### 17 U.S.C. §501 et seq.

147.   Plaintiff repeats and realleges paragraphs 1 through 146 as if fully set forth herein.

148.   This count arises from Defendant's unauthorized reproduction and public display of protected audiovisual content owned by Plaintiff in the Part 1 Video, and seeks statutory or actual damages, along with injunctive relief under the Copyright Act

149.   Plaintiff owns a valid and registered copyright in the Proven Video.

Signature ref: 4ba22b3a-3e3f-4492-a7ed-d34d1b6ef9e5

150. Defendant copied, reproduced, publicly displayed, and distributed substantial portions of the Proven Video without authorization, including on YouTube, TikTok, Instagram, and Facebook.

151. Defendant's conduct was not authorized by license, not excused by fair use, and was done for commercial purposes.

152. Defendant acted willfully and in reckless disregard of Plaintiff's exclusive rights.

153. Defendant's infringement was willful because McNally knowingly uploaded Plaintiff's copyrighted content to social media platforms including but not limited to YouTube, Instagram, and Facebook, under the guise that McNally either owned the content or had permission to distribute it, a prerequisite under each platform's Terms of Service.

154. Defendant's false certifications enabled him to gain preferential algorithmic exposure, monetization, and viral reach using Plaintiff's content, further demonstrating the commercial motive and knowing violation of Plaintiff's rights.

155. As a direct result of the infringement, Plaintiff suffered damages including, but not limited to, loss of control over its intellectual property, lost licensing opportunities, reputational harm, and diminution in the value of the copyrighted work.

## Count II
## Defamation by Implication

156. Plaintiff repeats and realleges paragraphs 1 through 146 as if fully set forth herein.

157. This count arises from Defendant's publication of the series of McNally

Signature ref: 4ba22b3a-3e3f-4492-a7ed-d34d1b6ef9e5

Videos, which, through tone, editing, omission, and visual presentation, falsely implied to viewers that Plaintiff's business was dishonest or incompetent and that Plaintiff's lock product was inherently untrustworthy.

158.  Although the McNally Videos did not explicitly state that Plaintiff committed fraud or sold a defective product, Defendant juxtaposed facts and edited content in a way that conveyed a defamatory implication, namely, that Plaintiff markets a security device that is ineffective, deceptively advertised, and easy to defeat by even an unskilled user.

159.  The Part 1 Video downplays the difficulty of shimming Proven's lock by making it seem as if shimming the lock is mere "child's play" by having the actor sip apple juice from an apple juice box and swing his legs in in a childlike manner, all while the actor watches Proven Video on a mobile device, which was specifically designed to ridicule Plaintiff and to suggest that its product is so flawed that it poses no real security barrier.

160.  These implications were materially misleading and false, and they were conveyed to millions of viewers across multiple platforms including YouTube, TikTok, Instagram, and Facebook.

161.  Defendant acted with actual malice or reckless disregard for the truth by presenting the product demonstration out of context, omitting necessary disclosures (such as the use of a custom shim, prior inspection, manipulation time, or setup), and selectively editing the footage to mislead viewers about the real-world difficulty of compromising the product.

162.  Viewers understood the Part 1 Video to imply that Plaintiff's product, and by extension, Plaintiff's company, was disreputable or fraudulent. The

Signature ref: 4ba22b3a-3e3f-4492-a7ed-d34d1b6ef9e5

implications extended beyond the product itself to cast doubt on Plaintiff's honesty, competence, and value as a manufacturer.

163.  Defendant furthered the false implication by continuing to publish additional videos after the commencement of this action.

164.  Defendant's additional videos Parts 2 through 6 include juxtaposition of tone and miscellaneous storytelling that seek to downplay the effort required to bypass the Proven lock.

165.  Additionally, some of the additional videos depict the Defendant bypassing a Proven lock under non-operational conditions where the lock is not attached to a coupling, such as a trailer. This makes the Defendant's lock shimming demonstrations easier because Defendant can manipulate the lock at will to be bypassed. This intentional omission makes the false implication that the Proven lock product is insecure.

