```
 1                IN THE UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
 2                        TAMPA DIVISION

 3

 4   PROVEN INDUSTRIES, INC.,        )
                                     )
 5                Plaintiff,         )
                                     )
 6                                   ) Case No.
            vs.                      ) 8:25-CV-01119-MSS-LSG
 7                                   )
                                     )
 8   TREVOR McNALLY,                 )
                                     )
 9                Defendant.         )

10

11

12   _____

                           MOTION HEARING
13          BEFORE THE HONORABLE MARY S. SCRIVEN
               UNITED STATES DISTRICT JUDGE
14
                           JUNE 13, 2025
15                          9:09 A.M.
                          TAMPA, FLORIDA
16   _____

17

18

19

20

21        Proceedings recorded by mechanical stenography,
     transcript produced using computer-aided transcription.
22   _____

23              DAVID J. COLLIER, RMR, CRR
               FEDERAL OFFICIAL COURT REPORTER
24            801 NORTH FLORIDA AVENUE, 7TH FLOOR
                  TAMPA, FLORIDA  33602
25
```

1    **APPEARANCES:**

2

3    **FOR THE PLAINTIFF:**

4           *Chemere Ellis*

5           Chemere Ellis, PLLC

6           400 North Ashley Drive, Suite 1900

7           Tampa, Florida  33602

8           (813) 712-8788

9

10          *Derek Roger Fahey*

11          *Austin Nowacki*

12          The Plus IP Firm and Derek Fahey, P.A.

13          101 NE 3rd Avenue, Suite 1500

14          Fort Lauderdale, Florida  33301

15          (561) 389-5187

16

17

18   **FOR THE DEFENDANT:**

19          *Kenneth George Turkel*

20          *David A. Hayes*

21          Turkel Cuva Barrios

22          100 North Tampa Street, Suite 1900

23          Tampa, Florida  33602

24          (813) 834-9191

25

```
 1
 2                       P R O C E E D I N G S
 3                       - - - o0o - - -
 4               THE COURT:  Call the case, please.
 5               The Court calls Case Number 8:25-CV-1119-MSS-LSG,
 6   Proven Industries, Inc. versus Trevor McNally.
 7               Counsel, please state your name for the record
 8   beginning with counsel for the plaintiff.
 9               MR. FAHEY:  Good morning, Your Honor.  Derrick Fahey
10   for Proven Industries.
11               MS. ELLIS:  Good morning, Your Honor.  Chemere Ellis
12   on behalf of Proven Industries.
13               THE COURT:  Good morning.
14               MR. TURKEL:  Your Honor, Ken Turkel and David Hayes,
15   Turkel Cuva Barrios, on behalf of Trevor McNally, defendant,
16   Mr. McNally is sitting with us.
17               THE COURT:  I can't hear you.
18               MR. TURKEL:  I'm sorry, Judge.  Mr. McNally is with
19   us also, defendant.
20               THE COURT:  Good morning.
21               And was there somebody else on the plaintiff's side
22   that wanted to introduce --
23               MR. NOWACKI:  Yes.  Austin Nowacki on behalf of
24   Proven industries.
25               THE COURT:  I'm sorry.  What is your name?
```

```
 1              MR. NOWACKI:  Austin Nowacki.

 2              THE COURT:  I thought you said Austin No Idea.

 3              MS. ELLIS:  That's Austin Nowacki.

 4              THE COURT:  All right.

 5         Now, we're here on a preliminary injunction motion

 6  filed by the plaintiff to enjoin the defendant from continuing

 7  to run his videos that incorporate the plaintiff's video,

 8  challenging the plaintiff's assertions that its Proven locks

 9  are impenetrable or slash can't be broke.  Is that the essence

10  of the matter?

11         Which one of you is lead counsel?

12              MR. FAHEY:  Your Honor, Derrick Fahey.  I'm lead

13  counsel, but Chemere Ellis will be arguing the motion.

14              THE COURT:  Okay.  Then you have a seat and let her

15  speak.

16         Yes, ma'am.

17              MS. ELLIS:  Yes, Your Honor.  That's the crux of it.

18  I think, to the heart of it though, we can -- the statements

19  that the plaintiff has made -- or the defendant has made are

20  defamatory, and so we want to enjoin further defamatory speech.

21              THE COURT:  And you have identified for the Court in

22  connection with your defamation claim known contractual

23  relationships that the defendant's speech is interfering with?

24              MS. ELLIS:  Yes, Your Honor.  There are customers who

25  have canceled products, and we do have record of that.  We have
```

1    a witness who will testify to that.

2         THE COURT:  Canceled products in the sense that they

3    had outstanding orders either on an ongoing basis or on a

4    one-time basis, and before you could deliver those products,

5    they cancelled their purchase orders?

6         MS. ELLIS:  Correction.  They returned.  So they had

7    purchased products and then instituted a return as a result of

8    some of the defendant's statements.

9         THE COURT:  Are those customers under a warranty that

10   contractually allows them to return their products, or are they

11   just sua sponte returning their products out of warranty?

12        MS. ELLIS:  They are sua sponte returning their

13   products.  There's no contract necessarily between the

14   plaintiff and the customers.

15        THE COURT:  So the plaintiff is under no obligation

16   to refund the money to these customers who watch Mr. McNally's

17   video and say, "We want to put our locks back"?

18        MS. ELLIS:  There is a return policy that would --

19   that would compel the return if the customer wanted it.

20        THE COURT:  Okay.  And the defendant for his part

21   says he can pick a lock without altering the lock system that

22   exists on the plaintiff's locks by cutting a monster beer can

23   into a sheath and sticking it in the lock and turning it and

24   popping the lock off?

25        MR. TURKEL:  Yes, Your Honor.  He doesn't actually

1    say that.  He does it on the video.

2          THE COURT:  Well, he is by implication saying that

3    the plaintiff's assertion that their locks cannot be broken is

4    false and I'm going to show you how it's false.  I'm going to

5    cut open a beer can, cut out a sheath, I'm going to stick it in

6    the lock, I'm going to turn the lock and pop the lock off, and

7    you're going to lose your van or your motorcycle or your

8    fifth wheel.  That's his whole point.

9          MR. TURKEL:  Yes, Judge.  The one video that was

10   framed within the pleadings -- they filed a motion for leave to

11   file an amended pleading yesterday.  The one video that was

12   within the four corners of the pending pleading, I don't

13   believe there's any statements at all, there is just literally

14   the exercise of popping the lock.

15         THE COURT:  Well, he's not doing that for his own

16   edification.  He's doing it to demonstrate the lock is

17   penetrable.

18         MR. TURKEL:  Absolutely, Judge.  I'm just clarifying

19   that --

20         THE COURT:  He doesn't say it out loud.

21         MR. TURKEL:  He's not saying anything out loud.  It's

22   not the standard defamation case where discreet statements are

23   identified in an implication setting that together create an

24   implication.  They're basically saying conduct.

25         THE COURT:  Okay.  Well, isn't the first order of

```
 1   business to determine whether it's true that he can open this
 2   lock?  Don't we need to know that before we know anything else?
 3              MR. TURKEL:  Judge, I heard "it's true" and I didn't
 4   hear after that.
 5              THE COURT:  Isn't it true that the first order of
 6   business is for us to ascertain whether he can open this lock
 7   or not?
 8              MR. TURKEL:  He does it on the video, very clearly.
 9   I --
10              THE COURT:  Has somebody got a beer can and a shim
11   and a lock?
12              MR. TURKEL:  I will tell you this, Judge, if the
13   right controls were in place and we knew we were getting the
14   lock that you get retail, just -- that would be subject -- we
15   could indulge it, but right now, Judge, I think the first order
16   of business -- there's two or three of them.  So housekeeping,
17   for instance --
18              THE COURT:  So the answer is I'm not going to get to
19   see the demonstration today?
20              MR. TURKEL:  Judge, I don't think we could be
21   compelled to do it.  I don't think that anything framed by
22   the --
23              THE COURT:  So the answer is I'm not going to be able
24   to see the demonstration today; is that correct?
25              MR. TURKEL:  I'm not going to say that to you, Judge.
```

1  If we could get the right situation, we know we're getting a

2  lock that we know hasn't been messed with, and we know --

3  there's a chain of custody so we know it hasn't been altered at

4  all -- I mean, I did it yesterday, so, you know, I'm not

5  worried about the ability to do it, but --

6           THE COURT:  The answer is, Judge, we are not today

7  prepared to make a demonstration?

8           MR. TURKEL:  Judge, I'm defending --

9           THE COURT:  Yes or no?

10          MR. TURKEL:  We didn't plan on it.

11          THE COURT:  Okay.

12          MR. TURKEL:  But I don't plan a lot of things when

13 I'm defending --

14          THE COURT:  Did the plaintiff bring a lock and a beer

15 can?

16          MS. ELLIS:  No, Your Honor, we didn't.  And if I

17 could make a note that I think a part of the issue and why we

18 allege -- you know, why we indicate that it's defamatory is

19 because, you know, the locks are being opened and manipulated

20 in non-real-world circumstances.

21          THE COURT:  I understand the argument, but I -- in

22 order to -- the truth is an absolute defense to defamation, and

23 whether or not Mr. McNally can open your lock by creating a

24 shive out of a beer can in real-time would determine whether

25 he's making a false statement, setting aside all the other

1  challenges to the claim, but that first challenge is the

2  ultimate challenge, because if he can do that, then wouldn't

3  you agree that it is not defamation in the sense that it is not

4  a false statement concerning your product?

5          MS. ELLIS:  Yes, Your Honor.  No, I would

6  respectfully disagree with that.  I think that it could still

7  be defamation by implication even if he could open the can --

8  I mean, open the lock with a beer can, for instance.

9          THE COURT:  How?

10         MS. ELLIS:  Because it's not real use or a real-world

11 situation, right?  He is manipulating the locks, he's able to

12 access it, put pressure on it in a way that one would not be

13 able to.  A normal regular customer who does not have the

14 expertise that Mr. McNally has evidently demonstrated that he

15 has and the capability and the experience and the hundreds of

16 hours of having to shim these locks, you know, wouldn't be able

17 to do that.  But more than that, in a real use situation

18 Mr. McNally would not be able to manipulative the lock in the

19 way that he does and to open it, and I think that it creates a

20 false implication that the product is not secure because of the

21 way that he has opened it.

22         THE COURT:  Yes, sir.

23         MR. TURKEL:  Judge, based on the Court's statement,

24 because I think there's a lot of other problems with the motion

25 that we briefed, but we have some locks back at the hotel,

```
1    we're happy to go bring them here and do it, and --
2              THE COURT:  Well, it's your defense, and as you've
3    said, you've done -- you've not done a lot of things you can do
4    in defense of a motion, it is just your prerogative.
5              MR. TURKEL:  It's their burden.
6              THE COURT:  Is the plaintiff abandoning the copyright
7    claim?  I haven't heard much about that this morning yet.
8              MS. ELLIS:  I'm sorry, Your Honor.
9              THE COURT:  Well, let me just explain to you, when
10   you are the lead counsel, your assisting counsel needs to stand
11   down to let you do your job.  He can't be your ventriloquist
12   through this whole hearing.
13             MS. ELLIS:  I understand, Your Honor.
14             THE COURT:  So in the context of this case, the
15   plaintiff is still pursuing the copyright claim as well; is
16   that right?
17             MS. ELLIS:  Yes, Your Honor, we are.
18             THE COURT:  All right.  So, Mr. Turkel, are you
19   standing for a reason?
20             MR. TURKEL:  Well, I didn't know if I was going to
21   get more questions, Judge.  I would just say for the record
22   it's not necessarily our burden to prove something is true,
23   it's their burden to prove it's false, but beyond that,
24   Your Honor, as long as -- as long as I know that to the extent
25   the Court has questions about the numerous layers of other
```

1  legal arguments we raised, Constitutional and otherwise, we'll

2  be prepared to do it.  I mean, it's not --

3        THE COURT:  Well, you agree your client doesn't have

4  a Constitutional right to lie about the functionality of the

5  plaintiff's locks?

6        MR. TURKEL:  Judge --

7        THE COURT:  Yes?

8        MR. TURKEL:  -- I think the issue is his protected

9  speech.  I don't think you can restrain it by an injunction at

10  the temporary level.  I don't think there's a case that stands

11  for the proposition that the Court can enter a temporary

12  injunction that restrains the continued publication of speech.

13  Look to what they've done.  They cite one thing as damage, one

14  returned lock.  Their pleadings -- their papers, Judge,

15  specifically say that their injunction is not predicated on

16  tortious interference.  The cases are legion, there's not a

17  case that stands for the proposition that this is somehow an

18  exception to the well-established rule that you can't enjoin

19  speech at the temporary stage, it's a money damages remedy, so

20  I don't think we even get out of the box.  There's not a case

21  they cite.  We cite the age-old cases that, you know, have --

22  I mean, there's -- all of them going back to -- I don't know of

23  a case in which speech is sought to be restrained on a

24  defamation theory where a Court has said, but, okay, we can

25  restrain speech by injunction.  It becomes a money damages

1    remedy.  That to me is the most fundamental problem with the

2    motion, is that there's no remedy for temporary injunction to

3    enjoin speech.

4              THE COURT:  Thank you.

5              MR. TURKEL:  The remedy is --

6              THE COURT:  Thank you.

7              MR. TURKEL:  And, Judge --

8              THE COURT:  Thank you.

9              MR. TURKEL:  -- I do have to make a statement for the

10   record.  We are reserving -- it's in the footnote of our

11   response, but we are reserving our right to challenge personal

12   jurisdiction.  I have to say it on the record in addition to

13   the papers and I wanted to make sure that I got that out before

14   we got to the merits.

15             THE COURT:  Thank you.

16             MR. TURKEL:  That's it, Judge.

17             THE COURT:  It is true in your moving papers that you

18   do not pursue the notion of an injunction of defamatory speech

19   as alleged on the basis of tortious interference, and in the

20   reply you seem to suggest you're not basing it on tortious

21   interference either, but here are the reasons why this

22   constitutes tortious interference, and then the first argument

23   made this morning is that there are customers whose interests

24   are being interfered with, and that was on the basis of the

25   Court's questions.  So are you or are you not seeking a

```
1   preliminary injunction on the basis of defamation by

2   implication through tortious interference with business

3   relationship?

4        MS. ELLIS:  We are seeking, you know, an injunction

5   based on defamation by implication that has caused tortious

6   interference with business relations, yes.

7        THE COURT:  And so why wasn't that your lead in your

8   motion?

9        MS. ELLIS:  Um, well, I --

10        THE COURT:  No.  Why wasn't that your lead in your

11   motion?

12        MS. ELLIS:  I do believe that we verify that it's

13   clear in the papers that that's what we are alleging, but also

14   in the -- and it was a lead in our motion, Your Honor.  There

15   is a section in the motion where we indicated that we are

16   seeking tortious interference in furtherance of -- I'm sorry,

17   defamation in furtherance of tortious interference.

18        THE COURT:  In the moving papers or in the reply?

19        MS. ELLIS:  I believe in the moving papers,

20   Your Honor.  I could be wrong.

21        I'm confident that we did in the papers.  If you

22   could just give me a moment, Your Honor, so I can cite to it.

23        THE COURT:  Yes, ma'am.

24        MS. ELLIS:  On page 11, Your Honor, we indicate

25   defamation by implication in furtherance of tortious
```

1    interference, and we discuss how the defendant's defamation by

2    implication has impacted the relationships that the plaintiff

3    has had with its current and prospective customers.

4          On page 12, Your Honor, we indicate in certain

5    instances Courts in Florida have authority to grant preliminary

6    injunctions that involve speech, such as defamation by

7    implication, where false commercial speech furthers a separate

8    tort and causes irreparable harm.  For example, when defamatory

9    implication furthers tortious interference with business

10   relationships, Courts may enjoin its continued publication

11   without violating the First Amendment, and we cite to the

12   *Murtagh* case for that proposition, *Murtagh vs. Hurley,*

13   40 So.3d 62.

14          THE COURT:  All right.  So we have the lay of the

15   land.

16          MR. TURKEL:  Judge.

17          THE COURT:  Yes, sir.

18          MR. TURKEL:  If I may, and just to make sure that our

19   position is clear, when they summarize the remedies in their

20   Complaint, and they literally list them out by count, so,

21   for instance, Count Two, defamation by implication, sub C, this

22   is on page 28 of docket -- document 1, a permanent injunction

23   prohibiting defendant from republishing the defamatory content,

24   et cetera, when you get to the tortious interference count,

25   which is Count Five, and they list the remedies they're

```
 1   seeking, they say award of damages for disruption of existing
 2   and prospective business relationships.  That's page 30,
 3   document 1.  Equally, Judge, in the reply --
 4         THE COURT:  But the notion of defamation by
 5   implication through tortious interference is oddly intertwined
 6   under Florida law, as I understand it.  So you can get an
 7   injunction against defamatory speech, but only if it's bottomed
 8   on a tortious interference with business relationship claims,
 9   and oddly, obviously, there are damages associated with
10   tortious interference with business relationships, and so --
11         MR. TURKEL:  Judge, if I may.
12         THE COURT:  Not until I finish speaking.
13         MR. TURKEL:  I'm sorry, Judge.
14         THE COURT:  And so I think there is a limited handle
15   under Florida law that permits the enjoining of speech if there
16   can be a demonstration that the speech is defamatory on a
17   preliminary injunction, which is a hard standard to meet, and
18   the speech has the effect of interfering with known existing
19   contractual relationships to the extent that if this Court
20   allowed the speech to continue, the plaintiff would continue to
21   be harmed.  And so I'm going to hear the plaintiff on their
22   claim and then we'll see where we get from there.  So do you
23   have a witness?
24         MR. TURKEL:  Judge --
25         THE COURT:  Do you want to call a witness or do you
```

```
 1   want to make argument?

 2           MR. TURKEL:  Judge, if I may just read one thing in

 3   the reply that I think is very clear.

 4           THE COURT:  Yes, sir.

 5           MR. TURKEL:  On page 6 of the reply, document 17,

 6   here plaintiff seeks injunctive relief under its defamation by

 7   implication claim, not its tortious interference claim.

 8           THE COURT:  Yes, sir.

 9           MR. TURKEL:  So from our perspective, Judge, they

10   didn't frame that, and understand that I don't think they --

11           THE COURT:  I understand.  Let me hear from the

12   plaintiff.

13           MR. TURKEL:  -- succeed on either, but --

14           THE COURT:  Let me hear from the plaintiff,

15   Mr. Turkel.

16           Yes, ma'am.

17           MS. ELLIS:  Yes, Your Honor.

18           It is -- I mean, we -- I just read from sections of

19   our emergency motion, plaintiff's emergency motion, where we

20   properly frame the issues that we --

21           THE COURT:  Do you intend to call any witnesses?

22           MS. ELLIS:  Yes, Your Honor.

23           THE COURT:  Let me hear from them.

24           MS. ELLIS:  Yes.  Your Honor, Mr. Anthony Sansone.

25           THE COURT:  Is anybody seeking to invoke the Rule?
```

```
 1              MR. TURKEL:  Judge, I'd invoke the Rule.  I don't
 2   know which people are witnesses, but --
 3              THE COURT:  All right.  Who all is testifying?
 4   How many witnesses are in the courtroom?
 5              MS. ELLIS:  There are two potential witnesses in the
 6   courtroom.  I think -- there are two witnesses.
 7              Your Honor, can you give me a moment to instruct the
 8   witnesses?
 9              THE COURT:  I'm sorry.  Who is the gentleman at the
10   end of the table, counsel table?
11              MR. ELLIS:  David Ellis.  I work with Ms. Ellis.
12              THE COURT:  You need to speak into the microphone.
13              MR. ELLIS:  My name is David Ellis.  I work with
14   Chemere Ellis' law firm.  I am just here to offer some support.
15              THE COURT:  Do you have a corporate representative
16   that you intend to have in the courtroom with you today?
17              MS. ELLIS:  No, Your Honor, we do not.
18              THE COURT:  Okay.  Well, instruct your witnesses to
19   step out, if they're not corporate representatives, and call
20   your witnesses one at a time.
21              Does the defense have any witnesses it intends to
22   call other than Mr. McNally?
23              MR. TURKEL:  No, Your Honor.
24              THE COURT:  All right.
25              Please come down to the table to be sworn, sir.
```

```
 1                COURTROOM DEPUTY:  Please raise your right hand.

 2                Do you solemnly swear or affirm, under penalties of

 3      perjury, that the testimony you're about to give in this cause

 4      will be the truth, the whole truth and nothing but the truth?

 5                THE WITNESS:  I do.

 6                COURTROOM DEPUTY:  Please state and spell your name

 7      for the record.

 8                THE WITNESS:  Anthony Sansone, A-N-T-H-O-N-Y,

 9      S-A-N-S-O-N-E.

10                COURTROOM DEPUTY:  Thank you.  You may be seated

11      right behind you.

12                THE COURT:  Mr. Sansone, you're under oath.  You have

13      to give truthful answers.  If you give false answers, you face

14      penalty of perjury.  Do you understand that?

15                THE WITNESS:  Understood.  Yes.

16                THE COURT:  Wait until Counsel completes her question

17      before you start your answer, and if you see opposing counsel

18      stand to object, wait until I rule on the objection before you

19      begin your answer, even if you can anticipate what she's asking

20      you.  Do you understand that?

21                THE WITNESS:  Understand.  Yes.

22                THE COURT:  Counsel.

23                MS. ELLIS:  Thank you, Your Honor.

24                May it please the Court and counsel.

25
```

1              **DIRECT EXAMINATION OF ANTHONY SANSONE**

2    **BY MS. ELLIS:**

3    Q    Mr. Sansone, please introduce yourself to the Court and

4    spell your last name for the record.