166.  Moreover, the Defendant fails to reveal his prior inspection, knowledge, and attempts at shimming the lock products and that Defendant is intentionally using a particular spring-lock mechanism offered by Proven to aid his demonstrations. Defendant fails to disclose the additional security options Proven offers that are less susceptible to the bypass technique shown by Defendant. As a result of this omission, Defendant implies that all of Proven's lock products are insecure. This implication is furthered by the Defendant using the same or similar lock core mechanism in each additional video with different lock products.

167.  As a direct and proximate result of these defamatory implications, Plaintiff and Plaintiff's product's reputation suffered reputational injury,

public ridicule, diminished trust within the customer base, and measurable economic harm in the form of lost goodwill, canceled transactions, and the need for emergency marketing expenditures.

**Count III**
**False Advertising**
**15 U.S.C. §1125(a)**

168.   Plaintiff repeats and realleges paragraphs 1 through 146 as if fully set forth herein.

169.   This count arises from the Defendant's materially false or misleading statements made in commercial promotion that misled consumers and diverted business from Plaintiff.

170.   These misrepresentations were made in commercial promotion and are likely to influence consumer purchasing decisions.

171.   Defendant's false claims about the ease of bypassing the lock were material and deceptive.

172.   Defendant's false representations were made in connection with the commercial promotion of alternative products or services affiliated with Defendant and/or Covert Instruments, and therefore directly harmed Plaintiff's commercial interests and consumer perception in the marketplace.

173.   Plaintiff suffered actual harm to its business, reputation, and goodwill.

174.   As a result, Plaintiff suffered actual harm including lost sales, reduced consumer confidence, market confusion, and increased costs to counteract false perceptions of its product.

**Count IV**
**Violation of FDUTPA**
**Fla. Stat. §501.201 et seq.**

175.   Plaintiff repeats and realleges paragraphs 1 through 146 as if fully set forth herein.

176.   This count arises because the Defendant engaged in deceptive and unfair practices in the course of trade and commerce by publishing misleading and materially false representations that affected Plaintiff's business operations and Florida consumers.

177.   Such deceptive acts included: (a) using Plaintiff's copyrighted content without authorization, (b) editing or presenting the content to imply product failure, and (c) omitting context regarding custom tools and manipulation time necessary to perform the bypass shown.

178.   Defendant's conduct was likely to mislead reasonable consumers and had the capacity to deceive the public into believing that Plaintiff's products were defective, insecure or easily shimmed, when in fact it was not.

179.   Defendant's actions were not merely opinion or puffery but constituted factual misrepresentations relating to the quality, functionality, and performance of a consumer product.

180.   As a direct and proximate result of Defendant's deceptive and unfair practices, Plaintiff suffered actual damages, including lost customer relationships, diminished consumer trust, and the need for corrective advertising and public relations expenditures.

**Count V**
**Tortious Interference with**
**Prospective Business Relationships**

181.   Plaintiff repeats and realleges paragraphs 1 through 146 as if fully set forth herein.

182. This count arises from Defendant's intentional disruption of Plaintiff's business relationships and prospective contracts.

183. Plaintiff maintains established and prospective business relationships with retail customers, commercial distributors, e-commerce partners, and online vendors, including but not limited to, Amazon.com.

184. McNally was aware, or should have been aware, of these relationships based on his statements in the McNally Videos, his responses to comments referencing where the locks are sold, and his deliberate targeting of Plaintiff's product branding and commercial reputation.

185. McNally intentionally interfered with Plaintiff's prospective business relationships by publishing a series of misleading videos, Parts 1 through 6, that falsely implied Plaintiff's lock products are defective, easily bypassed, and marketed with deceptive intent.

McNally, by continuing to publish the McNally Videos, encouraged and incited viewers to question the integrity of Plaintiff's products and company, contributing to a coordinated pattern of negative reviews, customer complaints, and reputational harm on public forums and retail platforms.