5    A    My name is Anthony Sansone, A-N-T-H-O-N-Y, S-A-N-S-O-N-E.

6    I am the Vice President of Manufacturing at Proven Industries.

7    Q    Can you briefly educate the Court about your educational

8    background.

9    A    I have a Bachelor's in Mechanical Engineering.

10   I graduated in 2007.  Since then I've held various jobs in

11   engineering and design of mechanical systems, mechanical

12   components.

13   Q    And so you've been working as a mechanical engineer since

14   2007?

15   A    Correct.  Yes.

16   Q    Provide a little bit more detail about the roles that you

17   held before you began working at Proven Industries.

18   A    Prior to Proven Industries I worked for Air Products and

19   Chemicals as a Senior Manufacturing Engineer.  I would provide

20   technical leadership to the manufacturing floor.  The facility

21   I worked at, we built large natural gas heat exchangers, so

22   I would help design lifting structures for moving these big

23   giant heat exchangers, I would provide --

24            THE COURT:  Does any of that have to do with locks?

25            THE WITNESS:  No.

Case 8:25-cv-01119-MSS-LSG    Document 31    Filed 06/30/25    Page 20 of 129 PageID 639
ANTHONY SANSONE - JUNE 13, 2025                            20
Direct examination by Ms. Ellis

1          THE COURT:  All right.  Let's move to locks.

2          MS. ELLIS:  I'll move on to that.

3    BY MS. ELLIS:

4    Q    Can you describe the experience that you've had that is

5    relevant to, you know, manufacturing and designing locks.

6    A    My -- throughout my appointment with Proven I have evolved

7    responsibilities, starting with directly designing and

8    manufacturing locks to now overseeing, providing more of a

9    management role into company operations.

10   Q    Talk a little bit about the design and the manufacturing

11   of the locks that you did initially when you joined Proven.

12         THE COURT:  That's not a question.  Is there a

13   question?

14         MS. ELLIS:  Yes.

15   Q    Will you please educate the Court about how you aided

16   Proven in designing locks.

17   A    When I first started, I would do the designing and

18   manufacturing of locks, locking components, full locking

19   assemblies, then evolved into reviewing and approving designs,

20   and then now I'm still involved with reviewing and improving

21   but also management of the entire manufacturing and engineering

22   processes.

23   Q    And when did you have that role of designing and approving

24   the locks initially, when did you first begin doing that?

25   A    It was approximately 2016.

ANTHONY SANSONE - JUNE 13, 2025                    21
Direct examination by Ms. Ellis

1   Q    When you joined Proven Industries, how many employees were

2   there?

3   A    Under ten.  Eight or so, approximately.

4   Q    Would you say that you were one of the first employees who

5   aided Proven Industries in designing and manufacturing their

6   locks and locking components?

7   A    When I started there were already established designs, but

8   we've -- Proven has expanded its product line up with my

9   involvement.

10  Q    Now, you said that your day-to-day activities have changed

11  a little bit.  Can you tell us -- you said -- what's your

12  current role at Proven Industries?

13  A    Current role is Vice President of Manufacturing.

14  I oversee all manufacturing operations, engineering and design,

15  also oversee the shipping and receiving warehouse area and

16  customer service.

17          THE COURT:  We have two hours set aside for this

18  hearing.  This is not the trial.  Can we get to the PI part.

19          MS. ELLIS:  I understand, Your Honor.

20  Q    I just need to establish a little bit of background about

21  Proven.  Do you know when it was formed.

22  A    I believe 2011.

23  Q    How many people are currently employed at Proven?

24  A    The previous payroll was 74.

25  Q    Now, we understand that Proven Industries manufactures

1  locks.  Can you describe to the Court, you know, the product

2  line that's offered by Prudent.

3  A    There are multiple different styles of locks for trailers.

4  We have locks for wheels, we have locks for the coupler that's

5  on the front of the trailer, we have pin locks, we have locks

6  for -- that's a different pin lock.  We also have other

7  non-locking products that we offer.

8  Q    Would you say that in your capacity as Vice President at

9  Proven that you are familiar with the -- you know, the

10 intricacies and how those locks operate and how they work?

11 A    Yes.

12 Q    Would you say that you're familiar in your capacity as

13 Vice President with the company's business and issues that

14 arise within the company?

15 A    I would say a vast majority.  I don't know if it's

16 100 percent everything, but a vast majority, yes.

17 Q    In your capacity as Vice President, did you become aware

18 of a series of videos published by the defendant?

19 A    I did, yes.

20 Q    Why were those videos escalated to you?

21 A    It was causing a -- an unusually high amount of customer

22 service interaction, so report -- we call them tickets in the

23 customer service platform, so an unusually high amount of

24 customer service tickets being created.

25 Q    Okay.  And do you recall when that occurred?

1   A    It was the day after the first video.  I don't remember

2   the date off the top of my head.

3   Q    Would April 3rd sound like an accurate date?

4   A    Approximately, yes.

5   Q    Okay.  Let's discuss just briefly -- I think it's

6   important for the Court to understand the different type of

7   locks.

8          Now, the defendant -- you became familiar with the

9   videos that he published -- attempted to bypass three different

10  types of locks; is that correct?

11  A    I believe it was four.

12  Q    Four.  Okay.  So let's talk about what those were.

13         Did you come to understand that he attempted to by --

14  or did he bypass a latch pin lock?

15  A    Yes.

16  Q    What are the typical uses for a latch pin lock?

17  A    What was the question?  I'm sorry.

18  Q    What are the typical uses for a latch pin lock?

19  A    It's used primarily two different applications, one is to

20  secure the trailer onto the vehicle, so when it's coupled to

21  the vehicle to prevent someone from removing it; and second

22  would be when the trailer is separate from the vehicle, to

23  prevent someone from attaching the trailer to the vehicle.

24  Q    Does Proven offer different internal core systems for the

25  latch pin lock?

ANTHONY SANSONE - JUNE 13, 2025                    24
Direct examination by Ms. Ellis

1    A    We do, yes.

2    Q    What are they?

3    A    There are multiple different options, different styles of

4    key, different manufacturers of the lock cores, there are

5    different types of locking plungers that we offer, that Proven

6    offers, I'm sorry.

7    Q    Okay.  And do each of them offer a different level of

8    security?

9    A    Yes.

10   Q    Okay.  The latch pin locks that you've come to understand

11   that Mr. McNally, the defendant, was able to bypass, were they

12   the least secure or the cheapest option that was available by

13   Proven?

14   A    They are one of the more entry level lock cores that we

15   offer.

16   Q    Let's talk about the padlock.  Did you come to understand

17   that Mr. McNally, the defendant, bypassed a padlock as well?

18   A    Yes.

19   Q    And what are the typical uses for that?

20   A    The padlock can be used to -- it's a standard padlock, so

21   anything that you can attach a padlock to, any two aligning

22   holes you want to maintain aligned, you can install a padlock.

23   Q    And does Proven offer, like it does with the latch pin

24   lock, different internal core mechanisms for that one as well.

25   A    Yes, all of -- all of our locking products can have all

ANTHONY SANSONE - JUNE 13, 2025                    25
Direct examination by Ms. Ellis

1   the cores interchanged.  That's one of our -- one of our

2   features we offer.

3   Q    And is it your understanding, based on your review of

4   Mr. McNally's videos, that the padlocks that he bypassed were

5   for the most entry level and the cheapest product line?

6   A    It was the same lock core that was present in the

7   latch pin lock, so one of the -- one of our standard -- we'll

8   call it standard level lock cores.

9   Q    Did you come to understand that he bypassed a puck lock in

10  one of his videos?

11  A    Yes, there was -- there were several.

12  Q    Okay.  And are the uses for the puck lock different than

13  it would be for the latch and the padlock?

14  A    The padlock can be used everywhere the puck lock can be

15  used, but the puck lock won't necessarily fit where the padlock

16  fits, so --

17  Q    Okay.  So what does the puck lock --

18       MR. TURKEL:  Judge, I want to object to this line of

19  questioning.  As I mentioned earlier, the pending Complaint

20  framed one video.  One of the elements they have to prove for

21  an injunction is likelihood of success on the merits.  The

22  merits as currently framed in this case have one video.

23       THE COURT:  Irrelevance, is that the objection?

24       MR. TURKEL:  Beyond the scope and irrelevance,

25  Your Honor.

Case 8:25-cv-01119-MSS-LSG    Document 31    Filed 06/30/25    Page 26 of 129 PageID 645
ANTHONY SANSONE - JUNE 13, 2025                    26
Direct examination by Ms. Ellis

 1              THE COURT:  Overruled.

 2              MR. TURKEL:  It's a pleading-based objection.

 3              THE COURT:  Overruled.

 4    BY MS. ELLIS:

 5    Q    What's the typical use for a puck lock?

 6              THE COURT:  What's a puck lock in the video?  Show me

 7    a puck -- is there a puck lock referenced in any of the videos,

 8    or --

 9              MS. ELLIS:  Yes, there are.  Yes, Your Honor.

10              THE COURT:  That's the video with the multiple locks?

11              MS. ELLIS:  Yeah.  Video 6, yes, Your Honor.

12              THE COURT:  All right.  Go ahead.

13    BY MS. ELLIS:

14    Q    What are the typical uses for a puck lock?

15    A    We advertise them primarily for use on the front of the

16    trailer, coupler lock, and also for use to secure doors on

17    trailers.

18    Q    Okay.  And I know you've indicated that there are

19    different internal mechanisms.  Did Mr. McNally in his video,

20    video number 6, in his attempt -- in his bypass of the puck

21    lock, what internal core mechanism did that lock have?

22    A    The same as the other products.  It's a rotary disc

23    detainer style puck lock.  It's the standard core we offer on

24    all of our products available on Amazon.

25    Q    And that's the most basic core; is that correct?

Case 8:25-cv-01119-MSS-LSG    Document 31    Filed 06/30/25    Page 27 of 129 PageID
646
ANTHONY SANSONE - JUNE 13, 2025                                    27
Direct examination by Ms. Ellis

1    A    One of the more -- one of the most -- it's one of our two

2    entry level cores we offer.

3    Q    Okay.  In March 2025 Proven released a promotional video.

4    Are you familiar with that promotional video?  It's entitled

5    "You guys keep saying you can easily break off our latch pin

6    lock."  Are you familiar with that?

7    A    Yes.

8    Q    What does the video show, and do you know why it was

9    created?

10   A    The video showcases the ability --

11        MR. TURKEL:  Objection.  Hearsay.

12        THE COURT:  Overruled.  You can answer.

13   A    The video showcases the product itself and tries to

14   address some of the more common customer service complaints at

15   the time.

16   Q    Okay.  And what were those?  What were those common

17   customer service complaints?

18   A    Mostly centered around "that thing looks like I could just

19   break it off."

20   Q    Okay.

21   A    To kind of paraphrase.

22   Q    And so when we talk about product testing -- well, let's

23   talk about product testing.  Does Proven conduct any product

24   testing to ensure the security of its locks?

25   A    We do, yes.

Case 8:25-cv-01119-MSS-LSG    Document 31    Filed 06/30/25    Page 28 of 129 PageID
647
ANTHONY SANSONE - JUNE 13, 2025                    28
Direct examination by Ms. Ellis

1   Q    Okay.  Describe what that is like.

2   A    Our -- Proven's product testing revolves around feedback

3   we receive from customer service and our -- from our customers

4   through customer service.  So based on customer questions,

5   customer complaints, we want to ensure that the products suit

6   the needs of what is being seen in the industry in terms of

7   security breach attempts.

8   Q    Okay.  To your knowledge, did Proven register that video

9   with the U.S. Copyright Office?

10  A    I believe so, yes.

11         MS. ELLIS:  Your Honor, I'll just ask a quick

12  housekeeping matter sort of in the middle.  We have several

13  videos.  We don't intend to play them all.  They are listed on

14  both the parties' witness list, just -- we attempted to confer

15  regarding the exhibits beforehand but we were not able to reach

16  a conclusion, so do we need to go through the formalities of,

17  you know, moving to admit the exhibits or will counsel

18  stipulate to their admission?

19         THE COURT:  Which exhibits are you referring to?

20         MS. ELLIS:  So we -- at this point I would refer

21  to --

22         THE COURT:  Well, I've looked at all the videos, so

23  I'm not sure what the challenge would be, so are you moving to

24  admit all, what is it, six of the videos?

25         MS. ELLIS:  All six videos and also Proven

Case 8:25-cv-01119-MSS-LSG    Document 31    Filed 06/30/25    Page 29 of 129 PageID
648
ANTHONY SANSONE - JUNE 13, 2025                              29
Direct examination by Ms. Ellis

1   Industries' initial video that I just discussed with Mr. --

2   Mr. Sansone.

3              THE COURT:  Any objection?

4              MR. TURKEL:  Judge, I would just renew my objection

5   to the extent that only one video is the subject of the

6   Complaint.  These other videos are in the Amended Complaint

7   that they moved to file yesterday.  We haven't addressed them.

8   They're -- they're not really part of the case, so --

9              THE COURT:  Counsel, what's your response to that?

10             MS. ELLIS:  So the Complaint was filed, and

11  subsequent to the Complaint being filed Mr. McNally filed

12  five separate videos after the Complaint was filed.  That's the

13  base -- that's the reason we moved for this emergency

14  injunction, because he continued to escalate his behavior, and

15  so --

16             THE COURT:  Are the other videos attached to the

17  motion?

18             MS. ELLIS:  Yes, Your Honor, they are.  We've sub --

19  we've submitted them.  I mean, they did, in fact, respond to

20  the --

21             THE COURT:  The answer is yes?

22             MS. ELLIS:  Yes, Your Honor.

23             THE COURT:  The objection is overruled.  The videos

24  will be admitted.

25             MR. TURKEL:  Judge, if I can get one clarification

1    from counsel or the Court -- well, the point we're making,

2    Judge, is they don't have any claims based on those videos.

3              THE COURT:  They don't have any claims based on the

4    videos?

5              MR. TURKEL:  Right.  They --

6              THE COURT:  All right.  Noted.  Overruled.

7    BY MS. ELLIS:

8    Q    Did you become aware -- I know you've testified to it --

9    of McNally's first video, the very first one that he --

10             THE COURT:  Asked and answered.

11             MS. ELLIS:  No problem, Your Honor.

12   BY MS. ELLIS:

13   Q    Did you see any portion of Proven's copyrighted footage in

14   that video?

15   A    Yes.

16   Q    Do you recall what portion -- how much of the copyrighted

17   video footage was in that video?

18   A    I believe around 15 or 20 seconds.

19   Q    Okay.  Besides copying Proven's footage, what lock picking

20   demonstration did Mr. McNally present in part 1?

21   A    Can you clarify that one?

22   Q    What lock picking demonstration did Mr. McNally portray in

23   that part 1 video?

24   A    Was using a shim to open the lock.

25   Q    And I don't know if it would benefit Your Honor to replay

1    it.  I know that you've indicated you've already seen it.

2    Would you like --

3              THE COURT:  It's left up to you.

4              MS. ELLIS:  I'll move forward, I'll ask questions,

5    and if we need to replay it, we will.

6    BY MS. ELLIS:

7    Q    From an engineering standpoint, what critical facts would

8    you say about Mr. McNally's preparation did the video omit?

9    A    The --

10             THE COURT:  Well, if there's going to be some

11   discussion about omission, it probably bears a presentation of

12   the video and stopping it where the omission supposedly occurs.

13             MS. ELLIS:  And I do have some screenshots.  I can

14   start there, Your Honor.

15             THE COURT:  Yes, please.

16   BY MS. ELLIS:

17   Q    Mr. Sansone I'm going to play part 1 of the video in its

18   entirety.

19                        *(Video played.)*

20   Q    And so I'll re-ask that last question.

21             From an engineering standpoint, what critical facts

22   are omitted from the video in Mr. McNally's shimming of that

23   lock?

24   A    So, from an engineering standpoint, the product appeared

25   to be pre-installed on the trailer.  The custom tool was

Case 8:25-cv-01119-MSS-LSG    Document 31    Filed 06/30/25    Page 32 of 129 PageID 651
ANTHONY SANSONE - JUNE 13, 2025                          32
Direct examination by Ms. Ellis

1  premade, assumingly with measurements taken to determine the

2  correct size and shape and form of the tool.  The core used in

3  the lock is -- as I mentioned before, our parts are made for

4  the cores to be interchangeable, so it's unclear from the video

5  whether or not that's a core that came with the lock or not.

6  Q    Okay.  Was there any information that you believe that

7  would have been omitted regarding Mr. McNally's preparation in

8  order to open the lock or his inspection of the lock?

9         MR. TURKEL:  Judge, I'm sorry, I didn't hear that

10  question, I lost the middle, but I think she's asking him to

11  speculate.

12         THE COURT:  Was there any information that you --

13  that would have been omitted regarding Mr. McNally's

14  preparation in order to open the lock or his inspection of the

15  lock?

16         MR. TURKEL:  Objection.  Speculation.

17         THE COURT:  Well, you need to lay a foundation.

18  BY MS. ELLIS:

19  Q    Let's talk a little bit about -- we discussed your

20  background.  In watching this video, were you able to -- or did

21  you attempt to follow Mr. -- follow the defendant's lead in

22  attempting to shim that lock?

23  A    At this video, yes, I did.

24  Q    Okay.  And we talked about your experience with those

25  locks.  Are you familiar with the internal core of those locks?

ANTHONY SANSONE - JUNE 13, 2025                    33
Direct examination by Ms. Ellis

1   A    I am, yes.

2   Q    Are you familiar with how they operate?

3   A    I am, yes.

4   Q    Are you familiar with what steps would have been necessary

5   in order to create a tool that would bypass that lock, based on

6   your experience?

7   A    Yes.

8   Q    And so I'll re-ask the question.  I believe I've laid a

9   foundation from an engineering standpoint.

10        What would you indicate is missing from this video

11  regarding Mr. McNally's preparation in order to shim that lock?

12        MR. TURKEL:  Judge, same objection.  The predicate

13  establishes such -- what he would do to do it.

14        THE COURT:  Sustained.

15  BY MS. ELLIS:

16  Q    Let's talk about the steps that you took after you viewed

17  this video.  What did you do?

18  A    I attempted to recreate the --

19        THE COURT:  Pull that microphone over towards you a

20  little bit.  Go ahead.

21        THE WITNESS:  Is that better?

22        THE COURT:  Yes.

23  A    I attempted to recreate the shim shown in the video and

24  bypass the lock in a similar method shown.