186. In several instances, McNally's videos directly referenced or alluded to directed negative retail and e-commerce purchasing behavior against Proven, such as unboxing new products from Amazon and misleadingly evaluating their performance, knowing such content would deter future customers and interfere with Plaintiff's online sales.

187. Defendant's conduct, including the publication of the McNally Videos and the resulting coordinated activity by his followers, interfered not only with

Signature ref: 4ba22b3a-3e3f-4492-a7ed-d34d1b6ef9e5

Plaintiff's customer relationships but also with Plaintiff's advertising efforts and marketing channels, causing reduced ad engagement, increased negative responses to paid placements, and the need for unplanned emergency media spend.

188.   In several instances, comments on the McNally Videos, of which McNally knew or should have been aware, directly referenced or alluded to interfering with Proven's business, ecommerce platforms, and/or customers.

189.   Plaintiff lost business and revenue as a result of such interference, including canceled commercial transactions, terminated sales leads, and interruption of planned advertising strategy.

190.   As a direct and proximate result of McNally's interference, Plaintiff suffered loss of prospective sales, disrupted vendor relationships, increased refund requests, reputational damage, and additional costs to mitigate the fallout from McNally's videos.

## Count VI
## Unjust Enrichment

191.   Plaintiff repeats and realleges paragraphs 1 through 146 as if fully set forth herein.

192.   This count arises from Defendant's unauthorized use and monetization of Plaintiff's content in the Part 1 Video and seeks equitable relief therefor.

193.   Defendant misappropriated Plaintiff's copyrighted content and used it to generate engagement, revenue, and traffic to his own platforms and affiliate entities.

194.   Defendant's enrichment was not limited to monetization or exposure; it was also derived by falsely warranting to social media platforms that McNally

Signature ref: 4ba22b3a-3e3f-4492-a7ed-d34d1b6ef9e5

had the rights to use Plaintiff's copyrighted content, thereby bypassing platform restrictions and gaining algorithmic distribution and user trust that would otherwise have been denied.

195.   Defendant's conduct violated the spirit and letter of the limited user licenses granted under YouTube, TikTok, and Meta's Terms of Service, resulting in additional inequitable benefit.

196.   Defendant retained a benefit to which McNally was not entitled, and it would be inequitable for Defendant to retain that benefit without compensation to Plaintiff.

197.   As a result, Plaintiff was deprived of control over its copyrighted work, licensing revenue, and competitive market position.

## Count VII
## Civil Conspiracy

198.   Plaintiff repeats and realleges paragraphs 1 through 146 as if fully set forth herein.

199.   This count arises from a coordinated and intentional effort by Defendant, acting in concert with third parties, including Covert Instruments and others, to cause reputational and commercial harm to Plaintiff through the production, distribution, and amplification of the series of McNally Videos and the targeted disparagement of Proven's products and business practices.

200.   Upon information and belief, Defendant entered into an agreement or common plan with one or more individuals affiliated with Covert Instruments to publish the misleading and harmful McNally Videos targeting Plaintiff's lock products, with the shared purpose of damaging Plaintiff's reputation and market share while promoting Covert's lock-picking tools and related products.

Signature ref: 4ba22b3a-3e3f-4492-a7ed-d34d1b6ef9e5

201.   Defendant further acted in concert with members of his online audience, including individuals who posted harassing, defamatory, or false comments and reviews targeting Plaintiff. Defendant knowingly encouraged and ratified their actions by continuing to post additional videos targeting Plaintiff.

202.   Upon information and belief, Defendant anticipated and intended that his videos would incite this coordinated online conduct. His continued publication of follow-up videos, despite being aware of the escalating harm caused by the comments and reposts, supports a reasonable inference of an implied agreement with third parties to participate in a campaign to damage Plaintiff's commercial reputation and goodwill.