25  Q    Describe how long it took you to do that in the process.

1  Give a little bit more detail.

2          THE COURT:  Well, first of all, were you ultimately

3  able to shim the lock using a device made out of a piece of

4  aluminum?

5          THE WITNESS:  Eventually, yes.

6          THE COURT:  And how long did that take you?

7          THE WITNESS:  I wasn't able to do it after this

8  video.  I was able to do it after the subsequent videos that

9  showed the cutaway more detailed view of the exact method of

10 shimming.  I'm not -- I don't have a lot of experience with

11 shimming locks open, so my initial attempts after this video

12 all ended with the shim breaking off.

13         THE COURT:  All right.

14 BY MS. ELLIS:

15 Q    And how long did you attempt, after watching this first

16 video, to open the lock?  How long would you say?

17 A    I would say I made approximately a dozen different shims.

18 Q    Okay.  12 different shims, and they all failed?

19 A    Correct.

20 Q    After Mr. McNally posted this video 1, I just want to ask

21 a question about how it impacted -- how Proven was able to use

22 its original marketing video.

23 A    What was the question again?  Can you --

24 Q    The original marketing video, was Proven able to use its

25 original marketing video after Mr. McNally posted this?

1    A    Are you asking if our -- if Proven's video --

2    Q    Were you --

3    A    -- was -- remained active?

4    Q    Yeah.  Did it remain active?

5    A    Yes.

6    Q    What changes were made to the way that it was marketed to

7    customers?

8    A    That I'm not clear.

9    Q    Are you aware of whether or not comments were disabled as

10   a result of Mr. McNally's --

11   A    They were, yes.

12   Q    Okay.  Do you know why?

13   A    The nature of the comments were overly -- I don't want to

14   use the wrong term, but overly harassing.

15   Q    How so?

16   A    I don't want to misquote comments without re-reviewing

17   comments, but to the tone of "these products don't work, these

18   products are cheap."

19   Q    Okay.  Now, you have some experience with the lock and the

20   interlocking core.  Would you say that an average person would

21   face even greater difficulty than you did in attempting to shim

22   the lock after watching video 1?

23   A    In my opinion, yes.

24   Q    Did you become aware of a part 2 video that was published

25   by Mr. McNally?

Case 8:25-cv-01119-MSS-LSG    Document 31    Filed 06/30/25    Page 36 of 129 PageID 655
ANTHONY SANSONE - JUNE 13, 2025                                36
Direct examination by Ms. Ellis

A    Yes.

         MS. ELLIS:  I'm going to go ahead and show some
screenshots now, Your Honor.

         THE COURT:  This is when you could use some help from
the table while you're asking the questions.

         MR. TURKEL:  Judge, while they're doing that, if I
just may, under the rules --

         THE COURT:  You may not do anything while they're
doing that.

         Do you have an objection, Mr. Turkel?

         MR. TURKEL:  I just think it's the same objection,
the video that's alleged to be the problem --

         THE COURT:  Noted and overruled.

         Please proceed.

BY MS. ELLIS:

Q    And you reviewed the part 2 video; is that correct?

A    Correct.  Yes.

Q    What step-by-step explanations, if any, did the defendant
provide about how to create a shim or how to fabricate a shim?

A    In the second video was the process of obtaining shim
material, approximate size and shape of the shim in the cutout
present to bypass the lock.

Q    Describe what's -- as you perceive with your engineering
background, what's special about that shim and what
difficulties one would face from an engineering standpoint in

ANTHONY SANSONE - JUNE 13, 2025                    37
Direct examination by Ms. Ellis

1   recreating that shim.

2   A     The position of the hook-shaped feature on the shim being

3   specific to the depth of the locking plunger on the lock

4   itself.

5   Q     Video 2, as you reviewed it, did it create a misleading

6   impression or a false implication about Proven's locks?

7              MR. TURKEL:  Judge, objection.  Again, we have the

8   video.  They've shown a screenshot.  He's given an opinion on

9   something that's not in the courtroom.  It's a hearsay video

10  the way they've chosen to enter it.  If he's going to opine on

11  it, they should completely show it.

12             THE COURT:  Overruled.

13             The question is could it, in your mind, create a

14  misleading impression or false implication about the locks.

15             THE WITNESS:  In my opinion, it gave the impression

16  of no -- no preparations of any kind were needed to determine

17  the size, shape, location of any of the components of the shim,

18  that it was just haphazardly made.

19  BY MS. ELLIS:

20  Q     Can you discuss what the -- in watching the video,

21  Mr. McNally attempts to shim -- I mean, shims the lock without

22  it being attached to anything.  Describe how that would impact

23  the perception of falsity, your perception of falsity.

24  A     So my impression is with the lock -- we'll call it free in

25  your hands, not attached to anything, it provides easier access

ANTHONY SANSONE - JUNE 13, 2025                    38
Direct examination by Ms. Ellis

1    to maneuver your hands around the product, to manipulate the

2    product, to have -- have a more comfortable feel and

3    positioning of your hands.

4    Q    Now, as we're looking at this -- these pictures that are

5    screenshots from the video, there are several arrows that are

6    pointing --

7              THE COURT:  Can you point out which exhibit this is.

8    And have the screenshots been admitted?

9              MS. ELLIS:  The screenshots have not been admitted.

10   I can move to admit them.  We created them for demonstrative

11   purposes, but I can move that.

12             These are screenshots of the part 2 video that are

13   presented at Plaintiff's Exhibit 2.

14             THE COURT:  They're intended to be demonstrative

15   only?

16             MS. ELLIS:  Yes, Your Honor.

17             THE COURT:  All right.  You may proceed.

18   BY MS. ELLIS:

19   Q    Describe what the arrows are demonstrating as you're

20   looking at that picture.

21   A    So the arrows appear to be pointing to the --

22             THE COURT:  Well, who put the arrows on the document?

23   Who put the arrows on the document?

24             MR. FAHEY:  Your Honor, I did.  I put the arrows on

25   the document for demonstrative purposes.

Case 8:25-cv-01119-MSS-LSG    Document 31    Filed 06/30/25    Page 39 of 129 PageID 658
ANTHONY SANSONE - JUNE 13, 2025                    39
Direct examination by Ms. Ellis

1          THE COURT:  All right.  Counsel, continue.

2          The arrows appear to be what?

3          THE WITNESS:  So the arrows appear to be pointing to

4    the area on the lock that would be surrounding the latch handle

5    of the coupler on the trailer.

6    BY MS. ELLIS:

7    Q    Would he have access to that if that lock was attached to

8    a trailer, to that area?

9    A    Not unrestricted, free, open access, no.

10   Q    Would he have the ability to turn the lock and move it and

11   manipulate it in the way that he's doing in the video, in those

12   screenshots right there?

13   A    Based on the trailer it's installed on, there's -- the

14   lock can kind of rotate -- some -- some trailers allow it to

15   rotate like 90 degrees, kind of like swing like a hinge, so --

16   not freely maneuver as needed.

17   Q    Now, would you -- would you say that this video

18   demonstrates a real-world use of this lock?

19   A    It does not, no.

20   Q    And just clarify for the record why it does not.

21   A    It's -- the product is intended to be used on a trailer to

22   secure the handle in a closed position.

23   Q    And describe why it's significant that he is shimming this

24   lock without it being attached to a trailer.

25          THE COURT:  Already asked and answered.  Is there

ANTHONY SANSONE - JUNE 13, 2025                    40
Direct examination by Ms. Ellis

1    another question?

2    Q    Would it be -- I'll ask another question.

3         Would it be easier to shim -- in your professional

4    experience, is it easier to shim the lock if it is not attached

5    to a trailer?

6    A    Yes.

7    Q    Let's move on to the part 3 video.  I know you indicated

8    you watched that.  Did you note anything about the shim that

9    the defendant used in that lock?

10        THE COURT:  We're presenting, for the record, a

11   screenshot from the part 3 video.  At what seconds?  Can you

12   tell from that screenshot?

13             MS. ELLIS:  No, we can't, Your Honor.

14             THE COURT:  All right.  Some portion of that video --

15             MS. ELLIS:  That's correct.

16             THE COURT:  -- is being shown as a demonstrative aid?

17             MS. ELLIS:  Yes, Your Honor, and I can -- if it

18   pleases the Court, I can play the video.  I just -- we have

19   limited time and so I was attempting to move through it.

20             THE COURT:  That's fine.  Go ahead.

21   BY MS. ELLIS:

22   Q    So as we're looking at the screenshots that are, you know,

23   being demonstrated there, did you note anything about the shim

24   in your -- in watching video 3?

25   A    The shim shown on the left two pictures was overall

ANTHONY SANSONE - JUNE 13, 2025                     41
Direct examination by Ms. Ellis

1   triangular-shaped, as opposed to the kind of hook shape shown

2   in the other videos.

3   Q    Okay.  And can you describe what, if anything, is

4   misleading about this video as you watched it.

5   A    Again, with the two pictures on the left, the restricted

6   access to the opening that would be present if it was installed

7   on a trailer is -- when the lock is not attached to the trailer

8   you get unrestricted, open access.

9            THE COURT:  Well, wouldn't anybody looking at that

10  video know that it wasn't attached to a trailer?

11           THE WITNESS:  I would assume so, yes.

12           THE COURT:  And he's not suggesting that it is

13  attached to a trailer?

14           THE WITNESS:  Correct.  Yes.

15           THE COURT:  He's just holding it up in his hand to

16  say, if I have this thing in my hand, I can open it by doing

17  this.

18           THE WITNESS:  Correct.

19           THE COURT:  Counsel, continue.

20           MS. ELLIS:  Yes, Your Honor.  May I ask one follow-up

21  question?

22           THE COURT:  You may.

23  BY MS. ELLIS:

24  Q    Now, you indicated -- let's talk about why that

25  implication is false, as you perceive it, that he would open

Case 8:25-cv-01119-MSS-LSG    Document 31    Filed 06/30/25    Page 42 of 129 PageID 661
ANTHONY SANSONE - JUNE 13, 2025                        42
Direct examination by Ms. Ellis

1   this lock not attached to a trailer.

2   A    Using -- in my opinion, using this method, when it's

3   installed on trailer there -- there wouldn't be sufficient room

4   to maneuver your hands and the tool from the reverse side as

5   the product is installed.

6   Q    Would you indicate -- would you -- would you testify that

7   this video gives the implication --

8             THE COURT:  That sounds like a leading question.

9             MS. ELLIS:  It does, Your Honor.

10  BY MS. ELLIS:

11  Q    What implication does this video give based on the fact

12  that it's not attached to a trailer regarding the safety of

13  this lock?

14  A    My opinion, this video would perceive the locks as

15  ineffective.

16  Q    Also showing another screenshot from video 3, it's the

17  portion of the video with the words -- where it indicates,

18  "You did it backwards."  Let's talk a little bit about what you

19  perceived was happening in the video at this moment.

20  A    It appears to be footage from -- or a still frame from

21  Proven Lock's response video demonstrating the level of

22  preparation and knowledge needed to use the shim to bypass the

23  lock.

24  Q    And why do you say that?

25  A    The -- as this video points out, the shim is used

 1   incorrectly to attempt to bypass the lock.

 2   Q    Prior to Mr. --

 3             THE COURT:  So, for the record, this is a screenshot

 4   of a video by McNally that incorporates a video from Proven

 5   explaining why McNally's shimming is misleading?

 6             THE WITNESS:  I believe so, yes.  I'd need to --

 7             MS. ELLIS:  Let me play the video for the record,

 8   Your Honor.

 9             THE COURT:  Well, I want him to answer the question

10   first.

11             THE WITNESS:  Yeah, I believe so, but I also believe

12   the portion on top is just a still frame shown from the video

13   of Proven.

14             THE COURT:  And the bottom is the actual video

15   running that now is a screenshot of itself?

16             THE WITNESS:  Correct.

17             THE COURT:  And Mr. McNally is indicating here, look

18   at what Proven says is wrong with my demonstration in video,

19   and I'm going to show you why they are wrong?

20             THE WITNESS:  I believe it is showing that Proven --

21   Proven's attempt is incorrect, that they're trying to shim the

22   wrong spot.  So you're shimming here, you should be shimming

23   here instead.

24             THE COURT:  So who is saying "You did it backwards"?

25             THE WITNESS:  Mr. McNally.

ANTHONY SANSONE - JUNE 13, 2025                    44
Direct examination by Ms. Ellis

1            THE COURT:  All right.  Play the video.

2            MS. ELLIS:  Yes, Your Honor.

3            THE COURT:  And this is video part -- the part 3

4    video; is that what we're getting ready to see?

5            MS. ELLIS:  Yes, Your Honor.

6                        (Video played.)

7    BY MS. ELLIS:

8    Q    Now, just to set the scene, let's talk about prior to this

9    video, did Proven post a response video to McNally, to the

10   defendant?

11   A    Yes.

12   Q    And what happened in the response video?

13   A    The response video I believe was an attempt by Proven to

14   provide more information to potential consumers on purchasing

15   options available.

16   Q    Okay.  And did someone from Proven attempt to shim the

17   lock in the way that the defendant had demonstrated?

18   A    Yes.

19   Q    Were they able to do that?

20   A    I don't believe so.

21   Q    Okay.  Just like you were not able to do it.

22   A    Correct.

23   Q    Now, we saw in the screenshot before, there were two, and

24   we can go back.

25            That is at second 21 in the video.  We see words that

Case 8:25-cv-01119-MSS-LSG    Document 31    Filed 06/30/25    Page 45 of 129 PageID
664
ANTHONY SANSONE - JUNE 13, 2025                    45
Direct examination by Ms. Ellis

1    say "You did it backwards, for the record," and then there's a

2    blue dot.  What -- based on you watching the video, what

3    does -- the green dot.  I'm sorry.  What does the green dot

4    demonstrate?

5    A    I believe the green dot represents --

6            THE COURT:  Well, who put the green dot and the red

7    dot on the video?  Is that something McNally did or something

8    Proven did in its video?

9            THE WITNESS:  Something Mr. McNally did in his video.

10           THE COURT:  All right.

11   A    I believe the green dot is indicating where the position

12   of the locking plunger is on the lock.

13   Q    And the red dot?

14   A    The red dot appears to indicate where the shim is

15   attempting to be used.

16   Q    So the incorrect spot for the shim?

17   A    Correct.

18   Q    What does that demonstrate to you?  I mean, that's a small

19   margin.  So one spot is right, one spot is incorrect.  What

20   does that mean to you as he's attempting to demonstrate that

21   Proven doesn't know how to pick its own locks?

22   A    To me that indicates a certain knowledge level and

23   skill set required to properly use those tools to bypass the

24   locks.

25   Q    Based on your experience, how do you develop that

Case 8:25-cv-01119-MSS-LSG    Document 31    Filed 06/30/25    Page 46 of 129 PageID
665
ANTHONY SANSONE - JUNE 13, 2025                              46
Direct examination by Ms. Ellis

1   knowledge and skill set?  Would you have to disassemble the

2   lock to know that?

3   A    You would need to examine the locking core.  Depending on

4   how the lock operates, it may be seen when the lock is open or

5   you may need to disassemble the lock to view it.

6          THE COURT:  Well, I'm confused.  When I am trying to

7   do something weird at home that I don't know how to do,

8   I Google it and up pops a YouTube video and it shows me how to

9   do it, and I follow the YouTube video to do what they're

10  telling me to do, and eventually I'm able to do what they're

11  telling me to do, based on their knowledge and experience.

12  I don't have to have their knowledge and experience first,

13  I just mimic what they're doing.  And so would a person who is

14  trying to learn how to shim locks have to know what Mr. McNally

15  knew or would they just have to do what Mr. McNally did a

16  couple or three times to mimic it?

17         THE WITNESS:  I believe with enough skill development

18  you would see how it's done by a -- someone more skilled in the

19  art, and then through repetition, like you said, you would

20  eventually develop that skill set yourself.

21         THE COURT:  But you don't have to open the lock and

22  find out where -- the placement of the ball bearings or any of

23  that, you could just watch what Mr. McNally did and just stick

24  a piece of aluminum in the lock a couple of times or three

25  times or five times, and you would put it in the place he told

Case 8:25-cv-01119-MSS-LSG    Document 31    Filed 06/30/25    Page 47 of 129 PageID
666
ANTHONY SANSONE - JUNE 13, 2025                              47
Direct examination by Ms. Ellis

 1  you to put it, and, voila, the lock would open?

 2          THE WITNESS:  So the problem I personally faced,

 3  every unsuccessful attempt the shim would break off inside the

 4  lock and then I would need to use the key to open the lock and

 5  clear out all the debris.  So after an unsuccessful attempt you

 6  need the key present to kind of reset the slate to try again.

 7          THE COURT:  But if I'm a thief and I'm invested in

 8  breaking into people's lock to take off their trailer hitches,

 9  I could buy one lock, practice a few times, figure out how to

10  do it, and then if I want to go steal somebody's trailer,

11  I would know how to do it, because I would have practiced

12  enough times with a legitimate lock and I would just open the

13  lock, subject to all this business about being able to access

14  it because it's hooked to something?

15          THE WITNESS:  Assuming the core of the lock is the

16  same.

17          THE COURT:  But that's your number one or two selling

18  lock on Amazon.

19          THE WITNESS:  The lock body itself, yes.  The actual

20  little lock core, we call it, we have many different options

21  available of different -- some are spring-loaded, with a

22  spring, some are -- it's called dead bolt style, so like a

23  dead bolt on the front door of your house, the thing comes out

24  and you can't push it back in, you'd use the key to retract it.

25  So depending on the lock core present in that lock body.

ANTHONY SANSONE - JUNE 13, 2025                    48
Direct examination by Ms. Ellis

```
1              THE COURT:  Which one is present in that one?

2              THE WITNESS:  That one has the spring-loaded disc

3    detainer core.

4              THE COURT:  And what percentage of your sales is that

5    lock?

6              THE WITNESS:  I don't have the exact numbers in front

7    of me.  I would say approximately 50 percent.

8              THE COURT:  So about half of your locks are the type

9    he's demonstrating?

10             THE WITNESS:  Approximately.  I would assume, without

11   reviewing the actual numbers, but approximately.

12             THE COURT:  All right, Counsel.  You have a couple

13   more minutes.  Mr. Turkel has to have a chance at this witness.

14             MS. ELLIS:  Thank you, Your Honor.

15   BY MS. ELLIS:

16   Q    After studying the parts 2 and 3 videos, I just wanted to

17   talk about his process very quickly.  You know, were you able

18   to open the lock in real life?  I think you testified to that.

19   A    Eventually I was, yes.

20   Q    What did you have to do in order to be able to do that?

21   A    I needed to manipulate the lock freely in my hands.

22   Q    In terms of reviewing the video, did you have to go

23   through it frame by frame?

24   A    I did go through it frame by frame.

25   Q    How long did it take you to do that?
```

Case 8:25-cv-01119-MSS-LSG    Document 31    Filed 06/30/25    Page 49 of 129 PageID
668
ANTHONY SANSONE - JUNE 13, 2025                          49
Direct examination by Ms. Ellis

1    A    A couple hours.

2    Q    Okay.

3    A    Approximately two, three hours.

4    Q    Okay.  And how long of a process did it take you to

5    eventually, you know, get the lock open, with your training and

6    experience and knowledge about those locks?

7    A    So eventually, to make the shim and open the lock,

8    approximately 30 seconds, 45 seconds.

9    Q    Okay.  After you had figured -- how many failed attempts

10   did you have?

11   A    Approximately 20 or so.

12   Q    Okay.  That's when the lock isn't attached to anything.

13   Did you attempt to shim the lock when it was attached to

14   something?

15   A    I did, yes.

16   Q    And what was your success rate?

17   A    I was not able to open it.

18   Q    How many times did you try?

19   A    Approximately a dozen.

20   Q    Okay.

21   A    So approximately 12.

22   Q    And that was after watching this video frame by frame?

23   A    Correct.  Yes.

24   Q    Was it -- what did you do to potentially -- what did you

25   do to create the shim after watching this video frame by frame?

ANTHONY SANSONE - JUNE 13, 2025                        50
Direct examination by Ms. Ellis

1   A    I used a pair of scissors to cut open a can and attempted

2   to make a shim similar in size and shape to the one shown.