203.   Defendant's acts, in furtherance of the conspiracy, included: (i) producing videos that falsely implied product ineffectiveness; (ii) omitting material context to mislead viewers; (iii) refusing to correct false narratives; and (iv) encouraging others to amplify defamatory content through reposts, false reviews, or harassing commentary.

204.   The social media channels to which the McNally Videos were published prominently featured outbound links to Covert's website in the social media bios affiliated with McNally. Covert Instruments' website likewise featured Defendant and benefited from the publication.

205.   Following publication of the McNally Videos, Defendant's large online following engaged in coordinated online conduct that included mass commenting on Plaintiff's social media, spreading mocking and threatening language, posting negative reviews, and submitting disruptive communications to Plaintiff's customer service channels.

Signature ref: 4ba22b3a-3e3f-4492-a7ed-d34d1b6ef9e5

206. Defendant and his co-conspirators engaged in a common plan and scheme to damage Plaintiff's reputation and interfere with its business relationships by spreading misleading and defamatory content about Plaintiff's lock products, using provocative and intentionally manipulative language and demonstrations.

207. This coordinated conduct included public commentary, social media activity, reposting or referencing Defendant's videos, and amplifying false implications that Plaintiff's locks are unsafe, ineffective, or fraudulently marketed, publishing tarnishing and false reviews on Proven's ecommerce platforms and online presence, overloading Proven's customer service with fraudulent and disparaging inquiries, and sending harassing, threatening, and racially motivated messages to Proven's employees and their family members. These actions were all with the shared objective of damaging Plaintiff's brand and disrupting its business operations.

208. This conduct was foreseeable and encouraged by the tone, messaging, and platform reach of Defendant's McNally Videos. Defendant and Covert Instruments ratified and benefited from the campaign without disavowing or attempting to mitigate the resulting harm to Plaintiff.

209. Defendant knowingly benefited from and encouraged these coordinated acts, and continued publishing additional videos in response to the growing backlash against Plaintiff, further fueling the conspiracy.

210. The conspiracy's objective was to inflict reputational injury, interfere with Plaintiff's business relationships, and suppress commercial demand for Plaintiff's products in favor of alternatives promoted by Covert Instruments

Signature ref: 4ba22b3a-3e3f-4492-a7ed-d34d1b6ef9e5

and affiliated with Defendant.

211.    The conspirators acted in concert with knowledge of the unlawful
objective, and each took overt acts in furtherance of the conspiracy, including
Defendant's publication of six defamatory videos, his selective engagement
with viewers' comments to encourage further dissemination, and participation
in follow-up content that falsely portrayed Plaintiff and its employees.

212.    As a direct and proximate result of the conspiracy and resulting acts in
furtherance of it, Plaintiff suffered reputational harm, loss of sales,
cancellation of prospective customer relationships, and increased expenditures
to restore brand integrity and public trust, reputational harm, customer
attrition, legal costs, and damage to its business relationships and goodwill.

**Count VIII**
**Trade Libel**

213.    Plaintiff repeats and realleges paragraphs 1 through 146 as if fully set
forth herein.

214.    This count arises from false and disparaging statements published by
Defendant concerning the quality, functionality, and performance of Plaintiff's
lock products, as opposed to Plaintiff's brand or reputation.

215.    Defendant published and widely disseminated the McNally Videos to
third parties that portrayed Plaintiff's locks as defective and easily bypassed.
The presentation mischaracterized the products' security features and falsely
suggested that they could be compromised in seconds using basic tools.

216.    These statements and implications were made with malice or with
reckless disregard for the truth and without due diligence or technical
accuracy. Defendant omitted critical context, including the use of specialized

Signature ref: 4ba22b3a-3e3f-4492-a7ed-d34d1b6ef9e5

tools, rehearsal time, inspection of the products, or manipulated conditions that would not be present in real-world use.

217.  The statements were materially false and concerned the product's physical attributes, mechanical performance, and suitability for its advertised use,  all of which are provable and verifiable facts.