3   Q    Okay.  Did you have to get the measurements exactly

4   precise in order to do it?

5   A    I did not check my measurements against the video exactly,

6   no.

7   Q    But did you have several failed attempts because the shim

8   that you created --

9              THE COURT:  Counsel, you can't ask leading questions.

10             MS. ELLIS:  Yes, Your Honor.

11  BY MS. ELLIS:

12  Q    Were there any attempts that you had made that failed, and

13  why -- why did they fail?

14  A    A lot of the failed attempts were either the shim was too

15  big or too small.  If it was too big, it would get stuck in the

16  lock.  If it was too small, it would rip.  If I -- if the shim

17  didn't quite catch the lock lug square, the shim would rip.  So

18  there were many different fail attempts.

19                    *(Video played.)*

20             MS. ELLIS:  Since we have limited time, I've moved on

21  to video 6 so that we can discuss this, already admitted into

22  evidence.  We're going to go ahead and play it.

23                    *(Video played.)*

24  BY MS. ELLIS:

25  Q    Can you describe what was false or what provides a false

Case 8:25-cv-01119-MSS-LSG    Document 31    Filed 06/30/25    Page 51 of 129 PageID
670
ANTHONY SANSONE - JUNE 13, 2025                    51
Direct examination by Ms. Ellis

1  implication about that video?

2  A    So, in my opinion, that video doesn't show the lock being

3  installed in a real-world application, so it gives pretty

4  similar content to the other videos, gives the ability to

5  freely manipulate the product in your hands without the

6  restriction of what it's mounted to.

7  Q    After these videos, were you in charge of moderating or

8  were you responsible for customer service complaints?

9  A    What was the question?  Was I --

10  Q    Were you -- did you receive customer service complaints

11  after these videos were posted?

12  A    I did, yes, when they were elevated to my level.

13  Q    And what were the customer complaints that were elevated

14  to your level?  What were they indicating that these videos

15  demonstrated about Proven's locks?

16  A    The overall message, I'll call it, was that the products

17  Proven offers are not secure.

18  Q    Were there any returns that occurred as a result of these

19  videos, product returns?

20  A    There was returns, yes.

21  Q    Okay.  Do you recall how many?

22  A    I don't.  I don't have that number in front of me.

23          THE COURT:  Is this document in evidence?

24          MS. ELLIS:  It's not, Your Honor.

25          THE COURT:  Well, before you display it, you need to

Case 8:25-cv-01119-MSS-LSG    Document 31    Filed 06/30/25    Page 52 of 129 PageID
671
ANTHONY SANSONE - JUNE 13, 2025                    52
Direct examination by Ms. Ellis

1  move it.

2          MS. ELLIS:  Yes, Your Honor.

3          And my apologies, Your Honor, we didn't print

4  physical copies of the exhibits because they had some quality

5  control issues, so I'll show the witness.

6          THE COURT:  You need to show it to opposing counsel

7  first.

8          MS. ELLIS:  Yes.  I'm sorry.

9          MR. TURKEL:  Judge, they've redacted out the name of

10 the declarant.  I don't know how I can tell whether it would be

11 covered by the hearsay rule.  It's clearly not a court

12 statement.

13         THE COURT:  Use the microphone.

14         MR. TURKEL:  And I think they're offering it for the

15 truth, so I'm going to object on hearsay.

16         THE COURT:  Counsel.

17         MS. ELLIS:  Yes, Your Honor.  I'll just clarify that

18 it's not being offered for the truth.  It's a product return.

19 A customer is returning a product.  The basis for why she's

20 returning the product, the statements that she makes in this --

21 in her correspondence with Proven are not being offered for the

22 truth, it's been offered for the effect on the listener, how is

23 this impacting Proven, how are the defendant's videos impacting

24 Proven.

25         THE COURT:  Well, I don't know what the statements

Case 8:25-cv-01119-MSS-LSG    Document 31    Filed 06/30/25    Page 53 of 129 PageID
672
ANTHONY SANSONE - JUNE 13, 2025                          53
Direct examination by Ms. Ellis

1   are, so can I see the exhibit?

2               MS. ELLIS:  Yes, Your Honor.

3               THE COURT:  Well, you're not offering the statement

4   to prove why the customer returned the lock?

5               MS. ELLIS:  Yes, Your Honor, we would be offering --

6   we would be offering it for that purpose.

7               THE COURT:  Isn't that the truth of her assertion?

8               MS. ELLIS:  It is the truth of her assertion.  I can

9   add to that, Your Honor.  First, I do believe that this is a

10  business record.  We can lay the predicate for the witness, but

11  this is a record that came into Proven as a result of the

12  defendant's actions and it's maintained in the regular course

13  of business, and Mr. -- our witness has -- Mr. Sansone has

14  reviewed it and is familiar with the record.

15              THE COURT:  Mr. Turkel.

16              MR. TURKEL:  They didn't lay the predicate,

17  Your Honor, for business records.  I don't know who the

18  declarant is other than perhaps a customer.  For all I know, it

19  could have been someone internal pretending to be a customer.

20  But it's a classic hearsay document unless they find an

21  exception or some other purpose for which they're offering it.

22              THE COURT:  Do you want to lay a predicate for this

23  being a business record?

24              MS. ELLIS:  I can lay the predicate, and I would

25  indicate, Your Honor, that we do have Eleventh Circuit case law

Case 8:25-cv-01119-MSS-LSG   Document 31   Filed 06/30/25   Page 54 of 129 PageID
673
ANTHONY SANSONE - JUNE 13, 2025                54
Direct examination by Ms. Ellis

1   that talks about hearsay and its admissibility.

2            THE COURT:  Can you lay a predicate?

3            MS. ELLIS:  Yes.

4            THE COURT:  I know what hearsay is.

5            MS. ELLIS:  Yes, Your Honor.

6   BY MS. ELLIS:

7   Q    I'm showing you what has been identified as Plaintiff's

8   Exhibit 18.  Do you recognize that document?

9            THE COURT:  And you're saying you didn't print these

10  documents because you don't have a printer?

11           MS. ELLIS:  No, Your Honor.  We were having -- when

12  we printed some of the -- when we printed them, it -- they

13  appeared blurry.  That is one of the only one that was not --

14  ones that was not blurry, based on the fact that they were --

15  how they were transmitted from the client to us, and so that

16  one appears clear, but every -- all the other exhibits were

17  blurry when we printed them, based on just the quality of the

18  screenshots.  The emergency nature of the injunction, it's the

19  way that the exhibits were prepared by the client and provided

20  and attached to the -- to the motions.

21           THE COURT:  All right.  Do you remember that

22  document?  Do you recognize it?

23           THE WITNESS:  I do, yes.  This is one of the -- one

24  of the tickets that was brought to my attention.

25           MS. ELLIS:  Okay.

Case 8:25-cv-01119-MSS-LSG    Document 31    Filed 06/30/25    Page 55 of 129 PageID
674
ANTHONY SANSONE - JUNE 13, 2025                    55
Direct examination by Ms. Ellis

 1            MR. TURKEL:  That what was?  I'm sorry.

 2            THE WITNESS:  That was brought to my attention from

 3   customer service.

 4   BY MS. ELLIS:

 5   Q    And is that record, that ticket brought to you, is it

 6   maintained in the regular course of Proven's business?  Is it

 7   maintained by Proven?  Does Proven keep and keep a record of

 8   that document?

 9   A    I believe so, yes.

10   Q    Okay.

11            THE COURT:  Well, do you know?

12            THE WITNESS:  I don't know why it would have been

13   deleted, but I -- there's no reason for this record to be gone,

14   but it should still be in the customer service platform.

15            THE COURT:  Counsel.

16            MS. ELLIS:  Yes, Your Honor.

17   Q    I think you just may be overthinking your answer.

18            THE COURT:  I think you're coaching your witness from

19   the stand.

20            MR. TURKEL:  Objection.

21            MS. ELLIS:  Yes, Your Honor.

22            THE COURT:  Improper.  The objection is sustained.

23   BY MS. ELLIS:

24   Q    Are e-mails that are received, customer e-mail tickets

25   that are received, does -- does Proven keep copies of those

ANTHONY SANSONE - JUNE 13, 2025                    56
Direct examination by Ms. Ellis

1  customer tickets that are received in its records?

2  A    Yes, they're kept in the customer service platform we use.

3  Q    Okay.  Is there any reason for you to believe that this

4  customer service ticket would not be kept in Proven's platform?

5  A    No.

6  Q    And so is it maintained in the regular course of Proven's

7  business?

8  A    Yes.

9  Q    As you see it, you do see some redactions there.  Can you

10 explain to the Court or explain why those redactions are there

11 or what they -- what they redact.

12 A    It appears to be the names of the customer and the

13 customer service representative that was handling this ticket.

14 Q    Okay.  Aside from those names being redacted, has it been

15 altered or manipulated in any other way?

16 A    I don't believe so.

17 Q    Okay.  Is this ticket an authentic ticket that was

18 received by a customer and that was escalated to you during

19 your duties, during the course of your duties?

20 A    It was received into customer service and then brought to

21 my attention, yes.

22        MS. ELLIS:  Okay.  At this point I'd move to admit

23 Plaintiff's Exhibit 18.

24        MR. TURKEL:  Judge, can I have three questions on

25 voir dire?

Case 8:25-cv-01119-MSS-LSG    Document 31    Filed 06/30/25    Page 57 of 129 PageID 676
ANTHONY SANSONE - JUNE 13, 2025                57
Voir dire by Mr. Turkel

1           THE COURT:  You may.

2                **VOIR DIRE OF ANTHONY SANSONE**

3    **BY MR. TURKEL:**

4    Q    You don't work at Prudent, right?

5    A    I do, yes.

6    Q    You don't work at a company called Dynamic Manufacturing?

7    You're not a VP of Dynamic Manufacturing?

8    A    I am, yes.

9    Q    All right.

10   A    The --

11   Q    That's who -- when you get a paycheck, it comes from

12   Dynamic Manufacturing?

13   A    The paycheck comes from Proven.

14   Q    What's the relationship between the companies?

15   A    Dynamic is the supplier of product to Proven.

16   Q    Proven is its sole customer, right?

17   A    No.

18   Q    How much of its business is Proven responsible for?

19   A    Approximately ninety -- I'd have to review the numbers.

20   Q    Have you not been at Dynamic Manufacturing since like

21   two thousand, what, eighteen or eight, which --

22   A    Correct.

23           THE COURT:  Which is it?

24           THE WITNESS:  2018.

25           THE COURT:  You've been there since 2018 at Dynamic?

Case 8:25-cv-01119-MSS-LSG    Document 31    Filed 06/30/25    Page 58 of 129 PageID
67
ANTHONY SANSONE - JUNE 13, 2025                        58
Voir dire by Mr. Turkel

 1            THE WITNESS:  The -- the payroll has always been from

 2   Proven.  So Dynamic is the -- for tax planning purposes, the

 3   manufacturing portion of the business is split into its own

 4   company.

 5            THE COURT:  Who do you work for?

 6            MR. TURKEL:  And that -- I'm sorry, Judge.

 7            THE COURT:  I just want to know who he works for.

 8            THE WITNESS:  My paycheck is from Proven Industries.

 9            THE COURT:  And who do you work for?

10            THE WITNESS:  I work for both Proven and Dynamic.

11   I serve functions for both manufacturing and -- customer

12   service is through Proven.  So I help with the management of

13   certain responsibilities for Proven as well.

14            THE COURT:  Counsel, may continue.

15            MS. ELLIS:  Thank you.

16            THE COURT:  No, I mean Mr. Turkel.

17            You can have a seat while he's voir diring the

18   witness.

19            MR. TURKEL:  Just a few more.

20   BY MR. TURKEL:

21   Q    I'm just going off what you're representing on your

22   LinkedIn page, but it says you're Vice President of Dynamic

23   Manufacturing from October 2018 to the present.  Direct and

24   manage all personnel within the facility, maintain

25   responsibility for the financial performance of the company,

1  lead the design and development of new products.  Is that a

2  true representation?

3  A    That is, yes.

4  Q    All right.  And I don't see Proven anywhere on your

5  employment, at least on your current LinkedIn page.  Is Proven

6  an employer of yours or do they just pay your paycheck?

7  A    That's where the --

8           MS. ELLIS:  Asked and answered, Your Honor.

9           THE COURT:  Overruled.

10 A    The company structure is set up as advised by the -- our

11 accountant that we hire.  So for tax planning, at least the way

12 I understand it, is the product line is ran as a separate

13 company than manufacturing for the purposes of tax planning.

14          THE COURT:  Well, the question pending is:  Is Proven

15 an employer of yours or do they just pay your paycheck?

16          What's the answer to that question?

17          THE WITNESS:  I -- I believe an employer.

18          THE COURT:  You believe you're employed by both

19 Proven and Dynamic?

20          THE WITNESS:  Correct.  I believe I serve roles for

21 both companies.

22          THE COURT:  Counsel.

23 BY MR. TURKEL:

24 Q    Any particular reason why you didn't list Proven as your

25 employer, your current employer on LinkedIn?

Case 8:25-cv-01119-MSS-LSG    Document 31    Filed 06/30/25    Page 60 of 129 PageID 679
ANTHONY SANSONE - JUNE 13, 2025                                         60
Voir dire by Mr. Turkel

1   A    No particular reason, no.

2   Q    All right.  You talk about the corporate roles and you say

3   the manufacturing was put off into its own division and that's

4   Dynamic, right?

5   A    Correct.

6   Q    All right.  That e-mail address that's on customer

7   support, that's not yours, is it?

8   A    On --

9   Q    The customer support e-mail for Proven, on that exhibit

10  that Ms. Ellis was showing you.

11  A    I -- I don't believe this one came to my e-mail, no.  This

12  would have been submitted directly to Proven, to the customer

13  service platform.

14  Q    Right.  That's what I'm asking.

15          Proven Lock Support, that's not your e-mail, right?

16  A    Correct.

17  Q    All right.  And it's not your job to monitor the e-mails

18  that come into that address as part of your role at Dynamic,

19  I guess, and/or Prudent, is it?

20  A    I -- the manager that oversees the customer service

21  platform does report to me, yes.

22  Q    No, that's not my -- my point is you're not the manager

23  who oversees the customer service platform, right?

24  A    I do have access to the customer service platform.

25  Q    When you go to work every day, is your job to monitor the

Case 8:25-cv-01119-MSS-LSG    Document 31    Filed 06/30/25    Page 61 of 129 PageID
680
ANTHONY SANSONE - JUNE 13, 2025                    61
Voir dire by Mr. Turkel

 1  customer service e-mail and maintain the records of that

 2  customer service e-mail?

 3          THE COURT:  You're under oath, sir.

 4  A    I do monitor the customer service platform, not every

 5  ticket that comes in, but I do review tickets as part of an

 6  auditing process to make sure they're being I'll say handled

 7  correctly by customer service.

 8  Q    Right.  Somebody reports to you who does that, right?

 9  A    Correct.  Yes.

10  Q    All right.  And I think the words you used when Ms. Ellis

11  was asking you about this document was whether I think you said

12  it was brought to your attention, right?

13  A    Correct.

14  Q    Who brought it to your attention?

15  A    I believe it was the manager.

16  Q    The manager who deals with these customer service

17  complaints on a daily basis, right?

18  A    Correct.

19  Q    All right.  That's not your job though, right?

20  A    Not to deal with the customer service tickets on a daily

21  basis, interacting with customers, no.

22  Q    Right.  You can't tell me like what subfile he or she may

23  save them in as part of his or her job as a -- whatever the

24  role is, manager of customer service, right?

25  A    They're on a cloud-based customer service platform where

Case 8:25-cv-01119-MSS-LSG    Document 31    Filed 06/30/25    Page 62 of 129 PageID 681
ANTHONY SANSONE - JUNE 13, 2025                              62
Voir dire by Mr. Turkel

1   all the records are kept by customer number and contact

2   information.

3   Q    Right.  But the person who works under you is the one who

4   does all that, right?

5   A    I believe it's done by the platform itself automatically.

6   Q    Good enough.

7          Were any others brought to your attention or was it

8   just this specific one?

9   A    There were several.

10  Q    All right.  As you sit here today, do you know for a fact

11  that that document was inventoried by the manager who oversees

12  that function every day and put in the right place, or even

13  where it came from?

14  A    I believe it would be kept within the cloud-based customer

15  service platform, Gorgias, as you see it listed.

16  Q    That's what you believe, right?

17  A    Right.

18  Q    All right.  Who is the customer that you redacted the name

19  on?

20  A    I don't recall the customer name.

21          MR. TURKEL:  Okay.  I have nothing further, Judge.

22          THE COURT:  So do you object to the introduction of

23  this document?

24          MR. TURKEL:  Yeah.  Judge, yeah, I do, and a big part

25  of it is the redaction of the name.  I mean, I have no idea, it

```
 1    could have been someone who works there, for all I know.
 2    I don't know who the declarant is.
 3              THE COURT:  Is the document kept in redacted form on
 4    your platform in the ordinary course of business?
 5              THE WITNESS:  No.
 6              THE COURT:  The ordinary course of business is the
 7    customer's name is on the document, and the customer service
 8    rep who received the document, their name is on the document?
 9              THE WITNESS:  Correct.  Along with any internal
10    communications between customer service representatives,
11    managers, myself.
12              THE COURT:  So if somebody sent it to you in the
13    ordinary course of business, the document would reflect that?
14              THE WITNESS:  If they typed my name at my attention.
15    If they had just mentioned it, hey -- for example, if they came
16    to my office, hey, can you go over this ticket with me, we
17    would pull up the ticket and review it.
18              THE COURT:  How did it happen this time?
19              THE WITNESS:  I believe they came to my office and we
20    reviewed it.
21              THE COURT:  Who is "they"?
22              THE WITNESS:  The customer service manager.
23              THE COURT:  What is the person's name?
24              THE WITNESS:  Dave Smith.
25              THE COURT:  And is that whose name should be
```

1    unredacted on the document?

2           THE WITNESS:  I'm not sure if it's Dave or one of the

3    customer service representatives.

4           MS. ELLIS:  I just want to indicate, Your Honor, that

5    it was redacted to preserve the privacy of those individuals,

6    because there were a lot of threats that were going to each of

7    the employees, and so every employee that was identified by

8    Proven were receiving, and we do have some exhibits to

9    demonstrate it, threatening messages to their e-mail addresses.

10          THE COURT:  Well, we're here on the point of whether

11   this document can be admitted into evidence or whether it is

12   impermissible hearsay, and you're trying to introduce it as a

13   business record, saying it's in the manner in which it's kept

14   in the ordinary course of business and it's the ordinary course

15   of business to keep it in this fashion, and that's not accurate

16   to this document because it's been modified for litigation, so

17   it is not a document kept in the ordinary course of business in

18   the manner in which it is kept, it's a separate pulled-out

19   document, so it can't be introduced as a business record, and

20   it is offered to prove the truth of the matter asserted, which

21   is why the customer returned the lock, and that's hearsay, so

22   it's hearsay, so it cannot be admitted.

23          MS. ELLIS:  May I respond just one -- if you would

24   allow me to do that, Your Honor.

25          THE COURT:  Yes.

ANTHONY SANSONE - JUNE 13, 2025                    65
Voir dire by Mr. Turkel

1              MS. ELLIS:  Business records are often redacted to

2     preserve confidentiality of parties, to remove personal

3     identification information.  You know, the witness has

4     testified to how the record is maintained, to how it was

5     escalated to him, to how he viewed it.  We understand that it's

6     been redacted for purposes of litigation, but it's not uncommon

7     that business records are redacted for that purpose.

8              THE COURT:  Do you have the unredacted version in

9     your possession?

10             MR. FAHEY:  It's on that laptop.  I can --

11    Your Honor, it's on that laptop.  I can access it.

12             THE COURT:  I need to see the unredacted version, and

13    if it needs to be sealed to protect the identity of the people

14    then let's seal it to protect their identity, but for purposes

15    of a business record it has to be a business record.