218.  Defendant made these statements publicly, and they were viewed by millions of consumers, including prospective customers, industry professionals, and product distributors.

219.  As a direct result of these false product-specific claims, Plaintiff suffered special damages, including but not limited to lost sales, disruption of distribution channels, and harm to product marketability.

## Demand for Jury Trial

220.  Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.

## Prayer for Relief

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in it favor and against Defendant, awarding the following relief:

i.   As to Count I – Copyright Infringement (17 U.S.C. § 501 et seq.):

a.  An award of Plaintiff's actual damages and any additional profits of Defendant attributable to the infringement pursuant to 17 U.S.C. § 504(b), or, in the alternative, statutory damages under 17 U.S.C. § 504(c);

b.  An award of enhanced statutory damages of up to $150,000 for willful infringement;

Signature ref: 4ba22b3a-3e3f-4492-a7ed-d34d1b6ef9e5

    c. A permanent injunction prohibiting Defendant from further copying, publishing, or distributing the Proven Video or any derivative thereof;

    d. An award of Plaintiff's full costs and reasonable attorneys' fees under 17 U.S.C. § 505.

ii.    As to Count II – Defamation by Implication:

    a. An award of general and special damages for loss of reputation, goodwill, and standing in the community resulting from the defamatory implications about its business integrity;

    b. An award of punitive damages under Fla. Stat. §768.72 for the Defendant's publication of a video that knowingly or recklessly implied false facts about Plaintiff's business integrity, including through selective editing, calculated omissions, and misleading tone designed to discredit Plaintiff before millions of viewers

    c. A permanent injunction prohibiting Defendant from republishing the defamatory content or further implying that Plaintiff engages in dishonest or deceptive business practices.

iii.    As to Count III – False Advertising (15 U.S.C. § 1125(a)):

    a. An award of Plaintiff's actual damages and corrective advertising costs;

    b. An award of Defendant's profits attributable to the false advertising;

    c. Treble damages under 15 U.S.C. § 1117(a) due to willful and deliberate conduct;

Signature ref: 4ba22b3a-3e3f-4492-a7ed-d34d1b6ef9e5

      d.  A permanent injunction prohibiting Defendant from making false or misleading commercial statements regarding Plaintiff's products;

      e.  An order of specific performance requiring Defendant to publish corrective statements on each platform where the false advertising was distributed — including YouTube, Instagram, TikTok, and Facebook — to clarify that Plaintiff's lock product was not fairly or accurately represented in the McNally Videos and to retract any misleading implications about its quality, performance, or security;

      f.  An award of Plaintiff's attorneys' fees and costs.

iv.  As to Count IV – Violation of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA):

      a.  An award of actual damages under Fla. Stat. § 501.211(2);

      b.  A permanent injunction enjoining further deceptive acts or practices;

      c.  An award of attorneys' fees and costs pursuant to Fla. Stat. § 501.2105.

v.  As to Count V – Tortious Interference with Business Relationships:

      a.  An award of damages for disruption of existing and prospective business relationships;

vi.  As to Count VI – Unjust Enrichment:

      a.  An order requiring Defendant to disgorge all financial benefits, revenues, engagement metrics, affiliate traffic, and other gains

Signature ref: 4ba22b3a-3e3f-4492-a7ed-d34d1b6ef9e5

derived from the unauthorized use and commercial exploitation of Plaintiff's copyrighted content and branding

b. Restitution in the amount of unjust benefits retained by Defendant, including social media monetization, increased promotional exposure, and traffic directed to affiliated entities such as Covert Instruments

vii. As to Count VII – Civil Conspiracy:

a. An award of special damages for commercial harm to Plaintiff's product, including lost sales, disruption of distribution channels, and damage to product marketability;

b. An award of punitive damages under Fla. Stat. §768.72 to address the willful orchestration and ratification of a coordinated scheme intended to damage Plaintiff's brand through widespread public ridicule, false online reviews, and targeted harassment, and to deter similar conspiratorial conduct designed to weaponize social media audiences against commercial competitors.