16             MS. ELLIS:  Yes, Your Honor.

17             THE COURT:  Do you have another question while Ms. --

18             MS. ELLIS:  Yes, Your Honor.  I'll move on to that.

19             I do have the unredacted version, Your Honor.  I'll

20    show counsel and then approach.

21             THE COURT:  You may.

22             MS. ELLIS:  May I approach, Your Honor?

23             THE COURT:  You may.

24             MS. ELLIS:  I'm now showing the unredacted version of

25    the e-mail to the witness.

Case 8:25-cv-01119-MSS-LSG    Document 31    Filed 06/30/25    Page 66 of 129 PageID
685
ANTHONY SANSONE - JUNE 13, 2025                    66
Direct examination by Ms. Ellis

1              **CONTINUED DIRECT EXAMINATION OF ANTHONY SANSONE**

2    **BY MS. ELLIS:**

3    Q    Mr. Sansone, are you familiar with that document?

4    A    Yes.

5    Q    And have you seen it before?

6    A    I have, yes.

7    Q    How was it escalated to you?

8    A    It was part of a series of tickets that were -- in the

9    overall discussion of here's another one, here's another one,

10   here's another one.

11              THE COURT:  Brought to your attention from customers

12   who were making complaints about the product?

13              THE WITNESS:  Correct.  Yes.

14   Q    And you've testified how these records are maintained in

15   the normal course of business.  Is it your understanding -- are

16   you able to identify the name of the customer and the name of

17   the Proven employee by reviewing that unredacted portion of the

18   video -- of the e-mail?

19   A    I don't see a --

20   Q    I'll rephrase the question.

21              THE COURT:  Well, I want to hear the answer to the

22   question.

23              You don't see what?

24              THE WITNESS:  I don't see a last name of the

25   customer, but based on first name and e-mail used, the

1    customer's full name will be present in the customer service

2    ticket platform.

3              MS. ELLIS:  All right.  I'll move to admit this as a

4    business record.  The witness has identified it as something

5    that's maintained in the normal course of business, that was

6    escalated to him during his -- pursuant to his duties as

7    Vice President, and I think that --

8              THE COURT:  Vice President of what?

9              MS. ELLIS:  Vice President --

10   Q    Can you clarify your role for the Court.

11             THE COURT:  Your Proven role is Vice President of

12   what?

13             THE WITNESS:  Of --

14             THE COURT:  Or do you only have a role as

15   Vice President of Dynamic?

16             THE WITNESS:  By title, Vice President of

17   Manufacturing, but as the company has grown I've expanded roles

18   into helping with roles of Proven as well.

19             THE COURT:  Do you have a title within Proven?  If we

20   look at their org chart, where would you appear?

21             THE WITNESS:  Under the org chart of Proven I would

22   not -- there is a vacant spot for Vice President of -- at

23   Proven, so I'm helping to fill those roles until we're able to

24   officially seat someone in that position.

25             THE COURT:  So you're not on the official org chart

ANTHONY SANSONE - JUNE 13, 2025                    68
Direct examination by Ms. Ellis

 1  of Proven in any capacity?

 2          THE WITNESS:  Not currently officially, no.

 3          THE COURT:  So your role is in Dynamic?

 4          THE WITNESS:  According to the current org chart,

 5  yes.

 6          THE COURT:  Any questions in follow-up, Counsel?

 7          MS. ELLIS:  Yes.

 8  BY MS. ELLIS:

 9  Q    Now, you indicate that you serve your duties, right --

10  you're not a part of the org chart, but your duties are

11  services -- you provide services to both Proven and Dynamic;

12  is that correct?

13  A    Correct.  Yes.

14  Q    Okay.  What are the services that you provide to Proven?

15  A    Overall -- overall leadership, problem solving, to the

16  manager in place at Proven.

17  Q    What type of problem solving for Proven do you conduct on

18  a day-to-day basis?

19  A    Would be tickets that get escalated to the manager and he

20  has unclear direction of how to proceed, would be an example.

21  Q    Okay.  Anything else?

22  A    Overall organization and allocation of inventory.

23  Q    Okay.

24          MS. ELLIS:  I don't have any further questions

25  regarding that.  I do think that the witness has demonstrated

1    that he's familiar with these processes, these tickets get

2    escalated to him, and he understands that this is kept in the

3    normal course of business.

4              THE COURT:  Counsel.

5              MR. TURKEL:  Again, his testimony said he worked for

6    Proven.

7              THE COURT:  I can't hear you.

8              MR. TURKEL:  Judge, at the beginning of his testimony

9    he said he worked for Proven.  I'm looking at his declaration

10   which is in the record as part of the court papers, the motion,

11   et cetera, and he doesn't mention Dynamic Manufacturing once in

12   his declaration in support of their motion.  In fact, he holds

13   out throughout the entire dec that he's only worked for Proven,

14   doesn't mention this role he has at another company, Judge.

15             THE COURT:  What's the docket number?

16             MR. TURKEL:  Docket number 10(5).  10(5), Judge.

17             THE COURT:  Is that in the folder,

18   Ms. Johnson-Restrepo?

19             MR. TURKEL:  10(5) is Plaintiff's Exhibit 10(11).

20             THE COURT:  Do you swear under oath that you are

21   currently a mechanical engineer employed by Proven Industries,

22   the plaintiff in this matter?  Is that a true statement?

23             THE WITNESS:  That is a true statement, yes.

24             THE COURT:  And you're employed by them because they

25   pay your paycheck, even though you work for Dynamic officially?

ANTHONY SANSONE - JUNE 13, 2025                    70
Direct examination by Ms. Ellis

1          THE WITNESS:  Correct.  The paycheck comes from
2     Proven, and as the company grows the -- I'll say we're a little
3     slow to establish the overall leadership structure of the
4     individual companies, so there is some blending of
5     responsibilities.
6          THE COURT:  Counsel.
7          MR. TURKEL:  Judge, I asked him whether he's
8     maintained the representation that he was Vice President of
9     Dynamic was true, and he said that was true.  It's an
10    injunction, Your Honor.  It's a snapshot.  I don't have the
11    ability to delve into what he puts on his tax returns or what
12    the relationships are, I just know this, he signed a
13    declaration that didn't mention the name of an employer who he
14    swore to me today was a correct representation of his employer
15    on his LinkedIn.
16          Why it calls into question what I would normally
17    consider a somewhat benign document is that, number one,
18    I don't think he's established a clear vision of being a
19    custodial predicate witness at Proven; secondly, I now am
20    looking back on his testimony, which was largely opinion,
21    wondering who he is testifying on behalf of, his role as a
22    Proven person, Dynamic, or neither.  I don't really know.  It's
23    hard at an injunction hearing.  But I certainly don't think
24    he's a custodial witness for this document.  As to his
25    representations in his declaration, Your Honor, versus his

Case 8:25-cv-01119-MSS-LSG    Document 31    Filed 06/30/25    Page 71 of 129 PageID 690
ANTHONY SANSONE - JUNE 13, 2025                      71
Direct examination by Ms. Ellis

1    testimony and this somewhat wishy-washy "I'm employed by
2    Proven, I guess," I'll leave that to the Court.
3              THE COURT:  Do you have some other records custodian
4    you want to introduce these documents through who actually
5    works for Proven on an org chart, whose job it is to maintain
6    the custody of Proven's records?
7              MS. ELLIS:  Give me a moment, Your Honor.
8              THE COURT:  Yes.
9              MS. ELLIS:  Yes, Your Honor, we do.
10             THE COURT:  All right.  Then the Court sustains the
11   objection.  I don't believe that Mr. Sansone has adequately
12   demonstrated to the Court that he knows anything about the
13   maintenance of records in a way that gives the Court comfort
14   that it can rely on this document, which is, you know, rife
15   with hearsay, as a business record without someone telling me
16   how it's kept in the ordinary course of business, and if
17   there's such a person, I'd like to hear from that person.
18             Is there any other question of this witness?
19             MS. ELLIS:  Yes, Your Honor.  One moment.
20             THE COURT:  How many more questions of this witness?
21             MS. ELLIS:  Just a few, Your Honor.
22             THE COURT:  I beg your pardon?
23             MS. ELLIS:  Just a few, Your Honor.
24             THE COURT:  All right.  We're going to take a recess
25   for 15 minutes and then come back.

Case 8:25-cv-01119-MSS-LSG    Document 31    Filed 06/30/25    Page 72 of 129 PageID
691
ANTHONY SANSONE - JUNE 13, 2025                          72
Direct examination by Ms. Ellis

```
 1              We're going to have to pick this up after the lunch

 2    hour, so I hope your schedules permit.

 3              Yes, sir.

 4              MR. TURKEL:  Yes, Judge.  My doesn't.  I was supposed

 5    to fly to Louisville this morning for a wedding, my

 6    son-in-law's family.  My wife went alone.  I moved my flight to

 7    three o'clock.  I don't have a limited -- I mean, I'm supposed

 8    to be up there by dinnertime.  I, generally speaking, Judge,

 9    have had an awful lot of injunctions before you.  It never

10    really has gone like that.  I can certainly talk to my family

11    and see, but I need to be --

12              THE COURT:  We're going to take a 15 minute recess.

13    You all figure this out.  I will be back in just a few minutes.

14              MR. TURKEL:  Thanks, Judge.

15                         - - - - -

16         (Recess at 10:57 a.m. until 11:13 a.m.)

17                         - - - - -

18              THE COURT:  Please retake the stand.

19              We have a few more minutes.  I moved my meeting at

20    noon back so we can move quickly through any couple more

21    questions, meaning three to five, you have of this witness.

22              The Court reminds you that you're still under oath,

23    sir.

24              THE WITNESS:  Yes, Your Honor.

25              MS. ELLIS:  Yes, Your Honor.  We can actually release
```

Case 8:25-cv-01119-MSS-LSG    Document 31    Filed 06/30/25    Page 73 of 129 PageID 692
ANTHONY SANSONE - JUNE 13, 2025                                73
Cross-examination by Mr. Turkel

1    this witness.  I can follow up my questions at the end with my

2    other witness.

3              THE COURT:  Well, he has an opportunity to Cross him.

4              MS. ELLIS:  Yes.

5              THE COURT:  So, Counsel.

6              **CROSS-EXAMINATION OF ANTHONY SANSONE**

7    **BY MR. TURKEL:**

8    Q    Mr. Sansone -- is it Sansone or Sansone?

9    A    Sansone.  That's how we pronounce it.

10   Q    There was a lot of discussion about your efforts to shim

11   the lock that's in the part 1 video.  The bottom line is though

12   after you said 20 attempts, you also were able to do it, right?

13   A    After watching the other videos, yes.

14   Q    Right.  You watched a how-to-do-it video and then you

15   replicated it, and maybe it took you a few times, but you could

16   do it, right?

17   A    Eventually, yes.

18   Q    All right.  And so one truth we know is that with a shim

19   made from a tinfoil can, you can trip that latch and release

20   the lock, right, bypass it, as you say, right?

21   A    Correct.  Yes.

22   Q    Have you ever gone on YouTube like to figure out how to do

23   something to your car or your house?

24   A    Yes.

25   Q    All right.  When you see a car mechanic explain how to do

Case 8:25-cv-01119-MSS-LSG     Document 31     Filed 06/30/25     Page 74 of 129 PageID
693
ANTHONY SANSONE - JUNE 13, 2025                              74
Cross-examination by Mr. Turkel

1  something with a car, do you assume that's the first time

2  they're trying it?

3  A    I don't assume that, no.

4  Q    Right.  You assume they know what they're doing and

5  they're showing others how to do it, right?

6  A    Yes.  I would hope so.

7  Q    The -- the -- the language that you kept using over and

8  over again, at least one of the things you said was misleading

9  was that it was misleading about the prep, the measuring, size

10  and shape of the shim, right?

11 A    Correct.

12 Q    All right.  Now, you've obviously got an engineering

13 background.  At times in your testimony you stated that that

14 was your opinion, right?  Right?

15 A    Correct.

16 Q    That this was misleading because of the size and shape of

17 the shim.  But in the videos you watch, of course, Mr. McNally

18 doesn't make any statement about what he did or didn't do in

19 prep, does he?

20 A    I don't believe so, no.

21 Q    And he doesn't say you need to get a ruler out and measure

22 this and cut it with a certain kind of scissor or knife or

23 anything like that, right?

24 A    I believe the one video he mentions the measurement needs

25 to be exact.

ANTHONY SANSONE - JUNE 13, 2025                          75
Cross-examination by Mr. Turkel

1   Q    The video, and we'll show it, I think it's going to show

2   that after y'all -- or after Proven calls him out, he says in

3   precise words like "a wee bit" and "a smidge," right?

4   A    I believe words to those effects, yes.

5   Q    Yeah.  Because he was joking about the precision, wasn't

6   he?

7   A    That I don't know.

8   Q    As you sit here today, you don't have any idea about what

9   Mr. McNally did or didn't do before he shot the video, right?

10  A    Before the videos?  No, I --

11  Q    Well, you just think they're misleading because it's your

12  opinion he would have had to do something, right?

13  A    Correct, it's my opinion.

14  Q    Now, we can agree that on the actual videos you see what

15  you see, right?  You see what he does real-time, correct?

16  A    You do see the content presented, yes.

17  Q    All right.  You're not contending it's been altered by CGI

18  or some kind of software that changes the content between when

19  he shoots it and publishes it, are you?

20  A    That's where I -- after breaking the videos down, there

21  are some inconsistencies that I noted.

22  Q    That's not my question.

23           My question was:  Are you saying that there was some

24  alteration using some computer program, or that it was

25  computer-generated graphics, or anything like that?

1    A    As I just stated, the -- there appear to be some visual

2    inconsistencies in the video that -- I'm not overly familiar

3    with video editing processes, but based on observation, there

4    seemed to be parts that don't -- aren't fully carried through

5    the whole content.

6    Q    You're not a graphics designer, are you?

7    A    No.

8    Q    You're not educated and trained in computer graphics, are

9    you?

10   A    I'm not, no.

11   Q    So you're giving me an opinion based on what limited

12   knowledge you have in that area?

13   A    Correct.

14   Q    All right.  Let's look in one of the videos.  This is --

15         MR. TURKEL:  What is it, number 16?  Is that

16   Plaintiff's 16?

17         MR. HAYES:  Defense.

18   Q    Defense 16.  I'm sorry.

19         Before you get that -- Mr. Sansone, who is that

20   gentleman there?

21   A    That is Chris Canning.

22   Q    But who is he?  I mean, who is he to Proven or Dynamic or

23   anyone else?

24   A    He is hired by Proven to produce social media content.

25   Q    Is that all he does at Proven?

Case 8:25-cv-01119-MSS-LSG    Document 31    Filed 06/30/25    Page 77 of 129 PageID
096
ANTHONY SANSONE - JUNE 13, 2025                    77
Cross-examination by Mr. Turkel

 1   A    Yes.  I believe so.

 2   Q    Is that what he is, a social media influencer?

 3   A    He has a charter fishing business that he also produces

 4   social media content for, and then --

 5   Q    Does he have a social media platform like any of

 6   Mr. McNally's in which the sole purpose of it is to discuss,

 7   critique, exhibit locks and locking mechanisms?

 8   A    Other than what he does for Proven, I don't believe so.

 9   Q    Right.  Like that's not something he does on the stand as

10   a vocation or a business or anything like that, right?

11   A    Not that I'm aware of, no.

12            THE COURT:  So is he an actor?

13            THE WITNESS:  I mean, Proven hires him to do these

14   videos, so he films and edits and posts content, but he --

15   that -- in terms of his roles at Proven, that's the extent of

16   his roles, is the social media footage and content and

17   management.

18            THE COURT:  Does he produce the video or does he just

19   act in the video?

20            THE WITNESS:  Both.  He produces the videos, edits,

21   posts and monitors content now.

22            THE COURT:  Does he create the content of the video?

23            THE WITNESS:  I believe so.  I believe there's

24   general direction given to him of this is the type of video

25   we're looking for, and then it's under his discretion to come

ANTHONY SANSONE - JUNE 13, 2025                          78
Cross-examination by Mr. Turkel

1   up with the content, film it, post it.

2   BY MR. TURKEL:

3   Q    And just to close that line of questioning, he's not a

4   full-time employee of Proven or Dynamic, right?

5   A    I don't believe so.  I believe he is paid --

6               THE COURT:  Do you know or are you guessing?

7               THE WITNESS:  I'm assuming.

8               THE COURT:  Okay.  Don't give us any assumptions.

9               THE WITNESS:  Okay.

10              THE COURT:  Only testify about what you know.

11              THE WITNESS:  Okay.  So I'm not sure.

12              MR. TURKEL:  All right.  I can't remember if we

13  played this one, Judge, I've lost track of which ones are

14  screenshots or not, but I'm going to offer it at the end, so

15  I don't know if the plaintiff has any objections.

16              THE COURT:  This is Exhibit 16.  It's already in

17  evidence, right?

18              MS. ELLIS:  It's not.

19              MR. TURKEL:  No, I think they screenshot it.

20              THE COURT:  All right.  The screenshot of this is in

21  evidence.

22              MR. TURKEL:  They didn't offer.  They said

23  demonstrative.

24              THE COURT:  Are you moving it?

25              MR. TURKEL:  I'm going to move it in, yes,

Case 8:25-cv-01119-MSS-LSG    Document 31    Filed 06/30/25    Page 79 of 129 PageID
698
ANTHONY SANSONE - JUNE 13, 2025                    79
Cross-examination by Mr. Turkel

```
 1   Your Honor.
 2            THE COURT:  Any objection?
 3            MS. ELLIS:  No, no objection.
 4            THE COURT:  It will be received.
 5            MR. TURKEL:  All right.  Let's go ahead and play the
 6   video.
 7            THE COURT:  I'm sorry.  Can you describe it first,
 8   for the record.
 9            MR. TURKEL:  Yes.  I think this is what they've
10   defined as the part 1 video.  The response video to the part 1
11   video.  I'm sorry.  So the video attached, Your Honor,
12   referenced in the pending Complaint, part 1 video, this is
13   their response to that.
14            THE COURT:  Does it have an exhibit number?
15            MR. TURKEL:  Yes, I thought I had said that.
16   Defense 16, Your Honor.
17            THE COURT:  Defense Exhibit 16.
18            All right.  Continue.
19                         (Video played.)
20   BY MS. ELLIS:
21   Q    All right.  What's his name?  Is it Chris Canning?
22   A    Yes.
23            THE COURT:  Use the microphone, Mr. Turkel.
24            MR. TURKEL:  Yes, Judge.  I'm sorry.  It's a bad
25   habit of mine.
```

Case 8:25-cv-01119-MSS-LSG    Document 31    Filed 06/30/25    Page 80 of 129 PageID
699
ANTHONY SANSONE - JUNE 13, 2025                    80
Cross-examination by Mr. Turkel

```
 1    BY MR. TURKEL:

 2    Q    When Mr. Canning -- when the video cuts to someone trying

 3    to shim that lock, is it Mr. Canning?

 4    A    I'm not sure.

 5    Q    Was it you?

 6    A    It was not me.

 7    Q    Those cylinders that he references, those are manufactured

 8    by Dynamic for Proven, right, the puck lock cores or whatever

 9    they call them, the three things he had there on the table?

10    A    No.

11    Q    Where are they manufactured?

12    A    They're manufactured by outside vendors.

13    Q    China?

14    A    One of them, yes.

15    Q    All right.  Is one of them done by Dynamic?

16    A    No.

17    Q    What Proven does is just assemble the parts, right?

18    A    Correct.

19    Q    All right.  At the time Exhibit 16, the video we just

20    watched, was shot, had you already tried to shim the lock

21    yourself?

22    A    I believe so, yes.

23    Q    And so Mr. Canning tells everybody that we've never had a

24    customer or anybody tell us that this can be shimmed.  Did you

25    go to him and tell him, well, I actually did it after a few
```

Case 8:25-cv-01119-MSS-LSG    Document 31    Filed 06/30/25    Page 81 of 129 PageID
700
ANTHONY SANSONE - JUNE 13, 2025                                81
Cross-examination by Mr. Turkel

1    tries, Chris, maybe not the best thing to say?

2    A    At the time of that video, I still hadn't successfully

3    shimmed the product.