viii. As to Count VIII – Trade Libel:

a. An award of special damages, including lost sales, loss of product marketability, and the cost of corrective messaging;

b. An award of punitive damages under Fla. Stat. §768.72 based on Defendant's malicious and/or reckless publication of misleading content concerning the physical attributes and security functionality of Plaintiff's lock product, made with the intent to discredit Plaintiff's product and divert consumer trust toward

Signature ref: 4ba22b3a-3e3f-4492-a7ed-d34d1b6ef9e5

competing commercial interests.

ix.   As to All Counts:

    a. Pre- and post-judgment interest as permitted by law;

    b. Such other and further relief as this Court deems just, equitable, and proper under the circumstances.

*[Remainder of Page Intentionally Left Blank]*

Signature ref: 4ba22b3a-3e3f-4492-a7ed-d34d1b6ef9e5

## Verification Statement

I, Ronald J. Lee II, being duly sworn, depose and say:

I am the President of Proven Industries Inc., the Plaintiff in the foregoing Verified Complaint. I have read the foregoing Complaint and, based upon my personal knowledge and/or information provided to me by counsel, believe that the factual allegations contained therein are true and correct to the best of my knowledge, information, and belief.

Executed on this 12th day of June, 2025.

*Ron lee*
_____
*Signature*


President                            Proven Industries Inc.
_____
*Title*                               *Company*

Signature ref: 4ba22b3a-3e3f-4492-a7ed-d34d1b6ef9e5

Dated: June 12, 2025                    Respectfully Submitted,


                              /Derek Fahey/
                              _____
                              Derek R. Fahey, Esq.
                              The Plus IP Firm, PLLC
                              Fla. Bar. No. 88194
                              101 N.E. 3rd Ave., Suite 1500
                              Fort Lauderdale, Florida 33301
                              Telephone: (954) 332-3584
                              Email: Derek@plusfirm.com
                              *Attorney for Plaintiff*
                              ***LEAD ATTORNEY TO BE NOTICED***


                              /Austin Nowacki/
                              _____
                              Austin R. Nowacki, Esq.
                              The Plus IP Firm, PLLC
                              Fla. Bar. No. 1016961
                              101 N.E. 3rd Ave., Suite 1500
                              Fort Lauderdale, Florida 33301
                              Telephone: (954) 332-3584
                              Email: austin@plusfirm.com
                              *Attorney for Plaintiff*

# Audit trail

| | |
|---|---|
| Name of the document | Amnd.Complaint-12June2025.pdf |
| Signature reference ID | 4ba22b3a-3e3f-4492-a7ed-d34d1b6ef9e5 |
| Date format | YYYY-MM-DD HH:MM:SS UTC |
| Status | SIGNED |
| Signing completed | 2025-06-12 16:59:05 UTC |

**Signing initiated**
2025-06-12 16:54:47 UTC

**Patent Specialist** (info@plusfirm.com) sent document for signing.
**Signers:**
   **- Ronald J. Lee II** (rlee@provenlocks.com)
Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/137.0.0.0 Safari/537.36
IP: 2600:8800:4184:2700:3d10:401c:1247:aae6

**Document viewed**
2025-06-12 16:58:11 UTC

**Ronald J. Lee II** (rlee@provenlocks.com)
docbase-public
IP: 2603:900b:4f0:c430:9998:ec6:3785:7adc

**Document signed**
2025-06-12 16:59:04 UTC

**Ronald J. Lee II** (rlee@provenlocks.com)
docbase-public
IP: 2603:900b:4f0:c430:9998:ec6:3785:7adc
Authentication code: Not required

**Signing completed**
2025-06-12 16:59:05 UTC

Document was signed by using Pipedrive signing service.
We store viewing info only for signers that allow it. We show the first view from each signer.
Electronic signatures in this PDF document can be verified with Adobe Acrobat Reader.

pipedrive