4    Q    So when you had these 20 efforts to shim it, were they

5    like broken up over days, or did you just sit there in one

6    sitting to try and do it?

7    A    Correct.

8            THE COURT:  Well, I'm just confused.  The question

9    was:  "At the time Exhibit 16, the video we just watched, was

10   shot, had you already tried to shim the lock yourself?"

11   And you said, "I believe so, yes."  And now you're saying that

12   you weren't successful before the video was shot?

13           THE WITNESS:  Correct.  I had tried but wasn't --

14   hadn't successfully shimmed it open.

15           THE COURT:  Counsel, continue.

16   BY MR. TURKEL:

17   Q    All right.  Let's assume for a second your memory is off

18   and you shimmed it afterwards, okay?  All right?  Let's look at

19   that space for a second, all right?

20           You have to say yes or no --

21   A    Yes.

22   Q    -- because the court reporter can't take a nod down.

23           After you successfully shimmed it, did you go back to

24   the owner, Mr. Ron Lee, or to Chris Canning or to anybody and

25   say, "Hey, we should probably take that video down, because

Case 8:25-cv-01119-MSS-LSG    Document 31    Filed 06/30/25    Page 82 of 129 PageID
701
ANTHONY SANSONE - JUNE 13, 2025                          82
Cross-examination by Mr. Turkel

 1  when he tells everybody we've never had anybody tell us this
 2  can be done, it's not true, I did it last night"?
 3  A    I did not suggest to take the video down.
 4  Q    Well, I mean, but, wait, he's not telling the truth, is
 5  he?
 6  A    I believe what he said in the video is we've never had a
 7  customer complaint that their lock was shimmed off.
 8  Q    I think he said more things than customer, but my point is
 9  this:  As we sit here today, we know that it can be shimmed,
10  right, popped out with a shim, right?
11  A    Correct.
12  Q    Let's take a look at Defense 17.  It's another video.
13          MR. TURKEL:  Again, Judge, I lost track of the
14  screenshots versus the one video they admitted, so I'm going to
15  offer this.  If it's already in --
16          THE COURT:  Any objection?
17          MR. TURKEL:  -- we can --
18          THE COURT:  Defense Exhibit 17.
19          MS. ELLIS:  No objection.
20          THE COURT:  One second.  One second.
21          MS. ELLIS:  No objection, Your Honor.
22          THE COURT:  It will be received.
23                      (Video played.)
24          MR. TURKEL:  Stop right there.  Just hold on for one
25  second.

Case 8:25-cv-01119-MSS-LSG    Document 31    Filed 06/30/25    Page 83 of 129 PageID
702
ANTHONY SANSONE - JUNE 13, 2025                    83
Cross-examination by Mr. Turkel

1   BY MR. TURKEL:

2   Q    Up at the top is a post from the Proven Locks' Instagram

3   account; do you see that?

4   A    I do see it, yes.

5   Q    All right.  Now, it says:  Sorry, but McNally has been

6   fooling people for years.  He makes and edits his videos to

7   make himself look good.  The lock was altered, and we currently

8   have a lawsuit against him for the lies he has made.  He will

9   be exposed in court with a jury to decide.  That's how

10  confident we feel.

11          Now, was this video -- let me rephrase that.  Was

12  that post sent out after the Canning video, Exhibit 16 that we

13  just saw?

14  A    I'm not sure of the timing.

15  Q    Did you read that post before it went out?

16  A    No.

17  Q    Do they run any of the technical language in these posts

18  by you as the mechanical engineer who knows locks?

19  A    No.

20  Q    Do you know of any facts that support Proven Locks'

21  statement in this segment of Exhibit 17?  Do you know of any

22  facts that support the company's statement that the lock was

23  altered?

24  A    No.  To me it seems like opinion.

25  Q    Like opinion, right?  Like they're pushing back at some

Case 8:25-cv-01119-MSS-LSG    Document 31    Filed 06/30/25    Page 84 of 129 PageID
703
ANTHONY SANSONE - JUNE 13, 2025                          84
Cross-examination by Mr. Turkel

1   critic, right?

2   A     To me is how it seemed, yes.

3   Q     Robust discourse, free market capitalism, right?  Right?

4   A     I don't quite understand the question.

5   Q     Well, when people go to restaurants, if they don't like

6   them, do they go on Yelp and say "I didn't like the

7   restaurant"?

8   A     People do, right.

9   Q     Right.  There are people that are paid to review

10  restaurants also, correct?

11  A     I believe so, yes.

12  Q     We can apply that to cars, right?

13  A     I believe so, yes.

14  Q     Any number of consumer products that are subject to parity

15  or critique, et cetera, correct?

16  A     I believe so, yes.

17  Q     In fact, in Exhibit 16, the one with Mr. Canning in it, he

18  kind of lays down the challenge, I think he says, "We're

19  throwing down the gauntlet, let's get down to business," and he

20  says, "this is why McNally is wrong," right?

21        MS. ELLIS:  Objection, Your Honor.  Mischaracterizing

22  the video.

23        THE COURT:  Overruled.  Please --

24  Q     You remember that part --

25        THE COURT:  -- make your -- I'm sorry.  Please make

Case 8:25-cv-01119-MSS-LSG   Document 31   Filed 06/30/25   Page 85 of 129 PageID
704
ANTHONY SANSONE - JUNE 13, 2025                    85
Cross-examination by Mr. Turkel

1  your objections from your feet so that there's --

2          MS. ELLIS:  Yes, Your Honor.  My apologies.

3          THE COURT:  All right.  Overruled.

4  BY MR. TURKEL:

5  Q    Do you remember that part of the video though where in the

6  beginning Canning says, right, we like to hear feedback, blah,

7  blah, blah, and, you know, now down to business, right, the

8  transition, right?

9  A    Something to that effect.

10 Q    Right.  And so now this is McNally coming back against --

11         MR. TURKEL:  Dave, we'd like to keep the --

12 Q    Against the background of this video where Proven Locks is

13 basically calling him a liar, saying he's been fooling people

14 for years, and claims the lock was altered in the very first

15 video he did and that they currently have a lawsuit, talking

16 about this lawsuit, right?

17 A    I believe so, yes.

18 Q    All right.

19         MS. ELLIS:  I'm going to -- I'm going to object

20 again, Your Honor.  I mean, this witness does not have personal

21 knowledge of that post.  That was posted by Mr. -- by the

22 defendant.

23         THE COURT:  Overruled.

24 Q    So you've seen this video before, haven't you?

25 A    This video, yes.

Case 8:25-cv-01119-MSS-LSG    Document 31    Filed 06/30/25    Page 86 of 129 PageID
705
ANTHONY SANSONE - JUNE 13, 2025                          86
Cross-examination by Mr. Turkel

1    Q    He goes to the Amazon locker and Mr. McNally takes a box

2    out with unopened locks in it, right?

3    A    Correct.

4    Q    Okay.  Now --

5              THE COURT:  Or he purports to.

6              THE WITNESS:  What was the question?  Sorry.

7              THE COURT:  Or he purports to.

8              THE WITNESS:  Correct.  Yeah.  It would appear that's

9    how that would work.

10   BY MR. TURKEL:

11   Q    Well, do you know as you sit here today of any factual

12   evidence that Mr. McNally is not going to an Amazon locker that

13   he opened and had unopened Proven locks in it?

14             MR. TURKEL:  Dave, go back to the beginning of that.

15   Let's look at it again.

16                      *(Video played.)*

17             MR. TURKEL:  Stop right there.

18   BY MR. TURKEL:

19   Q    Is there any fact that you know of that says that he did

20   not walk to that locker and take that Amazon box out of it?

21   A    That appears in the video that's what happens, yes.

22   Q    All right.  And at that point, when he does that, do you

23   have any knowledge or has anybody at Proven told you that they

24   have knowledge that he altered the locks in that box?

25   A    No, not retrieving it out of the locker.  No.

Case 8:25-cv-01119-MSS-LSG    Document 31    Filed 06/30/25    Page 87 of 129 PageID
706
ANTHONY SANSONE - JUNE 13, 2025                    87
Cross-examination by Mr. Turkel

1    Q    All right.

2              MR. TURKEL:  Play the rest of the video, please.

3                        (Video played.)

4    BY MR. TURKEL:

5    Q    Now, there are no representations in there -- let me ask

6    it this way.  Everything he did, everything Mr. McNally did in

7    that, he has shown you as he does it, right?

8              MS. ELLIS:  Objection, Your Honor.  Speculation.

9              THE COURT:  There's no objection on that side of the

10   room that I heard.

11             MS. ELLIS:  I'm so sorry, Your Honor.  Objection,

12   speculation.

13             THE COURT:  Overruled.

14   BY MR. TURKEL:

15   Q    All right.  So when you opined earlier that, you know, he

16   must have done something, or there's no way he could have done

17   this without prepping, everything is transparent on that video,

18   is it not?

19             MS. ELLIS:  Objection, Your Honor.  Again,

20   speculation.  He was not present for that video that is

21   purported.

22             THE COURT:  He can answer the question.

23   A    There is a portion of the video where the lock in question

24   is out of frame.

25   Q    Out of frame.  All right.  Other than that, you can see

1   everything he's doing with his hands, right?

2           THE COURT:  Well, that's the big magician question.

3   Other than that, you know, the rabbit did come out of the hat.

4           Can you just play back the video and let me see what

5   portion of it is he says is the potentially altered section of

6   the video?

7           MR. TURKEL:  Yeah.

8           THE COURT:  Just tell him to stop it when you get to

9   that point.

10                      *(Video played.)*

11          THE COURT:  Right there, where the beer can covers

12  the camera, you're indicating that you don't know what happens

13  in this segment, somebody theoretically could have slipped the

14  box out and set a new box in?

15          THE WITNESS:  In theory, yes.

16          THE COURT:  All right.  Counsel.

17          MR. TURKEL:  All right.  We don't need to watch the

18  video again, Your Honor, unless you wanted to see it.

19          THE COURT:  Is there another place?

20          THE WITNESS:  With regards to stuff being off frame?

21          THE COURT:  Yes.

22          THE WITNESS:  No, it was just this portion.

23          THE COURT:  All right.  And that is what segment,

24  what point?  25 seconds?

25          THE WITNESS:  Yes.

ANTHONY SANSONE - JUNE 13, 2025                    89
Cross-examination by Mr. Turkel

```
 1              THE COURT:  All right.  Counsel, continue.
 2   BY MR. TURKEL:
 3   Q    The word that I kept hearing during your testimony was it
 4   was your opinion that it was misleading as to the size and
 5   shape of the shim, right?
 6   A    Correct.
 7   Q    He cuts the shim on camera, does he not?
 8   A    Correct.  Yes.
 9   Q    You don't see him measure it or anything, do you?
10   A    No, you do not see him measuring.
11   Q    Maybe he had a lot of experience at cutting shims and it
12   comes easier to him, right?
13   A    Yes.
14   Q    And when -- well, we've already talked about it, but when
15   anybody goes on YouTube, you're going to assume that the person
16   doing the video, showing you how to do something, knows how to
17   do it already, right?
18              THE COURT:  I'm sorry.  Yes, ma'am.  Is there an
19   objection?
20              MS. ELLIS:  No.
21   BY MR. TURKEL:
22   Q    What I'm trying to get to here with you, Mr. Sansone, is a
23   precise statement of what is false about what's happening on
24   that video, other than the things we've discussed, the
25   misleading about prep time and so on and so forth.
```

Case 8:25-cv-01119-MSS-LSG    Document 31    Filed 06/30/25    Page 90 of 129 PageID
709
ANTHONY SANSONE - JUNE 13, 2025                        90
Cross-examination by Mr. Turkel

 1              There was -- do you have any factual basis to say
 2    anything happened off camera during the making of that other
 3    than one instance you point out where the can kind of obscured
 4    the lens?
 5    A    Off camera, no, but there was a portion of using the key
 6    to open the lock to inspect the functioning of the lock core --
 7    Q    Okay.
 8    A    -- and to, as I said, inspect the lock core prior to
 9    attempting to shim.
10    Q    And that's it, he looked at the lock core by opening it
11    with the key, right?
12    A    Correct.
13    Q    Wanted to make sure the lock worked, that's what he said
14    in the video, isn't it?
15    A    And at that time he would have visually noted the function
16    and shape of the lock, the plunger, whether it was square cut,
17    tapered.
18    Q    You mean he'd be able to see how the lock works; is that
19    what you're saying?
20    A    Correct.
21    Q    Okay.  And as someone who basically does this full time,
22    he often sees how they work before he figures out whether they
23    can be bypassed, right?
24    A    I would assume so, yes.
25              MR. TURKEL:  All right.  Let's go to 18.  And I'm

Case 8:25-cv-01119-MSS-LSG    Document 31    Filed 06/30/25    Page 91 of 129 PageID
710
ANTHONY SANSONE - JUNE 13, 2025                              91
Cross-examination by Mr. Turkel

1  going to offer this Defense 18, Judge.  I think it's been

2  defined in the papers as video part 3.

3              THE COURT:  Any objection?

4              MS. ELLIS:  No objection, Your Honor.  No objection,

5  Your Honor.

6              THE COURT:  It will be received.

7  BY MR. TURKEL:

8  Q    Did you see that video when it was published?

9  A    I did, yes.

10  Q    And were there any new opinions you had beyond what we've

11  talked about as it related to essentially this implication that

12  anybody could do this quickly with household items?

13  A    What was the question?  I'm sorry.

14  Q    Well, your declaration in the case, Complaint in general,

15  frames this as these videos appear to be defamatory and false

16  because they imply that anybody can do this in one try with any

17  number of household items, right?

18  A    To that effect, yes.

19  Q    Yeah.  You signed the declaration.  You remember that

20  part, right?

21  A    Yes.

22  Q    Okay.  Now, nowhere on these videos does Mr. McNally ever

23  make a statement that you can do this in one try with any

24  household item, does he?

25  A    I don't believe so, no.

Case 8:25-cv-01119-MSS-LSG   Document 31   Filed 06/30/25   Page 92 of 129 PageID
711
ANTHONY SANSONE - JUNE 13, 2025                              92
Cross-examination by Mr. Turkel

1   Q    No.  That's just what you decided you saw when you saw the

2   videos, right?

3   A    My interpretation of it, yes.

4   Q    And with respect to how it's done, to the extent there's

5   any explanation by Mr. McNally while he's in the process, it's

6   basically reflecting exactly what his hands are doing at the

7   same time, right?

8              MS. ELLIS:  Objection again.  Speculation.

9   Speculation, Your Honor.

10              THE COURT:  Overruled.

11  Q    Do you understand the question?

12  A    No.  What was the question?  I'm sorry.

13  Q    To the extent Mr. McNally narrated these videos, he's

14  narrating what he's doing at that time, right?

15  A    Yes.

16  Q    Right?

17              Cut the shim and make it rounded off here, and then

18  take the lock and jam it in the outside rim, et cetera,

19  et cetera.  You get that, right?

20  A    Yes.

21  Q    There's no editorial past that, is there?

22  A    That's where -- I can't say for certain whether it's --

23  whether there's editing or not.

24  Q    No.  Editorial meaning him speaking --

25  A    Oh.  I'm sorry.

Case 8:25-cv-01119-MSS-LSG    Document 31    Filed 06/30/25    Page 93 of 129 PageID
712
ANTHONY SANSONE - JUNE 13, 2025                    93
Cross-examination by Mr. Turkel

1   Q    -- and embellishing, et cetera.

2   A    There's, I believe, the one -- you're talking just in this

3   video or all videos?

4   Q    The three we looked at.

5   A    I mean, the one talks about guacamole.

6   Q    Yeah.

7   A    There is some -- some commentary other than just

8   describing what's going on.

9   Q    But the guacamole thing didn't relate to the lock, right?

10  A    I don't believe so.

11          THE COURT:  So is your concern that he is defaming by

12  omission or that he is defaming by making false statements?

13          THE WITNESS:  I believe by omission primarily.

14          THE COURT:  Because he's not telling you all the

15  different steps he had to go through to figure out what size

16  shim to make, to figure out where to stick the shim, to figure

17  out the first time how to turn the shim?

18          THE WITNESS:  And that it's only applicable to

19  certain lock cores.  Correct.  Not all products contain that

20  core.

21          THE COURT:  Counsel.

22          MR. TURKEL:  If I may.

23  BY MR. TURKEL:

24  Q    You think he was obligated when he was done bypassing that

25  lock to say:  But that type of shim only works on this lock, so

Case 8:25-cv-01119-MSS-LSG    Document 31    Filed 06/30/25    Page 94 of 129 PageID 713
ANTHONY SANSONE - JUNE 13, 2025                    94
Cross-examination by Mr. Turkel

1    I'm not representing it works on another 1,000 out in the

2    market by every other manufacturer?

3    A    I believe a fair and honest review would have provided

4    that information.

5    Q    Would have added that "my information is only limited to

6    the product I'm reviewing"?

7    A    Not Proven Locks in general.  Correct.

8    Q    Does he make any statement at any point that states that

9    this is limited or not limited -- does he make any statement

10   beyond what he does to the actual lock, is probably the better

11   question.

12   A    So what's the question?  Does he make a statement --

13   Q    Sure.  Does he make any statement that what he's doing is

14   applicable to every other lock made by Proven, or anybody?

15   A    I don't recall everything that was mentioned in all the

16   videos.  I don't want to state --

17   Q    What kind of car do you drive?

18   A    It's a Dodge pickup truck.

19   Q    If you want to fix something on a Ram and you pull up a

20   YouTube video, do you expect that guy to say "This isn't going

21   to work on a Ford or a Chevy"?

22            MS. ELLIS:  Objection, Your Honor.  It's an improper

23   analogy.

24            THE COURT:  Overruled.

25   Q    Do you?

Case 8:25-cv-01119-MSS-LSG    Document 31    Filed 06/30/25    Page 95 of 129 PageID
714
ANTHONY SANSONE - JUNE 13, 2025                    95
Cross-examination by Mr. Turkel

1   A    If I was pulling up the video for something specific to my

2   truck --

3   Q    Right.

4   A    -- it would be irrelevant.

5   Q    All right.  Another point you discussed was it was

6   misleading because he didn't mention that it would be harder to

7   do depending on what it was attached to, right, something about

8   that, like a trailer, you may have made more than one reference

9   to it, but do you remember that general discussion?

10  A    I believe he does mention it.

11  Q    He does, right?  I was about to say, in one of the videos

12  he says it could be harder depending on what it's attached to,

13  right?

14  A    Yeah, the video we just clicked.

15  Q    Right.  But you've testified to the fact -- you've

16  testified a number of times that it's misleading because you

17  have to be able to freely manipulate in it your hand, right?

18  A    Correct.

19  Q    We can agree that Mr. McNally actually says that in one of

20  the videos, right?

21  A    He does, yes.

22  Q    And it would be obvious to a viewer, would it not, that

23  he's only manipulating it with his hands?

24       Let me try it this way.  A common viewer, right,

25  looking at that video, any of those videos, can tell the

Case 8:25-cv-01119-MSS-LSG    Document 31    Filed 06/30/25    Page 96 of 129 PageID
715
ANTHONY SANSONE - JUNE 13, 2025                              96
Cross-examination by Mr. Turkel

1  difference as to whether the lock is just being manipulated in

2  his hands or if it's attached to a door or a boat or a trailer

3  or whatever, right?

4  A    That's where it's a little difficult for us based on the

5  feedback, or even into our customer service platform, of -- to

6  the effect of these locks are ineffective.

7  Q    Wait.  Wait.  I understand the customer base may be upset

8  that someone is out there showing them something you already

9  know, which is a piece of tinfoil could pop this lock, right?

10 I get that.  What I'm talking about is where do you put it on

11 Mr. McNally, that he's somehow representing that what he's

12 doing with his free hands would equally work when it's attached

13 to a building or a boat or a trailer or whatever?  Where does

14 that become something he stated falsely?

15 A    It's based on the response, like I said, we're getting

16 into our customer service of the overall impression of these

17 locks are ineffective.

18 Q    All right.  So your customers are upset that the locks are

19 ineffective; that means somehow Mr. McNally has lied about

20 statements he didn't even make?  I don't get the correlation,

21 is my point, all right?

22            THE COURT:  Is that a question?

23            MR. TURKEL:  Yes, Judge.

24 Q    I'm sorry for editorializing, but I don't understand

25 where -- where your testimony came from stating that this was

Case 8:25-cv-01119-MSS-LSG   Document 31   Filed 06/30/25   Page 97 of 129 PageID
716
ANTHONY SANSONE - JUNE 13, 2025                    97
Cross-examination by Mr. Turkel

 1  misleading because he's only manipulating it with his hands.

 2              THE COURT:  Hold on one second.

 3              MS. ELLIS:  Objection.  I'm sorry, Your Honor.

 4              THE COURT:  No.  Go ahead.

 5              MS. ELLIS:  Objection, Your Honor.  He's -- counsel

 6  is providing testimony at this point, he's not asking

 7  questions.

 8              THE COURT:  He's now turned it into a question, so

 9  overruled.

10  BY MR. TURKEL:

11  Q    I'm just trying to understand that, man.  Like it's fairly

12  obvious when he's just got it in his hands, right?

13  A    To me it is, yes.

14  Q    And he's not making statements that Proven has identified

15  in a pleading or a court document that, "and, by the way, I'm

16  only holding it in my hands, but this is just as easy if it's

17  attached to a trailer," right?  He didn't say that?

18  A    I don't believe he says it, but based on, again, the

19  feedback we're receiving to customer service, that's how it's

20  being perceived.

21  Q    The only feedback I've seen is the one document that we

22  spent 30 minutes on earlier, I haven't seen all the feedback,

23  but would it be true that the feedback related to the fact that

24  people paid $130 for a lock that you can open with aluminum?

25  A    When held in your hand, yes.

Case 8:25-cv-01119-MSS-LSG    Document 31    Filed 06/30/25    Page 98 of 129 PageID
717
ANTHONY SANSONE - JUNE 13, 2025                    98
Cross-examination by Mr. Turkel

1    Q    All right.  And did he do any other exemplars other than

2    that?

3    A    The first video was installed on a trailer.

4    Q    On a trailer, transparent for the eye to see, correct?

5    A    Correct.

6    Q    The -- the real problem -- and, parenthetically, all

7    Mr. McNally is doing is exhibiting how the lock can be shimmed,

8    right?

9    A    Those particular locks, yes.

10   Q    The fact that it gets your customers upset is the reaction

11   they have to watching him bypass the lock with a piece of foil,

12   right?

13   A    I believe so, yes.

14   Q    When you did it yourself, did it occur to you for one

15   moment that maybe the best thing to do, instead of file a

16   lawsuit, was to fix it?

17              MS. ELLIS:  Objection, Your Honor.

18              MR. TURKEL:  I think it's a fair question, Judge.

19              THE COURT:  Well, I don't understand what the

20   objection is.

21              MS. ELLIS:  I mean, again --

22              THE COURT:  Relevance?

23              MS. ELLIS:  Relevance.

24              THE COURT:  Hearsay?  What is the objection?

25              MS. ELLIS:  Relevance, Your Honor.

Case 8:25-cv-01119-MSS-LSG    Document 31    Filed 06/30/25    Page 99 of 129 PageID
718
ANTHONY SANSONE - JUNE 13, 2025                              99
Cross-examination by Mr. Turkel

1           THE COURT:  Overruled.

2           THE WITNESS:  I'm sorry.  What's the question?

3           MR. TURKEL:  Well --

4           THE COURT:  Did it ever occur to you that the

5    solution, rather than filing a lawsuit, would be to fix the

6    lock so you can't shim it with a piece of aluminum foil?

7           THE WITNESS:  Proven is taking steps to rectify some

8    of the issues with inserting shims.

9    BY MR. TURKEL:

10   Q    Has Proven taken down any evidence -- has Proven taken

11   down any of its social media posts calling Mr. McNally a liar,

12   a deceiver, whatever words they used, since you discovered that

13   you could shim the lock with a piece of aluminum?

14   A    I -- I believe a majority of the comments have been

15   removed that were --

16   Q    Well, y'all removed a lot of comments, I get that.  I'm

17   talking about whether you've removed posts about him, like the

18   one we just looked at on Exhibit 18, calling him someone who

19   has been fooling people for years and all that.

20   A    I believe that was a comment that's been since removed.

21   Q    We had talked to -- Ms. Ellis had talked to you a little

22   bit about copyright, the 14 or 15 seconds of Mr. Canning that

23   Mr. McNally used in, I think, the first video.  Do you recall

24   that?

25   A    Yes.

ANTHONY SANSONE - JUNE 13, 2025                    100
Cross-examination by Mr. Turkel

1   Q    All right.  You don't sell the videos of Mr. Canning doing

2   whatever he does for Proven, do you?

3   A    I don't believe so.  I can't say for certain.  I don't

4   believe so.

5   Q    Well, they don't package videos up and like sell them

6   online, hey, buy this Instagram post from last week, right?

7   A    No.  Correct.

8   Q    And you and I can agree, I would think, that what

9   Mr. McNally was doing was taking a small bit of, I think, a

10  90 second video to set up his critique of that product, right?

11  A    That -- I'm not sure of the intent of the use of the

12  content.

13  Q    Let me ask it differently.

14          Mr. Canning's videos are meant to promote Proven

15  products, right?

16  A    Right.

17  Q    All of the videos we've seen of Mr. McNally were meant to

18  critique Proven Locks' products, right?

19  A    Correct.

20  Q    They're not doing videos for the same purpose, are they?

21  A    Under those --

22          MS. ELLIS:  Objection, Your Honor.  Again,

23  speculation.

24          THE COURT:  Overruled.

25  Q    Go ahead.

Case 8:25-cv-01119-MSS-LSG    Document 31    Filed 06/30/25    Page 101 of 129 PageID
720
ANTHONY SANSONE - JUNE 13, 2025                    101
Cross-examination by Mr. Turkel

1   A    I was going to say, as you just described it, no.

2   Q    Well, but we've seen the videos, right?

3   A    I've seen the videos, yes.

4   Q    We know Mr. Canning -- you've told us that Mr. Canning was

5   hired to do the videos, produce them, with Proven's direction,

6   right?

7   A    Correct.

8   Q    And they're promotional, he's promoting the locks, right?

9   A    Correct.

10  Q    Okay.  Mr. McNally isn't promoting Proven locks, is he?

11  A    Not yet.  Definitely not.

12  Q    No, not yet.  That may be the best point of the day, but

13  the -- what he's doing is essentially showing how they fail,

14  right?

15  A    Correct.  Those particular locks.

16  Q    Have you ever tried to open one of y'all's padlocks with

17  anything other than the key that comes with it?

18  A    I have, yes.

19  Q    You can open it with a screwdriver, can't you?

20  A    The padlock.

21        MS. ELLIS:  Objection, Your Honor, relevance,

22  speculation.  That's not even --

23        THE COURT:  The padlocks or the puck locks?

24        MR. TURKEL:  Padlocks, Judge.

25        THE COURT:  The ones he was shown on the last video

Case 8:25-cv-01119-MSS-LSG   Document 31   Filed 06/30/25   Page 102 of 129 PageID
721
ANTHONY SANSONE - JUNE 13, 2025                    102
Cross-examination by Mr. Turkel

1   where the 12 or so were unlocked?

2           MR. TURKEL:  No, some of the other videos that I've

3   been objecting about because they're not in the Complaint.

4           THE COURT:  All right.  Overruled.  If they're in

5   evidence, he can ask about them.

6   BY MR. TURKEL:

7   Q    Right.  Have you ever been able to bypass those, the

8   padlocks, just that little keyhole thing?

9   A    Um --

10  Q    I'm talking about your standard --

11          THE COURT:  That's not a complicated question.  Have

12  you ever been able to bypass your padlock with a screwdriver?

13          THE WITNESS:  No, not -- no.

14  Q    This thing right here.

15          THE COURT:  Can you tell us what "this thing right

16  here" is, for the record.

17          MR. TURKEL:  Yes, Judge.  I'm sorry.  It says Proven

18  Locks, and, honestly, Judge, it's just a big hunk of steel.

19  I don't see any other identifying marks, but, here, may I

20  approach, Judge?

21          THE COURT:  You may.

22          What is that?

23          THE WITNESS:  That's a stainless steel padlock.

24  BY MR. TURKEL:

25  Q    Have you ever tried to bypass that lock with anything

Case 8:25-cv-01119-MSS-LSG    Document 31    Filed 06/30/25    Page 103 of 129 PageID
722
ANTHONY SANSONE - JUNE 13, 2025                103
Cross-examination by Mr. Turkel

1   other than the key it comes with?

2   A     Only the key, and I've tried shimming, not that particular

3   one, but --

4   Q     Have you ever put a flat head screwdriver --

5               THE COURT:  But what?

6               MR. TURKEL:  Go ahead.

7               THE COURT:  Not that particular one, but --

8               THE WITNESS:  Oh.  I've tried to shim a similar

9   padlock, the aluminum padlock, not the stainless steel one.

10  It's the same overall product, just different material.

11              THE COURT:  Are we going to call that an exhibit,

12  Exhibit something?

13              MR. TURKEL:  Judge, it's just demonstrative so I

14  could make sure he and I were talking about the same lock.

15              MS. ELLIS:  Also, Your Honor, I'm going to object to

16  this line of questioning.  Now he's introducing a screwdriver.

17  We are here to discuss the shimming, the methods that were on

18  the video.  I mean, this has nothing to do with the motion that

19  we filed or even any of the defenses that he's raised.

20              THE COURT:  Is that lock on one of your videos as

21  being opened by Mr. McNally?

22              MS. ELLIS:  It's a -- no, not this lock.

23              THE COURT:  A different type of lock?

24              MS. ELLIS:  A different lock.  That's correct.

25              MR. TURKEL:  It's -- a different padlock?

Case 8:25-cv-01119-MSS-LSG    Document 31    Filed 06/30/25    Page 104 of 129 PageID
723
ANTHONY SANSONE - JUNE 13, 2025                    104
Cross-examination by Mr. Turkel

1              Judge, part of what we're dealing with is a lot of

2     the videos are covered by that.

3              THE COURT:  I don't understand what you're saying.

4              MR. TURKEL:  The new Complaint -- we were focusing on

5     the one video because that was what was framed, and now there's

6     a new Complaint, so -- it's not that big of a deal, Judge, it's

7     really sort of a peripheral issue, and I can move on from it.

8              THE COURT:  All right.  Sustained on stipulation.

9              MR. TURKEL:  May I approach, Judge?

10             MS. ELLIS:  Your Honor, may I see it, please?

11             THE COURT:  Show Counsel.

12    BY MR. TURKEL:

13    Q    If you could tell the Court whether those are the same

14    padlocks.

15             THE COURT:  Is this on the record, Mr. Turkel?

16             MR. TURKEL:  My question, or is there a record

17    exhibit that relates to this?

18             THE COURT:  What you're talking about, is it supposed

19    to be on the record?

20             MR. TURKEL:  Yes, Judge.

21             THE COURT:  Then you need to use a microphone or you

22    need to speak up.  What is the question to the witness?

23    BY MR. TURKEL:

24    Q    Yes.  Are those two locks the same product, Mr. Sansone?

25    A    Other than the material difference, it's the same series

ANTHONY SANSONE - JUNE 13, 2025                      105
Redirect Examination by Ms. Ellis

1   of product.

2   Q     Locking mechanism the same?

3   A     I believe the cores appear to be similar.

4         Do you have the key?

5         THE COURT:  Is one of those an aluminum lock?

6         THE WITNESS:  Yes.  This one.

7         THE COURT:  The blue one?

8         THE WITNESS:  The blue one, yes.

9         THE COURT:  And that's the one you attempted to shim?

10        THE WITNESS:  Correct.

11        THE COURT:  Okay.  Counsel, what's your question

12  about the blue lock?

13        MR. TURKEL:  Judge, we're going to offer Exhibit 21,

14  which is a video on that particular lock.

15        THE COURT:  Any objection?

16        MS. ELLIS:  No objection, Your Honor.

17        THE COURT:  It will be received.

18                    (Video played.)

19        MR. TURKEL:  Judge, I don't have any further

20  questions.

21        THE COURT:  All right.  Any brief, brief Redirect?

22        MS. ELLIS:  Yes, Your Honor.

23            **REDIRECT EXAMINATION OF ANTHONY SANSONE**

24  **BY MS. ELLIS:**

25  Q     There were a lot of questions on Cross about whether or

1  | not Mr. -- the defendant was making any statements, making
2  | particular statements; is that right?
3  | A    There were questions, yes.
4  | Q    Okay.  Does the video -- as you watch it, does the video
5  | make a statement?
6  |            THE COURT:  Which video?
7  | BY MS. ELLIS:
8  | Q    Any of them, videos 1 through 6 that the defendant posted,
9  | do they -- even without his words, do they make a statement
10 | when you watch them?  Do they tell you something?
11 | A    I interpret them as the locks are able to be bypassed with
12 | relative ease.
13 | Q    And is that the implication that you get when you watch
14 | those videos?
15 | A    Yes.
16 | Q    And is that implication derived from the fact that the
17 | video -- that the locks are being picked in non-real-world use
18 | scenarios?
19 | A    Yes, by someone of Mr. McNally's skill level.  Yes.
20 | Q    Now, the McNally initial video, the marketing video
21 | that -- I'm sorry, the Proven marketing video with the
22 | sledgehammer we saw that was admitted as an exhibit, that video
23 | is commenting on brute force attacks of the Proven locks?
24 |            THE COURT:  Counsel, just because it's Redirect
25 | doesn't make it Cross.  You have to ask Direct questions.

1            MS. ELLIS:  Yes, Your Honor.

2   BY MS. ELLIS:

3   Q    Do you recall that initial video that Proven created,

4   I guess --

5   A    Yes.

6   Q    -- began the sequence?

7            What did that video comment on?  What was it

8   demonstrating?

9   A    That video demonstrates the performance of the lock in,

10  in Proven's experience, real-world theft attempt scenarios.

11  Q    And what are those real-world theft attempt scenarios?

12  A    From our experience is primarily focused on brute force

13  type breach attempts, so hammers and pry bars and chisels, that

14  sort of thing.

15  Q    Had there ever been any complaints that had been escalated

16  to you or that you are aware of that these locks were insecure

17  because they were being shimmed?

18  A    No.

19  Q    Now, the video 1 that Mr. McNally posted, where he copied

20  a portion, a substantial portion of Proven's video, was he

21  commenting on brute force attacks on the lock?

22  A    No.

23  Q    Was he commenting on the video itself?

24  A    No.

25  Q    What would you say that he was commenting on?

ANTHONY SANSONE - JUNE 13, 2025
Redirect Examination by Ms. Ellis

1    A    Commenting on that particular lock's susceptibility to

2    breach by a shimming attack.

3    Q    Based on the tickets that were escalated to you after

4    these videos, who were the viewers who were watching

5    Mr. McNally's content?  What type of customers?

6              MR. TURKEL:  Object, Your Honor, foundation.

7              THE COURT:  Sustained.  Sustained.

8    BY MS. ELLIS:

9    Q    Were you able to determine what type of customers made

10   reports to Proven as a result of the defendant's videos?

11             MR. TURKEL:  Judge, the same objection, and add kind

12   of overbroad and vague.  I don't know what a type of customer

13   is.

14             THE COURT:  Sustained to the extent that any of this

15   questioning has to do with his review of alleged customer

16   complaints that are not in evidence.

17             MS. ELLIS:  Got it.  One moment.

18             Your Honor, at this time -- I know that we've talked

19   and you've made a ruling regarding some of the exhibits that

20   were intended to -- excuse me.

21             If I may just make one argument, Your Honor,

22   regarding hearsay admissibility at this stage of the

23   proceeding.  I do have some case law, I attempted to raise it a

24   bit earlier, and I'd like an opportunity to bring it to the

25   Court's attention.

1          We do have Eleventh Circuit case law, *Levi Strauss*
2    *Company versus Sunrise International Trading, Inc.*, 51 F.3d 982
3    is the citation, and that case says at the preliminary
4    injunction stage a District Court may rely on affidavits and
5    hearsay materials which would not be admissible evidence for a
6    permanent injunction if the evidence is appropriate given the
7    character and objectives of the injunction proceeding.

8          We do believe that, you know, the witness's testimony
9    as to tickets that were escalated directly to him pursuant to
10   his duties to oversee, you know -- to oversee issues that arose
11   would support the purpose of this hearing, and we do believe
12   that what we are attempting to introduce is admissible for
13   purposes of this hearing, even if the Court finds it to be
14   hearsay.

15         THE COURT:  All right.  The Court continues to
16   sustain its objection.  I believe at the point at which you
17   went to the table to attempt to see how you were going to
18   proceed with pursuing this line of questioning with this
19   witness, the plaintiff abandoned that attempt, indicating to
20   the Court that somebody else was going to offer this evidence
21   up.  This witness, I don't know who he is in reference to
22   Proven, I don't even know if he knows who he is in reference to
23   Proven, and he's not a records custodian, and I do not believe
24   he's competent to offer these customer complaints up.  If
25   there's someone else who can do so, I'm willing to hear from

1   them.

2           MS. ELLIS:  Okay.

3           THE COURT:  So the Court maintains its view, and

4   I don't even know that whatever these customers said is

5   relevant anyway, because there are other problems with this

6   theory of the case which haven't been overcome by this witness

7   or anyone else yet.  So the Court stands by its decision not to

8   allow this witness to be the source of the introduction of a

9   single customer complaint that was offered up on the record of

10  the case.

11          MS. ELLIS:  Okay.  Thank you, Your Honor.

12          No further questions for this witness.

13          THE COURT:  You may step down, sir.

14          Please call your next witness.

15          And, I'm sorry, sir, before you leave, Mr. Sansone,

16  my understanding is that you are not the corporate

17  representative of Proven; is that correct?

18          THE WITNESS:  Correct.

19          THE COURT:  All right.  You may stay in the

20  courtroom, since your testimony is completed.

21          MS. ELLIS:  Your Honor, we intended to introduce the

22  remaining evidence through Mr. John Lee, but at this time it

23  looks like he is not available to be present in the courtroom.

24          THE COURT:  Where is he?

25          MS. ELLIS:  We --

```
1                THE COURT:  Counsel.

2                MR. FAHEY:  May I speak, Your Honor?

3                THE COURT:  You may.

4                MR. FAHEY:  He is --

5                THE COURT:  Pull the microphone up though.

6                MR. FAHEY:  He is unavailable right now.

7                THE COURT:  Where is he was my question.

8                MR. FAHEY:  I believe he is close by, but he's

9     unavailable.

10               THE COURT:  Is this the witness who was in the

11    courtroom and then he left?

12               MR. FAHEY:  No.

13               MS. ELLIS:  No, Your Honor.

14               THE COURT:  This is some other person who has never

15    even made it today?

16               MR. FAHEY:  He has not entered the courthouse.

17               THE COURT:  Okay.  No other witnesses?

18               MR. FAHEY:  At this time, no, Your Honor, but if we

19    may just -- again, to move in the declaration of Ronald Lee,

20    subject to the Court's ruling on the fact that -- understanding

21    the objection on hearsay and also the case law that at the

22    preliminary injunction stage hearsay in some testimony is

23    admissible under the Levi Strauss case.

24               THE COURT:  Well, declarations are admissible.

25    What is he -- what are you offering him up for in the way of
```

```
 1   evidence?

 2           MR. FAHEY:  In the declaration, which is

 3   Exhibit Number -- we'll pull that in a second.  We are using

 4   him to discuss the text messages that he received from -- after

 5   some of the posts were made, also using him to testify as to

 6   the records custodian as the corporate representative as to the

 7   damages that Proven has received because of the videos and

 8   people saying that the locks are -- can be picked by a soda can

 9   or a, you know, can, which goes to a state of mind that the

10   consumers now think that because of Mr. McNally essentially

11   posting this video in unrealistic situations that anybody can

12   do it, which is why people are returning locks to Proven,

13   because of Mr. McNally's video, and I believe it's Exhibit

14   Number -- I think it's number --

15           THE COURT:  Well, can you point me to the paragraph

16   in his affidavit where he sets forth --

17           MS. ELLIS:  Yes, Your Honor.

18           THE COURT:  -- what losses Proven has sustained?

19           Paragraph 35 says, "These harms are not speculative,

20   they're measurable, immediate and continuing," and I don't see

21   the harms, the measurement or the immediacy in the affidavit.

22           MR. FAHEY:  Again, on page --

23           THE COURT:  Paragraph.

24           MR. FAHEY:  Paragraph 15, he goes on to say -- in

25   paragraph 15(A) he goes on to say:  A repeat customer that was
```

 1   hesitant to purchase after viewing the video.  This customer

 2   had previously purchased from us multiple times and had never

 3   indicated any dissatisfaction with our products.  However, due

 4   to the increased volume and stress caused by harassment from

 5   McNally's followers, our customer service team was unable to

 6   provide the level of support we normally offer, which

 7   contributed to the poor customer service.  And that's Exhibit F

 8   to Mr. Ronald Lee's declaration.

 9          He goes on to say -- in paragraph 16 he goes on to

10   say that:  I have access to the business records maintained in

11   the ordinary course of Proven's operations and I am familiar

12   with the procedures for creating and maintaining records.

13          Paragraph 17, he goes on to say:  I was involved in

14   Prudent's decision to disable comments on multiple social media

15   posts due to hostile and misleading user comments.  Because of

16   the large number of negative comments on the Proven video as a

17   result of the part 1 video, Proven disabled the comments from

18   public viewing.  Attached as Exhibit H to this declaration are

19   comments posted on some of Proven's videos after defendant's --

20   after defendant published the part 1 video.

21          Moving on to paragraph 30, he goes on to say in

22   paragraph 30:  As a result of the fraudulent negative reviews,

23   Proven's products, particularly on Amazon, Proven has a

24   measurable decrease in revenue, has a measurable decrease in

25   sales on Amazon, and has experienced permanent damage to the

1    ability to sell its products.  Specifically, Proven's products

2    are not indexing on Amazon as normal and Proven cannot have

3    featured offers on its products.  That's Exhibit P to Mr. Ron

4    Lee's declaration.

5            In paragraph 31 he goes on to say:  After part 1 of

6    McNally's video was posted, I observed a noticeable decrease in

7    revenue, an increase in advertising spend, and a decrease in

8    conversion.  From the period of April 3rd through May 28th

9    versus a period of February 6 through April 2nd, Proven saw a

10   loss of revenue from combined Google Ads and Meta Ads

11   conversion value versus previous.  After part 2 through 4 of

12   the McNally videos were posted, I observed a noticeable

13   decrease in revenue.  From May 23rd through May 28th versus

14   previous period of May 17 through May 22nd, Proven saw a loss

15   of revenue from combined Google Ads and Meta Ads conversion

16   value versus -- I think it's a typographical error.

17           Since the string of recent videos started on

18   May 23rd, Proven has seen a large increase in negative comments

19   on Meta Ads and Google Ad posts, many of which have mentioned

20   McNally or opening their locks with cans.

21           Based on my observations and leadership role,

22   I believe that Proven is suffering irreparable harm.  The

23   McNally video spreads a false implication that undermines

24   Proven's credibility in the marketplace and for employees.  The

25   damage to Proven's reputation, goodwill and customer

1    relationships cannot be adequately remedied by money.

2            After the McNally videos, there has been a

3    substantial influx of messages and customer service tickets

4    that have disrupted business operations.

5            Based on my personal observation -- knowledge and

6    past observations, I believe McNally's targeting of Proven

7    products was not isolated or accidental.  I observed online

8    that McNally previously posted a similar video falsely implying

9    that another company's lock could be defeated with a milk jug.

10   Like with Proven's product, that video began with use --

11           THE COURT:  Counsel, I've read the affidavit.

12           MR. FAHEY:  Yes.

13           THE COURT:  You're just asking me to rely on the

14   affidavit because the witness is not here to establish all the

15   potential loss that Proven claims to be suffering due to the

16   McNally videos?

17           MR. FAHEY:  Yes, Your Honor.

18           THE COURT:  All right.  Any other evidence or

19   witnesses the plaintiff would wish to call?

20           MS. ELLIS:  No, Your Honor, aside from the affidavits

21   that were filed in connection with the motion -- the motion for

22   injunction, which demonstrate that --

23           THE COURT:  I don't want your argument.  I want to

24   know if you have any other evidence.

25           MS. ELLIS:  No, your Honor.

```
 1          THE COURT:  All right.  Does the defense have any

 2   evidence it would wish to present?

 3          MR. TURKEL:  Your Honor, we probably want a few

 4   minutes to confer.  I don't think they've set forth a viable

 5   case for injunctive relief.  I think even the damages they were

 6   just talking about make a great case for why it's a money

 7   damages case, and they have an adequate remedy at law.  There

 8   were references -- you know, that's why, Your Honor,

 9   I referenced this --

10          THE COURT:  Do you have any evidence you would like

11   to introduce?

12          MR. TURKEL:  We want to confer --

13          THE COURT:  Confer.

14          MR. TURKEL:  -- really quick, Judge --

15          THE COURT:  Yes.

16          MR. TURKEL:  -- and let the Court know, but --

17          THE COURT:  Yes, sir.  Do that and then answer my

18   question.

19          MR. TURKEL:  Okay, Judge.  If we could have a moment

20   to confer.

21          Yes, Judge.  We're not going to call witnesses, and

22   the only -- I don't want to disappoint everybody.  The only --

23   we're -- since they're relying on Mr. Lee's declaration,

24   Your Honor, he's got three felony convictions.  We have

25   certified judgments.  Under 815, essentially, a hearsay
```

1    declarant could be impeached the same way as if they were in

2    court.

3              THE COURT:  Do you have those?

4              MR. TURKEL:  Yes, Judge.  They're on our exhibit list

5    and I was just going to offer those, with the understanding,

6    Judge, that --

7              THE COURT:  Just the convictions themselves, not the

8    nature of them?

9              MR. TURKEL:  It's the judgment -- judgment sent

10   certified with the public records seal from Pinellas County and

11   Manatee, I think.  It didn't have the sentence on it, which

12   usually -- surprised me, because judgment and sentence come

13   together, but --

14             THE COURT:  One second.

15             Does the plaintiff disagree that the declarant has

16   three felony convictions?

17             MS. ELLIS:  No, we do not disagree.

18             THE COURT:  The Court will accept that as a fact

19   without the introduction of the exhibit, to the extent that the

20   exhibit might disclose the nature of those convictions, which

21   isn't relevant to the Court's consideration of the fact that

22   he's a felon unless those documents establish that the crimes

23   were for crimes involving truth and falsity.  Are they?

24             MS. ELLIS:  They are not, Your Honor.

25             MR. TURKEL:  One of them, Judge, would be a crime

1   that would go to the character trait of honesty, veracity, yes.

2            THE COURT:  What's the crime?

3            MR. TURKEL:  Witness tampering.  Felony witness

4   tampering.

5            THE COURT:  That would go to the veracity and truth

6   of the declarant; would you agree, Ms. Ellis?

7            MS. ELLIS:  Yes, Your Honor.

8            THE COURT:  All right.  So he has one felony for

9   felony witness tampering and two other felonies of a different

10  character and type, but felonies nonetheless.

11           MR. TURKEL:  Yes, Your Honor.

12           THE COURT:  All right.

13           MR. TURKEL:  We have nothing else, Judge.

14           THE COURT:  All right.  Anything else in the way of

15  evidence?

16           I think the plaintiff rested and the defense rested

17  as to evidence.  Any other evidence that I did not get that I

18  was supposed to get?

19           MS. ELLIS:  Your Honor, at this time we would move to

20  admit the remainder of the declarations that were filed in

21  support of the plaintiff's motion for preliminary injunction.

22           THE COURT:  They've already been admitted through the

23  filing of the motion.

24           MS. ELLIS:  Okay.  Thank you, Your Honor.

25           THE COURT:  All right.

```
 1              MS. ELLIS:  In addition to the exhibits attached to
 2     them as well, Your Honor.
 3              THE COURT:  That's correct.
 4              MS. ELLIS:  Okay.  Thank you.
 5              MR. FAHEY:  May I speak, Your Honor?
 6              THE COURT:  Yes, sir.
 7              MS. ELLIS:  Exhibit 15 of plaintiff's list, which is
 8     an e-mail from myself to opposing counsel regarding -- it's
 9     attached to my declaration that I e-mailed to opposing counsel
10     regarding the fact that -- asking for McNally to stop posting
11     videos, is the declaration that I would like to submit as well.
12              THE COURT:  Any objection?
13              MR. TURKEL:  Relevance, Judge.
14              THE COURT:  Overruled and admitted.  The problem with
15     challenging exhibits when they're being presented to the
16     fact finder for the determination about the facts and the
17     determination of their admissibility is as a fact finder I've
18     already seen them, and I will consider them and give them such
19     weight as I deem appropriate.
20              MR. FAHEY:  If you'll just give me a couple minutes
21     to look through the list here to make sure that everything we
22     want admitted is admitted.
23              THE COURT:  Yes, sir.
24              MR. FAHEY:  Your Honor, that is all given the fact
25     that we consider everything that was submitted with the motion
```

1    and its reply.

2                THE COURT:  The motion and the what?

3                MR. FAHEY:  Its reply.

4                THE COURT:  All right.  The Court has heard all the

5    argument, I've read all of these affidavits and declarations

6    and the cases the parties have cited.  I've reviewed their

7    motions and responses and replies, and I've heard what evidence

8    was offered through the testimony of Mr. Sansone this morning,

9    the only witness called by the plaintiff, and the Court

10   declines to grant the preliminary injunction motion.

11               That's not to say that some of this stuff can't be

12   proven up in a full-blown trial after full development of the

13   record and discovery, but the extraordinary remedy of

14   preliminary injunction presumes, of course, certain substantial

15   factors that have not been satisfied here, principally the

16   proof of a likelihood of success on the merits of the motion,

17   based on the preliminary demonstration made at this hearing.

18   This is a high burden to meet, as you know, and I don't believe

19   it's been satisfied on this record.

20               In regard to the copyright claim, which is the first

21   claim that was pursued on the motion for preliminary

22   injunction, the Court is to consider a number of factors.  The

23   ones that sort of floated to the top of the factors for

24   consideration are the purpose and character of the use that is

25   claimed to be infringing, the nature of the copyrighted work

1   that is claimed to be infringed upon, the amount of
2   substantiality of the portion used in relation to the
3   copyrighted work as a whole, and the effect of the use upon the
4   market for the copyrighted work.
5           The Court finds that the purpose and character of the
6   use to which Mr. McNally put the alleged infringed work is
7   transformative, artistic and a critique.  He is in his own way
8   challenging and critiquing Proven's video by the use of his own
9   video.  He does use the copyrighted work, which is plaintiff's
10  video, which the Court takes at face value was filed and
11  thereby copyright protected.  Now, whether that copyright
12  protection will be upheld in a full-blown trial, I don't know,
13  but I assume for purposes of this hearing that it is a
14  copyrighted work entitled to protection.
15          The nature of the copyrighted work is barely
16  artistic, but as artistic as Mr. McNally's response video, so
17  they're either equally artistic or equally not artistic.
18  In any event, it is either a wash or lends to the favor of
19  Mr. McNally.
20          The amount and substantiality of the portions used in
21  relation to the copyrighted work as a whole, he used, I would
22  say, to use his word, a smidge of the work, but it was enough
23  to present what it was Proven was trying to claim, so it is
24  substantial enough but no more than is necessary to make the
25  point that he is trying to critique Proven's video, and I think

that's fair game and a nominative fair use circumstance.  It
was not greater than necessary, but it was enough, and the case
law suggests that even a full recounting of the copyrighted
work would be fine if that's necessary to set the stage for the
critique.

      The effect upon the use -- I'm sorry, the effect of
the use upon the market for the copyrighted work is a little
tricky here, because, of course, the copyrighted work is not
being sold, the copyrighted work is being used to sell the
product of Proven, and so if I take a logical view of that, not
this sort of strained view the defense would like, there is a
market for the copyrighted work that's tied to the market for
the sale of the goods.  In any event, the effect is the
intended effect, and it's not an improper effect, it's been
used to critique the claim that these devices are impenetrable,
and so it is at best for the plaintiff a wash, at best for the
defense a defense lean.

      And so as to the four factors, on a motion for
preliminary injunction where the plaintiff bears a substantial
burden ahead of full litigation, the Court says that the
copyright claim fails as a basis for a demand for preliminary
injunctive relief.  Again, that's not to say it will ultimately
fail once I see all the facts and circumstances after full
development of the record, but on this motion for preliminary
relief the claim does not support a preliminary injunction.

1              As to the defamation by implication claim, as I think
2    all the parties acknowledge, there has to be defamation under
3    Florida law and it has to be tied to an independent tort, and
4    here the independent tort that the plaintiff is trying to tie
5    it to is the independent tort of tortious interference with a
6    business relationship.  And of course for there to be tortious
7    interference with a business relationship there are the
8    internal factors:  One, the existence of a business
9    relationship that affords the plaintiff existing or prospective
10   legal rights; the defendant's knowledge of the business
11   relationship; the defendant's intentional and unjustified
12   interference with the relationship; and damage to the
13   plaintiff.
14             Two of these factors are missing on this record as
15   it's been developed to this point.  One is the existence of a
16   business relationship that affords the plaintiffs -- the
17   plaintiff an existing or prospective legal right.  There is no
18   outstanding contract that anyone has offered up to the Court
19   for the continual sale of these locks to a business that always
20   purchases these locks that I've seen in this record.  There are
21   repeat customers, but Florida case law says that the fact that
22   you might have a repeat customer who is dissuaded to buy your
23   product due to a criticism of the product is not the type of
24   business relationship the tortious interference with business
25   relationship concept is intended to apply.  There has to be a

1    contract or some clear business legal right to that

2    relationship, and the defendant has to know about it.

3          One of the very first questions I asked at the

4    beginning of the hearing is whether there is a return policy or

5    a warranty under which the plaintiff operates that forced them

6    to give back money to customers or that allowed customers to

7    rely on that right in pursuing some return of the product that

8    they now don't want because they've looked at Mr. McNally's

9    videos, and I think counsel turned to the back of the room and

10   got some affirmative nods of the head but no evidence was

11   offered on the record of this case to that effect.  So it looks

12   like customers read the video or saw the video and thought, oh,

13   wow, I don't want this lock anymore, put it back to the -- to

14   the plaintiff, and the plaintiff did whatever it did, it's not

15   even clear what it did, and the plaintiff is losing customers

16   because the customers aren't coming to them in as robust a

17   manner as they might have before the McNally video, but this

18   anticipation of continued growth in a customer base is not the

19   type of business relationship to which a tortious interference

20   with business relationship claim would support, and therefore

21   the underlying tort on which this defamation by implication is

22   based, and so on the preliminary injunction motion the

23   plaintiff hasn't met this very high burden.  It's very hard to

24   do without a full development of the record because it is a

25   prior restraint of a person's First Amendment right to talk

1   about whatever they want to talk about, and so Florida Courts

2   put a high bar to establishing a basis for a tortious

3   interference with business relationship claim that is part of a

4   defamation by implication claim.  It's not like Mr. Turkel

5   said, it's never been done in the history of the law before,

6   but it's hard.  It's hard to make out a claim like that, and

7   it's even harder still to do on a preliminary injunction, which

8   has its own high bar above the claim itself.  And so the Court

9   finds that plaintiff has not met its burden of proof in the

10  case as to either of the claims, and so the motion for

11  preliminary injunction is denied.

12          Mr. McNally, you operate at your own peril if you

13  continue to post these videos and say these things, and I don't

14  know what is happening when you're off video.  I'm not sure if

15  those boxes were opened or closed when you stuck your little

16  lock magic thing up at the Amazon box station.  They looked to

17  me in a couple of videos like the door was already open.  But

18  you operate at your own peril to say right things and correct

19  things and truthful things about the plaintiff's product, and

20  the plaintiff has to bear up the burden in these difficult

21  claims to sustain as the case progresses through the discovery

22  and litigation phase.

23          And I don't know who Mr. Sansone is in reference to

24  Proven, I'm not happy about his affidavit and declaration to

25  the extent it fudges his relationship to Proven, so someone

1  needs to revisit that declaration in regard to any future

2  representations he makes to the Court, or at least Proven and

3  Dynamic need to get together and decide who he is with

4  reference to those industries.

5            Yes, sir.

6            MR. FAHEY:  Yes.  I'll make sure to clarify that.

7            THE COURT:  All right.  So that's the Court's ruling.

8  I will accept and grant the motion for leave to file an

9  Amended Complaint, because there's been no Answer filed, has

10 there?

11           MR. TURKEL:  No, Judge.  I don't think our initial

12 deadline has hit yet.

13           THE COURT:  I don't understand what you're saying,

14 Mr. Turkel.

15           MR. TURKEL:  I don't think we had hit the initial

16 deadline, so it wasn't due yet actually.

17           THE COURT:  All right.  So you don't even need a

18 motion, but to the extent you filed a motion, the Court grants

19 the motion for leave to amend the Complaint.

20           You will probably after this hearing want to correct

21 the Complaint that you were trying to file, so I will grant you

22 leave to file an Amended Complaint.  I will not have the clerk

23 docket the proposed Amended Complaint.

24           How much time do you need to file the

25 Amended Complaint you'd like to file now?

 1          MR. FAHEY:  14 days, seven days, whichever Your Honor

 2   sees as reasonable.

 3          THE COURT:  Lawyers can't do anything in seven days,

 4   that's been my --

 5          MR. FAHEY:  30 days.

 6          THE COURT:  All right.  The Court will give you

 7   21 days to file the Amended Complaint that addresses concerns

 8   that now are pivotal and important based on how you have seen

 9   the case present in a hearing before the Court, and then the

10   defendant will have the reasonable course of time to respond to

11   any such Amended Complaint, and the response time, obviously,

12   to the existing Complaint is terminated.  No response is

13   required to the Complaint at this time.

14          And the Court will -- you haven't filed your CMRs yet

15   either, right?

16          MS. ELLIS:  No, Your Honor.

17          MR. FAHEY:  Not yet, Your Honor.  I believe it's due

18   next week sometime, I want to say.

19          THE COURT:  I will tag that date off of the

20   Amended Complaint rather than the first Complaint, and so the

21   parties will have whatever you would normally have after the

22   original Complaint against the Amended Complaint to file your

23   case management report so you're preparing a case practice

24   against what will be hopefully the real Complaint in the case.

25          MR. FAHEY:  Thank you, Your Honor.

```
 1              THE COURT:  Anything else the Court can assist the
 2   parties with --
 3              MS. ELLIS:  Nothing further.
 4              THE COURT:  -- from the plaintiff?
 5              MR. TURKEL:  I just thought of one thing, Judge, that
 6   a lawyer can do in seven days, and that's try a four day case.
 7              THE COURT:  The what is due?
 8              MR. TURKEL:  I said I thought of one thing lawyers
 9   can do in seven days, and that's try a four day trial.
10              THE COURT:  Yeah, that is absolutely true, except not
11   in front of me; isn't that right, Dave?
12              All right.  I will see you all in the course of the
13   case, but I will pray that you all come to a resolution of the
14   case that doesn't require all of this.  This is a capitalist
15   market and people say what they say.  As long as it's not
16   false, they say what they say.
17              We're dismissed.
18              MR. TURKEL:  Thank you, Judge.
19              MS. ELLIS:  Thank you, Your Honor.
20                        - - - - -
21              (Proceedings concluded at 12:44 p.m.)
22                        - - - - -
23
24
25
```

1          C E R T I F I C A T E

2

3          This is to certify that the foregoing transcript of

4   proceedings taken in a motion hearing in the United States

5   District Court is a true and accurate transcript of the

6   proceedings taken by me in machine shorthand and transcribed by

7   computer under my supervision, this the 23rd day of June, 2025.

8

9

10                              /S/ DAVID J. COLLIER

11

12                              DAVID J. COLLIER

13                              OFFICIAL COURT REPORTER

14

15

16

17

18

19

20

21

22

23

24

25